FILED

AUG - 2 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNDER SEAL

EDL

1  J. NELSON THOMAS (to be admitted *pro hac vice*)
   JONATHAN W. FERRIS (to be admitted *pro hac vice*)
2  MICHAEL J. LINGLE (to be admitted *pro hac vice*)
   ANNETTE M. GIFFORD - 270777
3  THOMAS & SOLOMON LLP
   693 East Avenue
4  Rochester, New York 14607
   Telephone: (585) 272-0540
5  Email:    nthomas@theemploymentattorneys.com
             jferris@theemploymentattorneys.com
6             mlingle@theemploymentattorneys.com
             amgifford@gmail.com
7

8  Attorneys for Relator Malou Tutanes-Luster

9           **UNITED STATES DISTRICT COURT**

10         **NORTHERN DISTRICT OF CALIFORNIA**

11          **SAN FRANCISCO/OAKLAND DIVISION**

CV17   4384

12

13 | **UNITED STATES OF AMERICA *ex rel.*** | **QUI TAM COMPLAINT AND**
   | **MALOU TUTANES-LUSTER,** | **DEMAND FOR A JURY TRIAL**

14 |                              *Plaintiff,* | FILED UNDER SEAL
                                              | PURSUANT TO
15 |    *v.* | 31 U.S.C. §§ 3729 *et. seq.*

16 | **BROKER SOLUTIONS, INC. d/b/a NEW**
   | **AMERICAN FUNDING and PATTY ARVIELO,** | Civil Action No.
17 |

18 |

19 |                              *Defendant.* |

20

21      Relator, Malou Tutanes-Luster, brings this qui tam action in the name of the United States of

22 America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows:

23

24                              **INTRODUCTION**

25      1.      This is a civil fraud action by qui tam Relator Malou Tutanes-Luster ("Relator") on

26 behalf of the United States ("the Government"), against Broker Solutions, Inc. d/b/a New American

27 Funding and Patty Arvielo (collectively "Defendants" or "NAF") to recover treble damages and civil

28 penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for damages sustained by the United

-1-

States Department of Housing and Urban Development ("HUD"), the Federal Housing Administration ("FHA"), and the United States Department of Veteran Affairs ("VA") in connection with NAF's origination, underwriting, and quality control of FHA and VA home loans (collectively "government loans") under the FHA and VA programs (individually and collectively, the "Government Programs").

2.      The FCA provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

3.      Under the FCA, liability attaches when a defendant submits or causes another to submit a claim for payment from Government funds that the defendant knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.

4.      Liability also attaches under the FCA when a defendant knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

5.      The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for himself as the Relator and for the Government and allow him to share in any recovery.

6.      The FHA promotes American homeownership through its Direct Endorsement ("DE") Lender Program or "DE Program."

7.      FHA is a part of HUD and is one of the largest mortgage insurers in the world.

8.      Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured millions of home loans since FHA's inception.

9.      Similarly, the VA promotes home ownership for veterans, active duty personnel, certain surviving spouses, and reservists through the VA Home Loan Guaranty Program ("VA Program").

10.     Under the VA Home Loan Guaranty Program, the VA provides a guarantee of up to 50% of the loan, which protects the lender against loss up to the amount guaranteed.

11.     Under the Government Programs, if a homeowner defaults on a government loan and the mortgage holder forecloses on the property, the Government Programs will pay the mortgage holder the balance of the loan (or in the case of VA loans, up to 50% of the loan) and assume ownership and possession of the property.

12.     By protecting mortgage holders against defaults on mortgages, the Government Programs encourage lenders to make loans to millions of creditworthy citizens who might not otherwise be able to secure a home loan under conventional underwriting criteria.

13.     Government insurance is also valuable in the secondary markets, as government loans are expected to have met stringent underwriting requirements and because they are backed by the full faith and credit of the United States.

14.     Through these mortgage insurance programs, the Government Programs provide insurance against losses on mortgage loans to single family home buyers originated and held by approved lenders, or mortgagees.

15.     Thus, for each loan underwritten, the government extends its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

16.     In addition, the taxpayer has been required to fund the insurance premiums for the Government Programs.

17.     Further, the government incurs significant administrative costs in running the Government Programs and accepting endorsed loans by NAF.

18.     In addition, the government paid claims on any loan that defaulted, including loss mitigation costs associated with the foreclosure or resale of properties, such as marketing expenses, real estate taxes, and maintenance costs.

19.     The government insures the government program loans only if the Direct Endorsement Lender certifies to the government that the loan specifically, and the Direct Endorsement Lender's loan program in its entirety, meet the requirements set forth by the government.

20.     For these loans, the government guarantees that mortgage holders will be reimbursed by the government (in full for FHA loans, and up to 50% for VA loans) if the borrower ultimately does not repay the loan.

21.     The Government Programs encourage lenders to extend loans to creditworthy low- and moderate-income families, as well as first-time homebuyers.

22.     As part of insuring mortgage loans, the government has outsourced to FHA and VA lenders (individually and collectively, "Government Lenders") the underwriting services for the loan application; the government no longer performs its own underwriting services for governmentally insured mortgage programs.

23.     In addition to performing underwriting services as part of the program, the Government Lenders also profit from any loan approved.

24.     Further, because the government insured each loan endorsed by the Government Lenders, the Government Lenders suffer no risk of loss if the loan fails.

25.     That means that built into the government mortgage program is a strong incentive for a Government Lender to endorse as many loans as possible, even those that are not qualified, in order to maximize profits, provided the Government Lender is not caught in the process.

26.     Endorsing fewer loans (even unqualified loans) only reduces a lender's profitability and puts them at a competitive disadvantage in relation to other Government Lenders who endorse more loans whether qualified or not.

27.     Therefore, ensuring that Government Lenders only endorse loans that meet government mortgage requirements is an essential part of the program.

28.     Because Government Lenders are permitted to endorse loans for government insurance without prior government review, the government requires Government Lenders to conduct due diligence on loans before endorsing them for government insurance, and relies on the Government Lenders' certifications to the government in regards to their conduct.

29.     The Government Lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with the government; to follow the government's requirements; and to certify annually, as well as on each loan file, that the lender is in compliance with government requirements.

30.     These are the basic checks that exist to check a Government Lender's self-interest to underwrite as many loans as possible, regardless to the qualifications of the files.

31.     NAF, a Government Lender approved by the government to originate and underwrite single-family residential mortgages insured by the government, knowingly approved loans that violated government rules while falsely certifying compliance with those rules.

32.     From at least July 2011 to the present (the "Relevant Time Period"), NAF engaged in a regular practice of reckless origination and underwriting of government loans and falsely certified to the government that these loans were eligible for government insurance.

33.     NAF's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages.

34.     As the risk was entirely on the government, when the non-complaint loans inevitably defaulted, this materialized into substantial losses to the government.

35.     NAF failed to live up to its obligations under the Government Programs.

36.     NAF's management instituted and encouraged practices that led underwriters to break HUD and VA rules and to approve ineligible loans.

37.     Some examples of these policies and practices include: paying commissions to underwriting employees to encourage them to approve ineligible loans for government insurance, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's Automated Underwriting System ("AUS"), inflating the value of appraisals through a value appraisal process whereby appraisers were instructed to inflate appraisal values to the values desired by NAF's sales employees, and failing to maintain sufficient quality control processes.

38.     More specifically, NAF made improper calculations of borrowers' income in violation of the government's rules regarding overtime and bonus earning and improperly excluded debt obligations to improperly lower borrowers' debt-to-income ratios.

39.     NAF established a culture that valued getting a loan approved and endorsed for government insurance over complying with the government's rules.

40.     NAF's aim was to get loans insured by the United States and sold for a profit—even when NAF could not truthfully certify to the government that the loan qualified for government insurance.

41.     Therefore, the United States seeks treble damages and penalties under the False Claims Act for the insurance claims paid by the government for mortgages wrongfully approved for government insurance by NAF.

**JURISDICTION AND VENUE**

42.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

43.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

44.     This Court has personal jurisdiction over NAF because NAF can be found and transacts business in the Northern District of California.

45.     For example, NAF maintains four branches within this District located at: 2105 South Bascom Avenue, Suite 200, Campbell, California 95008; 18525 Sutter Boulevard, Suite 240, Morgan Hill, California 95037; 600 Main Street, Suite E, Pleasanton, California 94566; and 55 South Market Street, Suite 1600, San Jose, California 95113.

46.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C.§ 1395, and 31 U.S.C. § 3732(a), because NAF can be found and transacts business within the Northern District of California.Additionally, NAF also underwrote and endorsed government-insured mortgage loans for properties located within the Northern District of California.

47.     There has been at least one foreclosure involving government mortgages for properties underwritten by NAF in this District.

48.     This property is located at 182 Sonoma Creek Way, American Canyon, California 94503.

49.     This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as

the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but upon rather information from Relator.

50.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.

51.     Relator has direct and independent knowledge of NAF's fraudulent activities.

52.     Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

53.     Relator shall serve on the United States a copy of this Complaint and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

**THE PARTIES**

54.     Defendant Broker Solutions, Inc. d/b/a New American Funding is a Direct Endorsement Lender and is authorized to, and if fact does conduct business in the Northern District of California.

55.     On information and belief, Defendant Broker Solutions, Inc. is a California corporation with its principal place of business at 14511 Myford Road, Suite 100, Tustin, California 92780.

56.     Broker Solutions, Inc. participates in HUD's FHA program under Institution ID 21221 and lists a home office of 14511 Myford Road, Suite 100, Tustin, California 92780.

57.     At all relevant times, Defendant Patty Arvielo has been the President and Co-Founder of NAF.

58.     Upon information and belief, Ms. Arvielo, in concert with others, develops and manages NAF's policies and practices regarding underwriting, including for FHA and VA loans.

59.     For example, according to NAF's website, Ms. Arvielo's involvement as President of NAF includes originating loans, and managing all sales and operations.

60.     Relator was employed by NAF in NAF's San Jose, California branch located in the Northern District of California.

61.     Relator was employed by NAF as a processor and worked on governmental loans.

62.     Although Relator was physically located in San Jose, Relator worked with NAF's locations in multiple states around the country and observed that NAF's policies and practices described in this Complaint were national in scope.

63.     As such, Relator is familiar with NAF's national policies as they relate to the improper issuance of government loans.

64.     Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to government loans.

## FACTUAL BACKGROUND

### *Civil Statutes to Combat Mortgage Fraud*

65.     The False Claims Act provides that a person is liable to the United States Government for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(l) (2006); 31 U.S.C. § 3729(a)(l)(A) (2010).

66.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   31 U.S.C. § 3729(a)(l)(B) (2010).

67.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information" 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(I)(A) (2010).

68.     The False Claims Act provides that no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(l)(B) (2010).

69.     The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or

property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

70.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. *See United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

71.     Any person who violates the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(G).

### HUD's FHA Mortgage Insurance Program

72.     HUD is a cabinet-level agency of the United States.

73.     Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.

74.     HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

75.     FHA is a part of HUD and is one of the largest mortgage insurers in the world.

76.     Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.

77.     Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

78.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD.

1    79.    HUD will then pay the mortgage holder the outstanding balance on the loan and other

2    costs associated with the default and has in fact done so repeatedly for NAF's loans.

3    80.    NAF, or whoever may purchase the loan from NAF, therefore suffers no loss when a

4    borrower is unable to repay a government loan- only the government suffers the loss.

5    81.    This no-loss guarantee encourages lenders to make loans to creditworthy applicants

6    who would otherwise have difficulty qualifying for conventionally available financing on favorable

7    terms, including the ability to put little money down to make the purchase.

8    82.    Government mortgage insurance programs therefore help many creditworthy low- and

9    moderate-income families as well as first-time homebuyers become homeowners.

10   83.    A lender, like NAF, must apply to be a Government Lender and must be approved by

11   the government to underwrite government-insured mortgage loans on the government's behalf.

12   84.    This is an important responsibility because the government "does not review

13   applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a).

14   85.    Instead, the Government Lender underwrites mortgage loans on the government's

15   behalf and is to truthfully certify to the government whether a borrower presents an acceptable credit

16   risk for the government.

17   86.    Thus, in underwriting the mortgage loan, the lender is to certify that the borrower and

18   the mortgage loan meet the government's requirements for insurance and whether the "proposed

19   mortgage is eligible for insurance under the applicable program regulations." *Id.*

20   87.    The Government Lender must decide whether or not to approve the borrower for a

21   government-insured mortgage loan.

22   88.    After the Government Lender approves a borrower for a government-insured mortgage

23   loan, the lender may submit the mortgage loan for government insurance (referred to as "endorsing"

24   the loan) and as part of the submission process must also certify that the mortgage loan itself, as well

25   as the lender's entire mortgage loan program, is fully compliant with government requirements and

26   thus can be insured by the government insurance fund in the event that the borrower cannot repay the

27   loan.

28

-10-

89. Thus, the Government Lender must certify that the loan meets all of the government's requirements and the government relies on the DE certification to endorse the loan for government insurance.

90. Certain Government Lenders, such as NAF, apply to, and participate in, the DE Program in which the mortgagees themselves endorse the mortgage for government insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6.

91. The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to the government only upon request. See Mortgagee Letter 2005-36; HUD Handbook 4000.1, II.A.1.a.i; HUD Handbook 4155.2, 8.B.1.d.

92. A Government Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with the government.

93. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein,* 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank Henrietta v. Small Bus. Admin.,* 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason,* 367 F.2d 289, 293 (1st Cir. 1966)).

94. As a result, in addition to the specific regulatory duties addressed below, the Government Lender owes both a fiduciary duty and a duty of reasonable care to the government.

**HUD's Direct Endorsement Program**

95. The success of the DE Program depends upon proper underwriting of loan files.

96. The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of HUD programming and FHA insurance.

97. Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance under the government's requirements, and ensure the integrity of the data relied upon to make such determinations.

98.     Under the DE Program, HUD relies on the expertise and knowledge of the lenders such as NAF and relies on their certification that their processes and decisions comply with the government's requirements.

99.     The government also relies on the truthfulness of the certification the lender, such as NAF, completes on each loan certifying that the loan is eligible for government insurance, as well as NAF's annual certification that it is complying with all government-required processes.

100.    As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

101.    Thus, the DE Lender, in exchange for the government's loan guarantee, provides underwriting mortgage services for HUD and determines whether a borrower presents an acceptable credit risk for HUD.

102.    After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.

103.    A DE Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.NAF's responsibility includes performing due diligence and ensuring the accuracy of loans it endorses.

104.    These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of the government when endorsing loans for government insurance, including among other things: reviewing the loans for quality control purposes, reporting defective loans, and submitting claims. See HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 1.B.8.a; 1.B.8.b; 1.B.8.c.

105.    NAF, as a Government Lender always remains responsible for the actions of its employees that participate in government transactions. *See* FHA Annual Certifications, *infra* ¶¶ 135-139; *see also* HUD Handbook 4000.1 I.A.6.i; HUD Handbook 4155.2, 9.D.6.b.

***The FHA's Due Diligence Requirements***

108.   Proper due diligence is a critical component of the DE Program.

109.   It is required by federal regulation and HUD Handbooks.

110.   The entire scheme of government mortgage guaranties presupposes an honest mortgagee performing the credit investigation with due diligence and making the judgment to lend in good faith after due consideration of the facts found.

111.   In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.

112.   HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

113.   As a result of this fiduciary relationship, the Direct Endorsement Lenders owe the government a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with the government.

114.   A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine a property offered as security for the loan to determine if it provides sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1; *see also* HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2, 2.A.4.b.

115.   Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.

116.   In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

117.   HUD has established specific rules for due diligence predicated on sound underwriting principles.

118.    In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Government Lenders and for which the government expects the Government Lender to fully comply. See HUD Handbook 4000.1, V.A.2.b.i(A)(1)(a); HUD Handbook 4155.2, 2.A.4.b.

119.    At various times, the government has promulgated several handbooks detailing the rules and regulations for lenders underwriting government loans.

120.    Currently, the operative handbook is the HUD Handbook 4000.1-FHA Single Family Housing Policy ("HUD Handbook 4000.1") which went into effect on approximately September 14, 2015.

121.    Prior to the implementation of HUD Handbook 4000.1, the operative handbook was the HUD Handbook 4155.1 Mortgage Credit Analysis for Mortgage Insurance on One-to-Four Family Properties ("HUD Handbook 4155.1") which was issued in approximately May 2009.

122.    As they say, these requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. 24 C.F.R. § 203.5(c).

123.    HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C; see also HUD Handbook 4000.1, I.B.3.a; HUD Handbook 4155.2, 2.A.3.a.

124.    When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing requirements, such as those set forth in the HUD Handbooks. See HUD Handbook 4000.1, II.A.5.a; HUD Handbook 4155.2, I.A.2.a.

125.    The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

126.    HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

127.    The Direct Endorsement underwriter must assume the following responsibilities:

-14-

a. compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

b. the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

c. the decisions relating to the acceptability of the appraisal, the inspections, the buyer's capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

d. the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program;

e. and awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

128. Additionally, Direct Endorsement lenders are required to comply with the following HUD guidelines:

a. Direct endorsement lenders may only engage in business practices that conform to generally accepted practices of prudent mortgage lenders. See FHA Title II Mortgagee Approval Handbook 4060.1, Section 2-10(D) (REV-2, August 14, 2006).

b. Direct endorsement lenders may not engage in practices that demonstrate irresponsibility. Id.

c. Direct endorsement lenders may only pay fees for services permitted by HUD program policy. Id. at Section 2-22.

d. Direct endorsement lenders are required to function so as to protect the FHA from unacceptable risk. Id. at Section 7-2.

129. The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d).Mortgagees must also employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); see also HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 2.A.4.b.

130. The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters. See HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii); HUD Handbook 4060.1 REV-2,1I2-9(A).

**Certifications and Endorsements for FHA Insurance**

131. HUD requires Government Lenders to certify their compliance with the fiduciary, due diligence, quality control, and reporting requirements discussed herein.

132. Direct Endorsement Lenders are required to certify their compliance with the FHA's programmatic and individual loan rules by certifying their compliance with government requirements, as well as governmental rules and regulations during their initial application to the government, on an annual basis, and on an individual loan-by-loan basis.

**FHA Initial Certifications to HUD**

133. First, NAF as a lender applies to participate in the Government Lender program and to endorse loans for government insurance on the government's behalf, NAF certified that it would fully comply with all governmental guidelines, regulations, and requirements:

> I [NAF] certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

134. Unless NAF submits a truthful initial certification to the government, NAF would not be entitled to obtain or maintain its status as a Government Lender or to endorse loans for government insurance.

**FHA Annual Certification Requirements**

135. Even once NAF was initially certified, NAF must re-certify, every year, that it is complying with the government's program requirements, including due diligence in underwriting, following all governmental underwriting requirements, and the implementation of a mandatory quality control plan.

136. As of 2010, NAF was required to annually certify:

> I [NAF] certify that I know, or am in the position to know, whether the

-16-

1
2
3
4
5
6
7
8

> operations of [NAF] conform[s] to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of [NAF]. I certify that [NAF] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, [NAF] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [NAF] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [NAF] . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

9   137.   As of approximately August 1, 2016, a corporate officer of NAF was required to
10  annually certify:

11
12
13

> I certify that I . . . have known, or have been in the position to know, whether the operations of [NAF] conformed to all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval as codified by 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by the Mortgagee Letter, and any agreements entered into between [NAF] and HUD.

14  138.   NAF also certifies that it is responsible for the actions of its employees, including
15  managers, supervisors, originators, underwriters and processors:

16
17
18

> I acknowledge that [NAF] is responsible for all actions of its officers, partners, directors, principals, managers, supervisors, loan processors, loan underwriters, loan originations, and other employees of [NAF], and for the actions of any Affiliates participating in the FHA programs for or on behalf of [NAF].

19  139.   Currently, NAF is additionally required to certify:

20
21
22
23
24
25
26
27
28

> I certify that, to the best of my knowledge and after conducting a reasonable investigation, [NAF] does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain [NAF's] FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between [NAF] and HUD, except for those instances of non-compliance, if any, that [NAF] reported to HUD and for which [NAF] received explicit clearance from HUD to continue with the certification process. Each of my certifications is true and accurate to the best of my knowledge. I understand that if I have made any false, fictitious, or fraudulent statement(s), representation(s), or certification(s) knowingly on this form, I may be subject to administrative, civil and/or criminal sanctions, including damages, penalties, fines, imprisonment, and debarment under applicable federal law. I acknowledge that [NAF] is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of

the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964.

### NAF's annual certifications to the FHA on its operations

140.    Absent a truthful annual certification, NAF is not entitled to endorse FHA loans for government insurance.

141.    Absent the applicable certifications in the annual certification described above, NAF cannot endorse loans for government insurance.

142.    Unless NAF had submitted a truthful annual certification, NAF is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

143.    The annual certification is material to the government's payment of any claim submitted under the Government Lender Programs.

144.    The government does not generally review lenders' operations; instead, it relies on lenders such as NAF to comply with the government's operational requirements and to ensure that the operational requirements are met.

145.    The certifications are required for NAF to enter and remain in the program.

146.    NAF's certifications are critical to the government's ability to ensure that only qualified and eligible loans are endorsed for government insurance and that NAF has met the government requirements on both a programmatic and individual loan basis.

147.    NAF's certifications are essential for a claim on a loan to be submitted for government insurance.

148.    And NAF's certifications are needed to protect the government insurance fund from undue risk and loss.

### FHA Individual Loan Certifications

149.    NAF must also submit a certification to the government for each loan for which it endorses for government insurance ("loan-level certifications").

150.    This is a certification to HUD that the individual loan complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD 92900-A.

151.    This loan-level certification can occur in two ways.

152.    One, NAF may use a government-approved automated underwriting system to review loan applications.

153.    Beginning in July 2008, the government required NAF to electronically process eligible loan requests through an automated underwriting system ("AUS").

154.    An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."

155.    Numerous requirements promulgated by the government explain how NAF must calculate each data point and what documentation it needs to support each data point.

156.    For each loan that was underwritten with an AUS, NAF must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." See FHA TOTAL Mortgage Scorecard User Guide; HUD Handbook 4000.1 II.A.4.a.iii(A)(1); HUD Handbook 4155.2 2.A.3.d.

157.    NAF must further certify that "there was no defect in connection with the approval of this mortgage such that the result reached in TOTAL should not have been relied upon and the mortgage should not have been approved in accordance with FHA requirements." See Form HUD 92900-A.

158.    The automated underwriting system processes information entered by NAF and rates loans as either "accept/approve" or a "refer/caution."

159.    Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, complete, properly documented, and accurate." See FHA TOTAL Mortgage Scorecard User Guide.

160.    It is NAF's responsibility to ensure the integrity of the data relied upon by TOTAL. See Mortgagee Letter 2004-1. In cases where NAF used a government-approved automated underwriting system, and the system rates a loan as an "accept" or "approve," NAF made the following certification:

1         This mortgage was rated as an "accept" or "approve" by FHA's Total
Mortgage Scorecard. As such, the undersigned representative of the mortgagee

2   certifies to the integrity of the data supplied by the lender used to determine the
quality of the loan, that Direct Endorsement Underwriter reviewed the

3   appraisal (if applicable) and further certifies that this mortgage is eligible for
HUD mortgage insurance under the Direct Endorsement program. I hereby

4   make all certifications required by this mortgage as set forth in HUD
Handbook 4000.4.

5

6       161.   However, in cases where NAF uses a government-approved automated underwriting

7   system, and the system rates a loan as "refer" or "caution," or when NAF does not use a government-

8   approved automated underwriting system, NAF must make the following certification, in sum and

9   substance:

10

11        This mortgage was rated as a "refer" or "caution" by FHA's Total Mortgage
Scorecard, and/or was manually underwritten by a Direct Endorsement

12  underwriter. As such, the undersigned Direct Endorsement Underwriter certifies
that I have personally reviewed the appraisal report (if applicable), credit

13  application, and all associated documents and have used due diligence in
underwriting this mortgage. I find that this mortgage is eligible for HUD

14  mortgage insurance under the Direct Endorsement program and I hereby make
all certifications required for this mortgage as set forth in HUD Handbook

15  4000.4.

16      162.   The certifications in HUD Handbook 4000.4, incorporated by reference in the

17  certifications above, include NAF's certification that the mortgage complies with the government's

18  underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters.

19      163.   Specifically, NAF certified that:

20

21        i.   The proposed mortgage meets the income and credit requirements of the
governing law in the lender's judgment.

22        ii.  NAF used due diligence in underwriting the mortgage.

23        iii.  That the statements made in its application for insurance are true and
correct.

24        iv.  NAF's statements made in the Lender's Certificate as part of the
Direct Endorsement Approval for a HUD/FHA Insured Mortgage are

25  true and correct.

26        v.   NAF's underwriter makes all certifications required by Direct
Endorsement Handbook, which include:

27

28

1. The mortgagor's monthly mortgage payments will not be in excess of his or her reasonable ability to pay. 24 C.F.R. § 203.21.

2. The mortgagor's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance. 24 C.F.R. § 203.33.

3. The mortgagor's general credit standing is satisfactory. 24 C.F.R. § 203.34.

### The VA's Home Loan Guaranty Program

164. Pursuant to the Servicemen's Readjustment Act of 1944, the VA offers mortgage assistance through the VA Program.

165. Like FHA loans, VA-guaranteed loans are made by private lenders, such as banks and mortgage companies.

166. To obtain a VA loan, a veteran must apply to a Government Lender.

167. If the loan is approved, the VA will guarantee a portion of the loan, which protects the VA Lender against loss up to the amount guaranteed. The maximum amount that the VA guarantees is 50% of the loan.

168. By partially guaranteeing loans against default, the VA loan guarantee encourages lenders to make loans to veterans, and makes the resulting loans valuable on the secondary market.

169. Many VA Lenders, including NAF, are authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for the VA, and approve loans for the VA guarantee without prior review or approval by the VA.

170. To qualify for the VA guarantee, a mortgage must meet all of the applicable VA underwriting requirements.

171. Much like the HUD underwriting requirements, the VA underwriting requirements relate to such things as the borrower's income and assets, the borrower's credit history, and the valuation of the subject property.

172. In underwriting loans and evaluating whether to approve loans for the VA guarantee, VA Lenders are required to follow the VA's applicable underwriting guidelines.

173. These guidelines are set forth in the VA Lenders' Handbook, see VA Pamphlet 26-7 at Ch. 4, and are incorporated into regulations at 38 C.F.R. § 36.4340.

174. The VA's underwriting guidelines contain rules that must be followed to ensure that each borrower's "present and anticipated income and expenses, and credit history[,] are satisfactory" such that the borrower "is a satisfactory credit risk." 38 C.F.R. § 36.4340.

175. Further, for a loan to be entitled to coverage under the VA program, the VA requires that all loans be underwritten by an underwriter with a SAR number, signifying that she is a VA-approved underwriter in the VA program.

176. Under the VA regulations, a SAR underwriter must have at least three years in process, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, §4.a.

177. Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. *Id.*

### *VA Loan Certifications*

178. The VA relies on Government Lenders to conduct due diligence on loans before approving them for the VA guarantee. *See id.* § 36.4340(j).

179. To satisfy this due diligence requirement, VA Lenders must, among other things, develop all credit information; obtain all required verifications and a credit report; ensure the accuracy of all information on which the loan decision is based; and comply with all of the applicable VA underwriting guidelines. *Id.; see* VA Pamphlet 26-7 at 4-3; VA Form 26-1820.

180. To initially participate in the VA Program, each VA lender is required to certify compliance with the VA regulations for underwriting VA loans by submitting VA Form 26-8736.

181. VA Form 26-8736 is an application for a lender to underwrite VA loans on an automatic non-supervised basis.

182. As part of the express certifications made in this form, each VA lender agreed and certified that it would, amongst other things: that it would: comply with Title 38 of the United States Code, VA regulations and other directives issued by the VA; it would notify the VA of any change in

its corporate structure, operations, or financial condition which would have a bearing on its qualifications to automatically underwrite loans; that it will not close loans on an automatic basis as a courtesy or accommodation for other mortgage lenders regardless of whether or not such lenders are approved themselves to close on an automatic basis, nor will it close loans on the automatic basis for any builder, real estate brokerage firm or other entity which it owns, is owned by, is affiliated with or has a financial interest in, without the express approval of the Department of Veterans Affairs; that it will not process loans that it does not itself intend to make; that all prospective VA loans to be closed on an automatic basis will be reviewed and either approved or rejected by an approved underwriter; and that the lender will take responsibility for all credit information; i.e., credit report, verifications of employment and deposit, and disclose the sources of such information.

183.    VA Form 26-8736 must be signed by the president or principal officer for each VA lender.

184.    Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must certify that it conducted due diligence to ensure that the mortgage complies with the applicable VA underwriting rules. See 38 C.F.R. § 36.4340(k).

185.    Pursuant to VA regulations, each loan approved for the VA guarantee or refinancing incorporates the following certification:

> The undersigned lender certifies that the (loan) (assumption) application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36; that all credit reports obtained or generated in connection with the processing of this borrower's (loan) (assumption) application have been provided to VA; that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

*Id.* at § 36.4340(k)(2)(i).

186.    Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must execute VA Form 26-1820, pursuant to which it further certifies, among other things, that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code, and the Regulations concerning guaranty or insurance of loans to veterans."

**NAF's Certifications to the Government Programs on Individual Loans**

187.     Absent a truthful loan application certification, NAF is not entitled to endorse a particular loan for government insurance.

188.     Absent the applicable certifications for an individual loan as described above, NAF cannot endorse that loan for government insurance.

189.     Unless NAF had submitted a truthful loan-level certification, NAF is not entitled to receive the government's financial backing of that mortgage, including the pledge of the government's full faith and credit for backing such mortgages.

190.     Each of the foregoing certifications is material to the government's payment of any claim submitted under the Government Lender Programs.

191.     The government does not review government loans for approval prior to the loan being endorsed for insurance; instead, it relies on lenders such as NAF to comply with the government's requirements and to ensure that every loan is in fact eligible for government insurance.

192.     The certifications are required for NAF to enter and remain in the Government Programs.

193.     NAF's certifications are critical to the government's ability to ensure that only qualified and eligible loans are endorsed for government insurance.

194.     NAF's certifications are essential for a claim on a loan to be submitted for government insurance.

195.     And NAF's certifications are needed to protect the government insurance fund from undue risk and loss.

**Defaulted Loans Result in Losses to the Government**

196.     Once a loan is endorsed by NAF, it is insured by the government on the basis that that the Government Lender has followed the government requirements and has submitted accurate certifications and that the loan is eligible for government insurance.

197.     Additionally, NAF's annual certifications ensure that NAF has met all of the government's requirements on both a programmatic and individual loan basis.

198.     Without those requirements being met, any loan submitted by NAF is not eligible for government insurance.

1    199.   It is only because a Government Lender endorses a loan for government insurance that
2    the holder of the mortgage is able to submit a claim to the government for any losses.

3    200.   If the borrower defaults, the holder of the mortgage can submit a claim to the
4    government for any loss from the default.

5    201.   The holder submits a claim for insurance by using HUD's electronic claim system.

6    202.   The claim must include certain information.

7    203.   Each loan that is endorsed for FHA insurance has a unique FHA case number, and the
8    claim must include the FHA case number.

9    204.   If a valid FHA case number is not submitted with the claim, an insurance payment will
10   not be processed on that claim.

11   205.   The claim also must include the identification number of the mortgagee inputting the
12   claim, which must be either the holder of record or the servicer of record of the mortgage.

13   206.   FHA pays these insurance claims in two parts.

14   207.   First, the mortgage holder makes an initial claim for the unpaid principal on the loan,
15   plus interest.

16   208.   Second, if applicable, the mortgage holder later makes a final claim for expenses and
17   allowances (e.g., foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4.

18   209.   These claims are submitted to HUD electronically, and HUD's electronic system
19   processes them automatically.

20   210.   The system ensures that the FHA insurance is active with respect to the FHA case
21   number provided and that there are no other impediments (such as a no-pay flag or indemnification
22   agreement) to paying the claim.

23   211.   After processing, the claim is approved for payment, and a disbursement request is sent
24   to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

25   212.   The damages sustained by the United States as a result claims on the government
26   resulting from NAF's conduct takes several forms.

27
28

-25-

213.    First, the United States sustains losses in the form of "net losses" whereby the amount of proceeds received by the government from reselling the foreclosed properties, or from bundling the loans for sale to an investor, is deducted from the loan or claim amount.

214.    Additionally, any costs associated with foreclosure, resale, or sale of the note, such as marketing expenses, real estate taxes, and maintenance costs, are added to the claim amount.

215.    In other words, the loss to the government on the loans is adjusted for any proceeds received by the government from the sale of the foreclosed property, and for any costs associated with the disposition of the property.

216.    Thus, for each loan underwritten, the government extended its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

217.    In addition, the taxpayer has been required to fund the insurance premiums for the FHA program.

218.    Further, the government incurs significant administrative costs in running the FHA program and accepting endorsed loans by NAF.

219.    In addition, the government paid claims on any loan that defaulted.

## NAF'S NATIONAL SCHEME TO DEFRAUD HUD THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE FHA LOANS

220.    As described below, NAF knew, deliberately ignored, and recklessly disregarded the fact that many of its loans did not comply with the government's underwriting requirements, and thus were not eligible for government mortgage insurance, policies and practices which Relator personally observed occurring in this District.

221.    NAF's focus was on maximizing these profit-making schemes across all locations in the company so it made sure all locations followed these policies.

222.    NAF conducted formal and informal training to make sure the company's policies and practices were uniform across the company.

223. The policies described in this complaint reflect NAF's nationwide loan and underwriting polices which are used interchangeably at all its locations.

224. Throughout the Relevant Time Period, NAF has engaged in a regular policy and practice of reckless origination and underwriting of its government loans and falsely certified to the government that those loans were eligible for government insurance.

225. Furthermore, NAF knowingly was aware of certain underwriting processes that deliberately ignored and recklessly disregarded government requirements that would result in NAF endorsing materially deficient loans for government mortgage insurance.

226. Additionally, NAF pushed for increased loan volume that came at the expense of loan quality.

227. But NAF's management failed to take effective action to address the seriously deficient loan originations and underwriting that it knew was occurring.

228. The underlying causes of NAF's very serious loan quality problems and reckless underwriting are multifold, several of which are detailed in this Complaint.

229. In this case, NAF instituted a series of policies that replaced their fiduciary obligation with one that maximized their profits and sales.

230. NAF's interest was underwriting as many government loans as possible, secure in the knowledge that if it was not caught, the government would pay for any defaulted loans.

*NAF Falsely Represented to the Government That It Was Not Paying Employees Performing Underwriting Duties on a Commissions Basis*

231. Government regulations do not allow a Mortgagee to compensate an employee who performs underwriting functions with commissions. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(ii).

232. Therefore, NAF, as a mortgagee, "must not compensate employees who perform underwriting…activities on a commission basis." *Id.*

233. This helps to ensure that employees performing underwriting functions are making decisions completely on the merits of the individual file and not incentivized to approve mortgages because of the potential to be paid a commission.

234. This helps to ensure that employees performing underwriting functions are making decisions completely on the merits of the individual file and not incentivized to approve mortgages because of the potential to be paid a commission.

235. FHA regulations also prohibit an employee from having multiple sources of compensation, either directly or indirectly, from a single FHA-insured transaction. HUD Handbook 4000.1 I.A.3.c.iv.(B)(3)(b)(v).

236. Further, the NAF represented to the government that it was following such regulations.

237. NAF, however, as part of its scheme to profit off of government subsidized mortgage insurance, knowingly compensated its employees who performed underwriting activities on governmental files on a commission basis in order to get as many files approved as possible, even when those files did not meet the government's requirements.

238. Employees were only paid the commission if the employee performing underwriting functions approved the file.

239. This amounted to a "kick-back" from NAF to their employees when a loan was approved and created a conflict of interest because the employee's compensation was dependent on both supposedly meeting government requirements, as well as trying to get the loan endorsed even if it did not meet those requirements.

240. The compensation plan was company-wide in scope and applied at all of NAF's offices at which underwriting occurred.

241. The plan applied to a variety of different employees performing underwriting functions, including underwriters, processors and closers.

242. Although the amounts paid to each employee varied under the terms of the plan, the plan paid a commission to employees performing underwriting functions when they approved a file, regardless of the quality of the file.

243. Therefore, NAF's commission compensation plan was designed by NAF to put financial pressure on employees to approve a government loan file in order to increase their compensation.

244.    Significantly, NAF did not compensate employees with commissions for following government requirements in underwriting government loans.

245.    Instead, commissions were only paid if government loans were approved, and were paid regardless of whether the file complied with government requirements or not.

246.    By implementing this commission plan, NAF incentivized employees performing underwriting functions to approve as many governmental loans as possible even if it meant endorsing deficient files.

247.    The terms of the commission plan were quite generous.

248.    For example, Relator recalls that if in 30 days, an employee approved 20 loans, she would receive a commission of $2,500; 30 files, $4,500; 35 files, $5,500; 40 files, $10,000.

249.    In conversation with other employees performing underwriting functions, they told Relator that their pay could be more than double their base salary based on the commission payments they received for approving loans.

250.    Because they were paid so much for approving loans, the employees stated that they would attempt to approve as many files as they could, without regard to qualifications.

251.    Similarly, when Relator received an email on or about August 2016 explaining the size of NAF's bonuses for approved files, and an "extra surprise bonus" that was paid out in addition to the commissions paid based on the number of files approved, Relater called another employee who had been at NAF longer, Denidita Timberlake, to ask if NAF really paid these amounts.

252.    Ms. Timberlake said that they absolutely did.

253.    Relator asked how was it even possible to underwrite that many files and Ms. Timberlake said that at NAF the best way to maximize any bonus was to send "all files through for approval," regardless of whether they actually met all the qualifications.

254.    Ms. Timberlake noted that employees had learned that, provided there was the bare minimum of income, credit and asset documents, the government was unlikely to ever catch the other underwriting violations in the file and thus they could be just be sent through for approval and receive the bonus.

255.    Upon information and belief, NAF's policy of paying commissions based on the approval of files was applied at all of its branches.

256.    For example, underwriters and/or processors were paid commissions based on the number of loans that they approved at any number of locations, including Irvine, California; Riverside, California; Tustin, California (NAF's headquarters); and also for those underwriters working remotely.

257.    Given that NAF knew, or should have known, that their commission payment plan did motivate the endorsement of non-qualified applicants, regardless of the regulations' requirements, NAF's conduct was improper for a Government Lender.

258.    Further, NAF's representations to the government that it was not engaging in such conduct are false.

**NAF falsely represented to the government that it did not create a management exception policy under which NAF overrode government loan requirements and encouraged employees to do so as well**

259.    Government regulations only allow for the endorsement of loans that meet all of the government lending requirements. See HUD Handbook 4000.1, I.B.3.a. and II.A.

260.    As set forth above, for each FHA loan NAF endorsed, NAF also certified that, as to the loan, there was "no defect in connection with my approval of this mortgage," and also certified that, as to that loan, it was not the case that "the mortgage should not have been approved in accordance with FHA requirements." See Form HUD 92900-A.

261.    Additionally, for each VA loan that NAF endorsed, NAF certified that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36."

262.    Despite being required to comply with all government requirements, NAF instead created a management override process under which management would dictate that loans being endorsed even if they did not meet the government's requirements.

263.    For a loan to be entitled to coverage under the FHA program, the FHA requires that all loans be endorsed by a licensed underwriter with a CHUMS number, signifying she is a FHA-approved underwriter in the DE Program.

264.    Under the FHA regulations, the underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.3; see also HUD Handbook 4155.2 ch. 2.A.4.a.

265.    The FHA underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and "must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.A.l; see also HUD Handbook 4155.2 ch. 2.A.4.a.

266.    Further, for a loan to be entitled to coverage under the VA program, the VA requires that all loans be underwritten by an underwriter with a SAR number, signifying that she is a VA-approved underwriter in the VA program.

267.    Under the VA regulations, a SAR underwriter must have at least three years in process, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, §4.a.

268.    Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. Id.

269.    In addition, as discussed above, FHA regulations completely bars employees whose compensation depends on how many loan close from performing any underwriting functions. 1.A.3.c.iv.(B)(3)(b)(ii)

270.    Despite being required to comply with all HUD-FHA requirements, NAF instead created a management override process under which management would dictate that loans be endorsed even if they did not meet the Government Programs' requirements.

271.    The policy was created by NAF, and further fueled by the tremendous bonuses employees could receive pushing bad files through.

272.    This policy resulted in multiple endorsements of unqualified loans that the government insured.

273.    This policy was standard and of long-standing and pre-dated Relator's employment.

274.    This policy was standard operating procedure at NAF.

275.    Relator reviewed files from around the country and it was true across all locations that management was empowered in the same way to override underwriting decisions.

276.    The policy was so standard and had been so long established that it was common from the moment Relator first began work to hear loan officers and others demand that management override unfavorable credit decisions on government loans.

277.    The management overrides would in a variety of ways, three examples of which are listed below.

278.    One was with managers who were allowed to override underwriting decisions on files on a request of a loan officer.

279.    At NAF, when a loan file did not qualify for FHA insurance, a loan officer would first ask the underwriter to approve the file anyway.

280.    If the underwriter did not agree to underwrite the non-qualifying file under NAF's policies, the loan officer could then take the disagreement to the Loan Officer Manager or the Processing Manager who reach out to the underwriter.

281.    If underwriting did not change its decision, NAF's policy allowed the Loan Officer Manager to take the issue to the Regional Manager (also employed on the sales side of the business) who was empowered to override the decision of underwriting and have the loan approved.

282.    Relator saw this management override happen repeatedly.

283.    For example, starting in August 2016, and in every month after during her employment, Relator saw multiple government loan files that did not qualify for coverage being submitted by Loan Officers.

284.    In particular, she remembers Mario Martinez, Jamie Del Bosque and Leola Edmond submit non-qualifying files.

285.   All three individuals are employed on the sales side of the business, are not trained as underwriters, and do not have the requisite CHUMS or SAR certifications necessary to underwrite government loans.

286.   When those non-qualifying files were rejected, following NAF's policy, the loan officers approached Loan Officer Manager Michael Garcia to have those files accepted.

287.   Mr. Garcia was paid on a commission basis for having files approved.

288.   If Mr. Garcia did not succeed in having the decision on those files reversed, he would take the files to Kevin English, Processing Manager, and Mr. English would then generally have the non-qualifying files underwritten.

289.   Mr. English's only exception was if the file on its face lacked basic support in the three areas of income, asset or credit documents because that is all that NAF needed for an approval.

290.   This conversation occurred on or about the third week of September 2016.

291.   Mr. English's performance was measured on how many loans his group closed.

292.   In fact, Mr. English was constantly emphasizing the importance of having loans approved each month.

293.   At 5pm at the end of each month NAF would publicize whether he and the employees who worked for him had exceeded the number of approved files that they had approved the month before and he would circulate the results to his group.

294.   Further, Mr. English was called by loan officers around the country to have unqualified files approved, which he did, because NAF's policy was nationwide in scope.

295.   In addition to formal appeal process described above, the management override policy also functioned by having management approve problematic loans even before they were initially denied by underwriting.

296.   Mr. English told Relator that NAF tried to avoid even initial declines by underwriting and the subsequent appeals by Loan Officers.

297.   Mr. English told Relator that what NAF wanted to have happen was that if Relator saw a file that did not meet underwriting requirements, before it was declined, she was to take the file out of the normal process and bring the file to him or to her Team Lead, Joseph Garcia.

-33-

298.   He would then review the file.

299.   Only if the file lacked basic documentation in regards to income, assets or credit would Mr. English allow the decline to go forward; otherwise he would have the file approved.

300.   Even when Relator pointed out clear problems in the file to him stemming from other requirements, Mr. English would have the file sent through.

301.   The first conversation occurred on or about August 17, 2016, by telephone, when Relator was in the Campbell Branch and Mr. English was in Tustin Branch.

302.   These conversations with Mr. English occurred approximately weekly between September 2016 and December 2016.

303.   When the file did not qualify and Mr. English was having it approved anyway, Mr. English would say that "I'll just have it pushed through," or "Ok, we're fine—just send it off."

304.   As per NAF policy, Relator also took non-qualifying loan files to Mr. Garcia.

305.   She would do so multiple times a week between September 2016 and December 2016.

306.   If the file actually did meet the guidelines, Mr. Garcia would explain why.

307.   Most of the time, though, the files did not.

308.   If it did not meet the qualifications, Mr. Garcia would say "We will just push it through," something similar, and these statements happened at least weekly in September, October and November of 2016.

309.   Mr. Garcia would then have the non-qualifying file approved per NAF policy.

310.   Relator also remembers after both Messrs. Garcia and English would send the non-qualifying files through, underwriters on the files would often discuss with Relator how dangerous it was to be approving such bad files.

311.   As just one example, Merrill Schultz on or around the third week in September 2016 told Relator she was very upset, and was visibly upset, about the fact that files got approved under the management override policy, and she also remarked that this happens "a lot around here."

312.   As another example, Judy Burley on or about the last week of September told Relator that sales had too much influence over underwriting decisions at NAF because of the management override policy.

313. She also stated that she and the other underwriters were frequently lobbied by the Loan Officers to approve loans, which was not permitted at her last employer.

314. From the date of the August 2016 conversation with Mr. English on forward, every government loan file that Relator reviewed that did not meet the Government Programs' requirements ended up being endorsed to the government through the management override process provided there was minimal income, credit and asset documentation in the file.

315. Further, this management override policy was long-standing.

316. In fact, multiple long-term employees at the Defendants told Relator that this was the way NAF processes had always worked.

317. As one example, Loretta Bonander told Realtor that she could not believe that there had been management override on a highly unqualified FHA loan, but she then noted that this was the way NAF had done things for years.

318. Ms. Bonander had been employed by NAF for a total of approximately five years.

319. This conversation occurred on or about December 7, 2016.

320. As another example, Relator had a conversation with Ruby Dandha in which the Relator expressed surprise at the management override policy.

321. Ms. Dandha, who been employed at Defendants for approximately five years said that "that happens a lot around here."

322. This conversation occurred on or about September 6, 2016.

323. In fact, Maria Pineda said that she had originally started as a Processor at NAF but had switched five years ago because the sales team had so much control over the underwriting process that she moved over to become a Loan Officer.

324. This conversation occurred on or about November 29, 2016.

325. A third example of how management overrode underwriter decisionmaking involves NAF's condition approval policy.

326. Under NAF's condition approval policy, an underwriter conducts an initial review of all loans, and approve a subset of loans for government insurance with "conditions."

327.    These conditions—which relate to all aspects of the loans, including the borrower's income, assets and credit—must be satisfied before the loans can close and be endorsed for government insurance consistent with the Government Programs' underwriting rules.

328.    A "condition" is a government requirement for a loan to be approved, and if the condition is not met, the file cannot be approved.

329.    Because a condition represents a government requirement for the file to be approved, the review and decision on whether a condition is met must be made by the CHUMS or SAR underwriter herself, and not by other employees.

330.    NAF allowed Processing Managers to approve the files by removing the conditions, instead of that review being performed by properly certified (e.g., CHUMS or SAR) underwriters.

331.    These individuals lack the qualifications necessary to be underwriters on government loans.

332.    Moreover, because their performance was measured based on the number of loans approved, their financial incentive is to have the file approved, not to have the file underwritten correctly.

333.    Additionally, the policy also allowed the non-qualified approved employees to "move" a condition to post-close, whereby the loan would be funded and closed without having anyone approving the condition.

334.    Thus, despite what NAF government, NAF empowered non-qualified employees to approve government loans whenever there was a "condition" on that file, cutting the government-approved underwriters out of the process.

335.    For example, Relator had a conversation with a Barbara, an experienced underwriter, in which Barbara stated that conditions are normally moved by Kevin English even though the conditions were not satisfied.

336.    Barbara said it is very difficult to see in the system when this happened, but that it happened frequently under the NAF condition approval policy.

337.    This conversation occurred in late September 2016.

338.    This management override policy was nationwide in scope.

339.    Relator worked with NAF's locations in multiple states around the country, and the same management override policy covered the various offices and was implemented at each.

340.    In addition, other underwriters and processors around the country witnessed similar instances in which NAF improperly waived conditions or made management exceptions to files.

341.    For example, an underwriter who worked for NAF in its Irvine, California, Riverside, California branches and as a remote underwriter, was told by her manager, Lorenda Lozano, in approximately 2015 or 2016 that "we don't need to get that" or that "we'll be okay without that" referring to how NAF did not obtain documents that were required conditions for FHA and VA loans.

342.    Additionally, this underwriter recalls that when documents were required as conditions for FHA and VA loans, such as verifications of rent, Ms. Lozano would refer to waiving the conditions as a "business decision" and would allow the loan to be closed despite the fact that not all the required documents had been obtained.

343.    As another example, when a processor who worked at the Tustin, California headquarters told the loan officers that their files could not be approved with the income that had been used, the loan officers would complain to the sales managers to get the sales managers to waive the conditions that had been set by the underwriting team.

344.    For example, the processor witnessed a situation in which the loan officer had impermissibly used social security income for a son whose father was deceased even though the son was more than eighteen years old.

345.    After telling the loan officer that the social security income could not be used, the loan officer complained to the processor and lobbied to have the manager allow the social security income to be used for purposes of income.

346.    This same processor also witnessed her processing managers, Kevin English and Natalie Welch, frequently waiving conditions on files, especially towards the end of the month.

347.    Another processor who worked for NAF in Orange County, California, was also told by the processing manager, Natalie Welch, in approximately the second half of 2014 or first half of 2015, that she could "push" conditions by moving them to post-closing, or in some cases, waive them altogether.

348. The examples above describe just some of the ways NAF improperly had management override the Government Programs' underwriting requirements.

349. Consistent with the NAF's goals, NAF's subordination of underwriting management to the sales goals was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements yet still received government insurance.

350. Because of the management overrides, NAF succeeded in its goal of underwriting more guaranteed loans even though those loans did not qualify for insurance coverage.

351. Given that NAF knew, or should have known, NAF's subordination of underwriting management to the sales goals would result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, NAF's conduct was improper for a Government Lender.

***NAF Falsely Certified to the Government That It Was Performing Accurate Appraisals of Properties***

352. As described above, NAF's policies were designed to allow the underwriting of loans that did not comply with the Government Programs' requirements.

353. However, as described above, NAF wanted even non-compliant loans to appear to meet some basic requirements of income, credit and assets so that it was less likely that the bad loans would be discovered.

354. One of the ways to do this was falsely inflate the value of the collateral which NAF did through a value appeal process.

355. FHA regulations require that a Mortgagee prohibit "any person who is compensated on a commission basis upon the successful completion of a Mortgage…from ordering or managing an appraisal assignment." HUD Handbook 4000.1, II.A.1.a.iii.A.6.d.

356. The main purpose of this regulation is to make sure that employees ordering or managing appraisals are not being incentivized to have appraisals come at higher than market values to allow a loan to be approved.

357. The person ordering or managing an appraisal has both overt and subtle pressure on the person offering the appraisal findings, and such pressure is so hard to detect, that the government

-38-

requires that mortgagees, such as NAF, cannot have a person both ordering a mortgage, or managing its assignment, and then profiting off of the results of an appraisal outcome.

358.   In addition, the mortgagee must "have the property appraised in accordance with [the] standards and requirements" prescribed by HUD. Id. at § 203.5(e).

359.   A mortgagee must also ensure that it does not:

    a.   withhold or threaten to withhold timely payment or partial payment for an appraisal report;

    b.   condition the ordering of an appraisal report or the payment of an appraisal fee, salary, or bonus on the opinion, conclusion or valuation to be reached, or on a preliminary value estimate requested from an Appraiser;

    c.   order, obtain, use, or pay for a second or subsequent appraisal or Automated Valuation Model (AVM) in connection with a Mortgage financing transaction unless:

        1.   there is a reasonable basis to believe that the initial appraisal was flawed or tainted and such belief is clearly and appropriately noted in the mortgage file; or

        2.   such appraisal or AVM was completed pursuant to written, pre-established bona fide pre- or post-Disbursement appraisal review or quality control process or underwriting guidelines and the Mortgagee adheres to a policy of selecting the most reliable appraisal, rather than the appraisal that states the highest value;

    d.   withhold or threaten to withhold future business from an Appraiser, or demote or terminate or threaten to demote or terminate an Appraiser in order to influence an Appraiser to arrive at a predetermined or desired value;

    e.   make expressed or implied promises of future business, promotions or increased compensation for an Appraiser in order to influence an Appraiser to arrive at a predetermined or desired value;

    f.   request that an Appraiser provide an estimated, predetermined or desired valuation in an appraisal report prior to the completion of the appraisal report, or request that an Appraiser provide estimated values or comparable sales at any time prior to the Appraiser's completion of an appraisal report;

    g.   provide to the Appraiser an anticipated, estimated, encouraged or desired value for a subject Property or a proposed, or target amount to be loaned to the Borrower, except that a copy of the sales contract for purchase and any addendum must be provided; or

> h. perform any other act or practice that impairs or attempts to impair an Appraiser's independence, objectivity, or impartiality, or that violates any applicable law, regulation, or requirement.

4000.1 II.A.1.iii.(B)(6)(d).

360.  Additionally, a Government Lender "must accept responsibility, equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal." See HUD Mortgagee Letter 1994-54.

361.  The appraisal is important to the eligibility of the loan for government insurance because HUD places limits on the eligible loan amount based on the appraised value of the property.

362.  The maximum eligible loan amount is determined by HUD's loan-to-value limits, which compare the loan amount to the appraised value.

363.  This is one method by which HUD limits its exposure in the event of default.

364.  Even though NAF represented to the government that it was in compliance with these appraisal policies, NAFs appraisal policies were the reverse.

365.  NAF pressured appraisers with "value appeals" whereby they pressured the appraisers to come up with an inflated property value to enable the loan to go through.

366.  First, NAF policy was that the loan officer would contact the appraiser that was to perform the appraisal even though NAF was certifying to the government that loan officers played no role in the ordering or managing of appraisals.

367.  The loan officer was receiving a substantial commission if she could get the appraiser to appraise the property at a high enough number yet she was the one arranging for the appraisal.

368.  Second, at NAF, the scheduling of the appraisal was made visible to the loan officer so that the loan officer could be the property at the same time the appraiser was there.

369.  In September, October and November of 2016 Relator heard comments from loan officers that they had been at the property while the appraiser was performing the inspection to help get a good value for the property.

370.  Third, the loan officers made clear internally as well as to the appraisers that they would only use appraisers who would come in with numbers at the level they had set for the value appeal.

371.   When appraisers did not do so, the loan officers would record comments such as "please use a different appraiser" or "appraiser comes in too low" when the appraiser in question did not come in at the number the loan officer wanted.

372.   These comments were recorded in the vendor internal website, which was the company that selected which appraisers should appraise NAF properties.

373.   These comments would steer business away from appraisers who attempted to not simply give in to NAF's "value appeals."

374.   Additionally, NAF had only two appraiser vending companies so that it made the potential pool of appraisers small, and allowed Loan Officers to exercise great control by weeding out the appraisers who did not give in to the value appeals.

375.   For example, Relator remembers Loretta Bonander and Grace Olivetti, both loan officer assistants, recoding such comments on behalf of their loan officers on or about September to November 2016.

376.   Further, if a loan officer did not like the appraisal number, he would have NAF personnel get in contact with the appraiser and demand to know why there was such a low value.

377.   Relator remembers seeing comments in files such as "ask appraiser to explain low value."

378.   These comments were made by Loan Officer Assistants on numerous files.

379.   Fourth, during all these appraisals, NAF underwriters had limited involvement in any ordering or managing of the appraisals; the process was left almost entirely to loan officers and their assistants.

380.   The examples above describe just some of the ways NAF improperly secured appraisals through "value appeals."

381.   Consistent with the NAF's goals, NAF's use of value appeals was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements yet still received government insurance.

382.    Given that NAF knew, or should have known, NAF's use of value appeals would result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, NAF's conduct was improper for a Government Lender.

***NAF falsely represented to the government that it was not manipulating variables in the AUS/Total system in order to endorse FHA loans for unqualified buyers.***

383.    As part of its scheme to approve every government loan that it was presented, NAF instructed employees to systemically manipulate the data that was entered into NAF's AUS system to determine variables that would lead to an approval.

384.    TOTAL rates loans as either "accept/approve" or "refer" based on data points that NAF enters into its AUS, including, for example, the dollar value of the borrowers' income and assets.

385.    Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer" rating.

386.    Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating.

387.    As discussed above, loans that receive an "Accept/Approve" rating in the AUS system are subject to significantly less documentation requirements and scrutiny than loans that receive a "Refer" rating and must be manually underwritten.

388.    In order to avoid additional documentation and loan scrutiny that "Refer" ratings require, NAF schemed to defraud the government by predetermining data variables that would result in an "Accept/Approve" rating.

389.    When an NAF employee initially ran a loan through NAF's AUS, he or she would enter variable amounts consistent with the borrower's representations and/or the documents in the loan file.

390.    However, if a loan received a "Refer" rating, NAF employees would isolate one or more variables, including most commonly the borrower's income or monthly debt obligations.

391.   NAF employees would then systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "Accept/Approve" rating.

392.   As made clear by the HUD Handbook 4000.1, "[i]f a determination is made that the Mortgage must be downgraded to manual underwriting, the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage." HUD Handbook 4000.1, II.A.4. II.A.4(B)vi.

393.   Similarly, lenders are not to "willfully manipulat[e] the application variables . . . to obtain an accept/approve risk classification." HUD Mortgagee Letter 2005-15; HUD Handbook 4000.1, II.A.4. II.A.4(B)iv; HUD Handbook 4155.1, 16.A.c.

394.   The prohibition on entering unsubstantiated data points into an AUS exists, among other reasons, to protect against fraud.

395.   Additionally, non-underwriters, such as loan officers, are not supposed to be using the AUS system.

396.   The purpose of the system is to allow underwriters determine whether they need to manually underwrite a loan or not.

397.   The AUS is not to be used by sales people to manipulate fake variables in attempt to figure out how to get an "approve" score from the system.

398.   For instance, if a Government Lender entered factually unsupported income or asset amounts into an AUS—and thereby determined the precise amount of income or assets necessary to obtain an "accept/approve" rating from the AUS, the lender could falsify loan documents to state that the borrower possesses the required amount of income or assets.

399.   That is why the regulations require that a Government Lender's employees to cease using the system as soon as the result is a "refer."

400.   Here, Relator witnessed on numerous occasions loan officers would start manipulating data in the AUS system after the loan file got received a "refer."

401.   As just one example, in second week of November 2016 on NAF's internal File No. 120016109350, an FHA file, the AUS was run 22 times after a Decline so that the Loan Officer

Travis Dungca could reverse engineer and find out what data needed be made up to get an approval using incorrect asset information to get the file approved.

402.    Mr. Dungca used the incorrect information to get the file approved.

403.    Consistent with the NAF's goals, NAF's subordination of underwriting management to the sales goals was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the government's requirements yet still received government insurance.

404.    Given that NAF knew, or should have known, NAF's subordination of underwriting management to the sales goals would result in the endorsement of non-qualified applicants, regardless of the regulations' requirements, Defendants' conduct was improper for a Government Lender.

*NAF Improperly Inflated Borrowers' Income Using Unallowable Exceptions to Income Calculations*

405.    NAF falsely certified to the government that it was properly calculating borrowers' income in determining whether to approve a governmental loan even though it knew it was not doing so.

406.    NAF's policy of improperly calculating a borrower's income manifested itself in a variety of methods, some examples of which include not properly averaging a borrower's bonus and overtime earnings over the required regulatory time period in order to inflate a borrower's income.

407.    NAF's policy of improperly calculating borrowers' income was directed towards real estate transactions that occurred in this district, affected real estate transactions in this district, and was also applied nationally in scope.

408.    Given the significance of a borrower's income to the borrower's ability to make continued payments on a loan, the Government Programs' guidelines set strict standards for the proper calculations of income to be made.

409.    For example, under HUD Handbook 4000.1 II.A.4.c.v.B, a lender may only use a borrower's overtime and bonus income if the borrower has received that income for the past two years and it is reasonably likely to continue.

410.    Furthermore, under HUD Handbook 4000.1 II.A.4.c.v.C, for borrowers with overtime or bonus income, the lender must average the income earned over the previous two years.

411.    Under the HUD regulations, the lender must establish that the overtime and bonus income are likely to continue. See HUD Handbook 4000.1, II.A.4.c.v.B; see also HUD Handbook 4155.1, 4.D.2.b.

412.    Similarly, under the VA's relevant regulations, income from overtime and bonuses can only be used unless it has continued and verified for at least two years, must be regular and predictable, and must be reasonably likely to continue in the foreseeable future. VA Pamphlet 26-7, Chpt. 4, 2.h.

413.    Despite these requirements, NAF routinely used impermissible income calculations related to bonuses and overtime.

414.    For example, instead of using the borrower's income calculation for the previous two years, NAF routinely would extrapolate the borrower's income for the following two years based on their current earnings.

415.    In other words, instead of using a two-year history of the borrower's income, NAF used the borrower's present earnings as their "historical" earnings.

416.    Relator recalls that her manager Kevin English told underwriters in emails that they should use the borrower's "rolling 24 month" income, which meant that employees should use only the borrower's present income in projecting out the borrower's income for the following two years.

417.    Additionally, Relator recalls that NAF would use the historical earnings, overtime, and year-end bonuses for tomato pickers in California.

418.    Due to the climate in California, the earnings (including year-end bonuses) of the tomato pickers in California would fluctuate greatly.

419.    Despite these fluctuations that made the income unpredictable, Kevin English instructed NAF's underwriting staff to use the "rolling 24 month" income and treat the borrowers' income as if it would be consistently earned from year to year.

420.   As another example, Relator recalls a situation in which a borrower who was a bank teller making $24,000 per year was promoted to management and earned a $98,000 bonus as part of the promotion.

421.   For this loan, the loan officer wanted to impermissibly factor in the one-time bonus as part of the borrower's earnings.

422.   However, since the bonus was a one-time promotion bonus, it could not be included in calculating the borrower's income as it was unlikely to, and in fact would not, continue.

423.   Despite this prohibition, NAF used the bonus as part of a "rolling 24 month" income by averaging it over two years, despite the baseline requirement that the bonus be likely to continue in the future.

424.   In other situations, NAF would also impermissibly use bonuses that had not yet been earned to inflate the borrowers' income.

425.   For example, if a borrower did not qualify, but they were supposed to be getting a bonus soon, the loan officer would see if the loan would be approved by running the loan including the yet-to-be earned bonus.

426.   If the bonus was enough to get the borrower to qualify, the loan would be approved even though the money from the future bonus was not actually there.

427.   Relator is aware that NAF regularly submitted loans to the Government Programs despite such loans non-compliance with the income-related regulations listed above.

***NAF deliberately excluded debt obligations in order to obtain approvals***

428.   NAF also falsely certified to the Government Programs that borrowers' debt obligations were within the ratios allowed by the government in order to obtain approvals by deliberately excluding certain debts of borrowers.

429.   For example, under the FHA's applicable governmental regulations, a borrower's total debt-to-income ratio may not exceed 43% and the payment-to-income ratio may not exceed 31%. See HUD Handbook 4155.2, 4.C.3.c; HUD Handbook 4000.1 II.A.5.d.viii.

430.   Additionally, under the VA's applicable regulations, a borrower's total debt-to-income ratio may not exceed 41%. VA Pamphlet 26-7, Chpt. 4, 10.b.

-46-

431.   NAF's policy of excluding documentation of borrowers' assets and down payments was done in a number of ways including improperly excluding certain debts and contingent liabilities of borrowers.

432.   NAF's policy to approve ineligible government loans approved was directed towards real estate transactions that occurred in this district, affected real estate transactions in this district, and was also applied nationally in scope.

433.   Under HUD Handbook 4000.1, II.A.4.b.iv.A, in calculating the DTI ratio, the borrower must include all applicable monthly liabilities in determining the borrower's debt obligations unless such debts will be paid off within ten months and the cumulative payment of such debts is less than or equal to 5 percent of the borrower's monthly gross income.

434.   Similarly, under the relevant VA regulations, debts and obligations must be deducted from the effective income when those debt obligations have a remaining term of 10 months or more, or where any debt obligations of less than ten months would cause a severe impact on a family's resources for a period of time. *See* VA Pamphlet 26-7, Chpt. 4, 5.c.

435.   Under HUD Handbook 4000.1, II.A.4.b.iv(A), in calculating the DTI ratio, the borrower must include all applicable monthly liabilities in determining the borrower's debt obligations unless such debts will be paid off within ten months and the cumulative payment of such debts is less than or equal to 5 percent of the borrower's monthly gross income.

436.   Similarly, under the relevant VA regulations, debts and obligations must be deducted from the effective income when those debt obligations have a remaining term of 10 months or more, or where any debt obligations of less than ten months would cause a severe impact on a family's resources for a period of time. See VA Pamphlet 26-7, Chpt. 4, 5.c.

437.   Despite these regulations, NAF impermissibly waived debt obligations that were required to be calculated in the debt-to-income ratios for government loans.

438.   As just one example, for NAF's internal file 137316088706, Relator ran a soft credit report through Equifax shortly before the loan was set to close.

-47-

439.   When Relator reviewed the report, the credit report showed that the borrower had credit card debts, a new personal loan (which were previous credit card debts), had refinanced her car, and had a timeshare.

440.   As a result of these debts, the borrower's debt-to-income ratio was above the permissible amount.

441.   Despite the fact that the borrower's total monthly debt obligations had increased by more than $100 per month, NAF did not re-submit the loan for evaluation in the AUS.

442.   If NAF had properly run the loan through AUS including the debts, the loan would have otherwise been rejected because it exceeded the maximum allowable debt-to-income ratios.

443.   Due to these undisclosed debts, Relator called her manager Joseph Garcia and told him about the undisclosed debts that required re-running the AUS system.

444.   Ultimately, Relator is aware that the loan still closed on or about September 6, 2016 despite NAF never properly including the debt in the borrower's debt-to-income analysis.

445.   As another form of improperly excluding certain debts, NAF also excluded debts from the calculation of the debt-to-income ratio on the basis that such debts that were excludable contingent liabilities.

446.   A contingent liability refers to a liability that may result in the obligation to repay only when a specific event occurs.

447.   For example, a contingent liability exists when an individual can be held responsible for the repayment of a debt if another legally obligated party defaults on the payment.

448.   Government Lenders may exclude contingent liabilities only in limited circumstances.

449.   For example, if a Government Lender does not wish to include the cosigned liability in the calculation of a monthly obligation, the Government Lender must obtain documentation to evidence that the other party to the debt has been making regular on-time payments during the previous 12 months, and does not have a history of delinquent payments on the loan. HUD Handbook 4000.1 II.A.4.L.4.b.

450.   Evidence that the other party on a debt has been making regular on-time payments would require documentation such as twelve months of cancelled checks.

451.     Similarly, under the relevant VA regulations, a Government Lender may exclude the contingent liability from the calculation of the net effective income calculation if: (1) there is evidence of loan payments being made by someone else, and (2) there is no reason to believe that the borrower will have to participate in the repayment of the other loan. VA Pamphlet 26-7, Chpt. 4, 5.d.

452.     Despite the above regulations, NAF falsely certified on FHA Loan No. 198-05858356-703 that the borrower met the Government Programs' requirements by failing to include a contingent debt obligation.

453.     On this file, Relator's underwriting review revealed that the borrower had an undisclosed debt for a vehicle.

454.     Although the vehicle debt did not show up on the soft credit report, the borrower's bank statements showed recurring monthly payments which Relator determined were for car payments.

455.     Further investigation by NAF revealed that the borrower stated that the debt was not their own and instead was because the borrower's had co-signed on their son's car loan.

456.     Despite the above-cited regulations that NAF would be required to obtain twelve months of cancelled checks from the borrower's son to show that he was the party making timely payments on the car loan in order to exclude such debt from the debt-to-income ratio calculation, NAF excluded the debt despite the regulations to the contrary.

457.     Specifically, manager Kevin English stated that the debt could be waived because the borrower's said the debt was not theirs, and the debt had not showed up on the credit report.

458.     However, Relator is aware that NAF's post-closing review of the file indicated that the borrowers were listed on their son's car loan, and therefore it was a contingent liability.

459.     This loan closed on or about September 24, 2016.

460.     As another example of improperly excluding required debt obligations, NAF excluded debts where the borrower had unpaid income taxes that were required to be included in the calculation of the borrower's debt-to-income ratio.

461.     Under HUD Handbook 4000.1, II.A.4.D.2, a Government Lender must include any debts owed to the federal government.

462.     Despite this requirement, on FHA File No. 1198-0870544-734, NAF did not include the borrower's unpaid income taxes in the calculation of the borrower's debt-to-income ratio.

463.     Furthermore, the borrower had no payment agreement with the IRS for the payment of such a debt.

464.     This loan closed on or about October 22, 2016.

465.     Relator is aware that NAF regularly submitted loans to the Government Programs despite such loans non-compliance with the debt obligation regulations listed above.

***NAF Falsely Certified to the Government That it Maintained a Sufficient Quality Control Process***

466.     NAF falsely certified to the government that it was following audit findings and adopting proper quality control mechanisms, even though NAF knew that it was hiding and destroying such documents.

467.     NAF's policy of failing to follow audit findings and failing to adopt proper quality control mechanisms was directed towards real estate transactions that occurred in this district, affected real estate transactions in this district, and was also applied nationally in scope.

468.     The government requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions."  HUD Handbook 4060.1, REV-2, ch. 7-3.B; see also HUD Handbook 4700.2, REV-1, ch. 6-1.A.

469.     The quality control program must be designed to meet the goals of assuring compliance with the government's requirements, protecting the government from unacceptable risk, guarding against errors, omissions and fraud, and assuring swift and appropriate corrective action.   HUD Handbook 4060.1, REV-2, ch. 7-2.

470.     The quality control program also must review a sample of all closed loan files to ensure they were underwritten in accordance with the government's guidelines.   HUD Handbook 4060.l, REV-2, ch. 7-6.C; see also HUD Handbook 4700.2, REV-1, ch. 6-1.D.

471.     When a lender reviews a loan file for quality control, the lender must, among other things, review and confirm specific pieces of information.

472.     For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not

limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.; see also HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

473. If the lender finds discrepancies, it must explore them to ensure that there are no deficiencies.

474. "Any discrepancies must be explored to ensure that the original documents . . . were completed before being signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

475. At the end of the quality control review, the lender is expected to assess the significance of any deficiencies.

476. While NAF did maintain a basic quality control system, the system failed to comply with the government's basic quality control obligations, including the obligation to address serious quality control problems and to take steps to prevent mortgage fraud.

477. For example, a Quality Control Auditor that worked at the Tustin, California headquarters witnessed multiple incidents in which NAF's quality control auditors identified fraud or other underwriting deficiencies, but NAF ignored the audit findings.

478. In auditing an FHA file in approximately 2015, the review of the file indicated that the borrower had child support income which was used to qualify the borrower's income.

479. However, the Quality Control Auditor's review indicated while that the file showed the child was 14, the child was in fact 19, and therefore the child support income could not be used to qualify the borrower.

480. When the Quality Control Auditor contacted the borrower as part of further determining how this loan had been approved, the Quality Control Auditor received information that led him to believe that the borrower had been told by NAF's mortgage loan officer to change the child's date of birth so that the child was younger than they actually were so child support payments could be included in the borrower's income.

481. On other loans, this same Quality Control Auditor also witnessed other government loans that had already been approved, despite deficiencies in the files such as where NAF had not

obtained proper bank statements, such as where the bank statements did not have the name of the bank account on them or where the number of deposits did not match up.

482. While the loans had these serious quality control issues, NAF's auditing department would ignore these problems and did not act to address these discrepancies and deficiencies.

483. When the Quality Control Auditor in Tustin raised these issues, he was told by Mike Clary, NAF's Head of Wholesale Lending that "we're going to do it this way," referring to the fact that NAF would ignore the audit results and act as if the loans did not have any deficiencies or work to crack down on fraud by its own employees.

484. Upon information and belief, NAF did not self-report these serious deficiencies that it found in its underwriting of government loans.

*Initial certifications to the government*

457. As set forth above, NAF submitted initial certifications to the government in order to participate in the government programs.

458. As part of these certifications, NAF certified that it would comply with all of the government's guidelines, regulations, and requirements for government insurance.

459. Specifically, NAF certified to HUD that it would comply with all of HUD's requirements and regulations, including FHA handbooks, mortgagee letters, and Title I letters and other HUD policies.

460. NAF also certified to the VA that it would not process loans that it did not itself intend to make, to ensure that all VA loans were reviewed by an approved underwriter, and that all of the borrower's credit information was correct.

461. Unless NAF had submitted a truthful initial certification to the government, NAF was not entitled to obtain or maintain its status as a Government Lender or to endorse loans for government insurance.

462. However, despite NAF certifying that it was providing the government compliant underwriting services, NAF had no intention of providing such services.

463. NAF also knowingly intended to endorse loans that fell below the government's requirements.

464.     Thus, when NAF stated in its initial certification that its operations would conform to governmental requirements, NAF knew this statement was false because NAF intended to endorse such deficient files.

465.     These representations on the initial certifications were designed by NAF to, and in fact cause, the government to extend government funded insurance coverage and pay insurance claims on non-conforming home loans.

466.     In submitting these initial certifications, NAF did not disclose their intended non-compliance with these important regulatory requirements which made NAF's certifications false statements.

***Annual certifications***

467.     As set forth above, NAF submitted an annual certification to HUD in every year that it was a member of the Direct Endorsement Lender Program.

468.     For fiscal years 2011-2016, NAF annually certified to the federal government that the operations of NAF had been, and were, in conformance with all applicable HUD-FHA regulations and handbooks.

469.     From the years 2016 to the present, NAF annually certified to the federal government that its operations and had been, and were, in conformance with HUD Handbook 4000.1 Sections I and V, and any agreements between NAF and the government.

470.     However, NAF was not in compliance with these HUD-FHA requirements in a number of ways.

471.     For example, NAF made false, specific representations about the quality of the services it was providing.

472.     NAF annually certified that it was providing the government compliant underwriting services when NAF knew it was not, and had no intention of providing such services.

473.     Among other things NAF knew this statement was false because NAF was improperly paying commissions to underwriting employees to approve ineligible loans for government insurance in violation of the prohibition on paying employees such a commission, overriding government-required conditions on files,  allowing sales employees who did not have the proper qualifications

required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes, even though NAF contracted not to engage in such conduct and the government regulations forbade NAF from engaging in such practices.

474. NAF was also not in compliance with all government requirements because NAF knowingly endorsed loans that fell below the government's requirements.

475. Some examples are set forth above include that NAF made improper calculations of borrowers' income in violation of the government's rules regarding overtime and bonus earnings and improperly excluded debt obligations to improperly lower borrowers' debt-to-income ratios.

476. Thus, when NAF stated in its annual certification that their operations conformed to governmental requirements, NAF knew this statement was false because NAF had (and intended to continue) to endorse such deficient files.

477. These representations on the annual certifications were designed by NAF to, and in fact cause, the government to extend government funded insurance coverage and pay insurance claims on non-conforming home loans.

478. In submitting these annual certifications, NAF did not disclose their non-compliance with these important regulatory requirements which made NAF's certifications false statements.

***Loan-Level Certifications***

479. As set forth above, for each loan NAF endorsed, NAF also certified that, as to the loan, was "no defect in connection with my approval of this mortgage," and also certified that, as to that loan, it was not the case that "the mortgage should not have been approved in accordance with FHA requirements." See Form HUD 92900-A.

480. Additionally, for each VA loan that NAF endorsed, NAF certified that "all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36."

481.    Although NAF, through its employees and agents, certified that the process to approve the loan had no defect, and was approved in accordance with the government's regulations, NAF knew that such certifications on these loans was not accurate.

482.    NAF submitted these false loan-level certifications on virtually every business day from 2011 to the present.

483.    Among other things, as discussed above, NAF knew this statement was false because NAF had a defective underwriting process in place for the approval of the mortgage and that the loan itself did not meet the government's requirements.

484.    In addition, as a result of NAF's scheme to push though unqualified loans, NAF endorsed loan files that did not qualify under the government's standards, some examples of which include improper calculations of borrowers' income in violation of the government's rules regarding overtime and commissions earnings and improper exclusion of borrower's debt obligations.

485.    Therefore, NAF's statement on the loan-level certification, that the loan met government requirements, was false.

486.    Among other things, NAF knew this statement was false because NAF knowingly submitted files that it knew violated the government's rules regarding overtime and bonus earnings and the calculation of borrower debt obligations.

487.    Despite NAF's representations that they endorsed loans that complied with the government's underwriting requirements, NAF knew they it was in fact delivering non-conforming loans to the government.

***Materiality***

488.    The false statements by defendants were material in inducing the government to extend insurance coverage to loans endorsed by NAF and to pay claims on government loans that had been endorsed by NAF.

*Initial Certifications to the Government*

489.    As set forth above, the purpose of the regulations, and the purpose of NAF's initial certifications that it was following the regulations, was to ensure that NAF's underwriting operations would meet acceptable underwriting standards for government-insured loans.

490.   A reasonable person would not have extended loan insurance on a loan file, and certainly not provided it at the lower rates offered in the government's underwriting program, if she knew that NAF would not follow the required underwriting process, such as by improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

491.   A reasonable person would not have allowed NAF to participate in the Government Programs if she knew that NAF was not following the required underwriting process to participate in the Government Programs, including important requirements such improperly paying commissions to underwriting employees, overriding government-required conditions on files,   allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

492.   NAF knew that the government attached importance to these initial certifications that NAF was in compliance with the regulations.

493.   Among other things, the government required NAF to initially certify its compliance with the HUD regulations and before allowing NAF to participate in the Government Programs.

494.   Further, the regulations define such violations as "material."

495.   The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and NAF: NAF would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to NAF's loans based on NAF's accurate representation that it had followed the requirements to endorse the loans, including not improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government

loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

496.    Therefore the government was expressly clear that a condition of extending insurance coverage to NAF's endorsed loans, and the government's ultimate payment on any losses was that NAF initially certify their compliance with the regulations, including not improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

497.    The government, in reliance on these false statements by NAF in their certifications to the government, extended government insurance coverage to the government home loans endorsed by NAF.

498.    The government extended that insurance based on NAF's certification that it was in compliance with all government regulations, including not improperly paying commissions to underwriting employees, overriding government-required conditions on files,   allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

499.    Without NAF's certifications, the government would not have allowed NAF to participate in the Government Programs, as NAF knew.

500.    As NAF also knew, the government had on numerous occasions commenced enforcement proceedings against mortgagees who fail to comply with the government regulations.

501.    Without NAF's certification, the government would not have extended insurance coverage to files endorsed by NAF, and certainly not at the rates guaranteed by the government.

502.     Without NAF's certification, the government would not have been liable for the insured losses on loans endorsed by NAF and covered by the government.

503.     Had NAF truthfully told the government that NAF would not be complying with the government regulations, and specifically the regulations relating to: improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain a proper quality control program, NAF would not have been allowed to endorse any loans for the FHA.

*Annual certifications*

504.     As set forth above, the purpose of the regulations, and the purpose of NAF's annual certification that it was following the regulations, was to ensure that NAF's underwriting operations met acceptable underwriting standards for government-insured loans.

505.     A reasonable person would not have extended loan insurance on a loan file, and certainly not provided it at the lower rates offered in the government's underwriting program, if she knew that NAF was not following the required underwriting process, such as by improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

506.     A reasonable person would not have allowed NAF to participate in the Government Programs if she knew that NAF was not following the required underwriting process to participate in the Government Programs, including important requirements such improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS,

inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

507.   NAF knew that the government attached importance to these annual certifications that NAF was in compliance with the regulations.

508.   Among other things, the government required these annual certifications before extending insurance coverage to NAF's endorsed loans, and before allowing NAF to participate in the Government Programs.

509.   Further, the regulations define such violations as "material."

510.   The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and NAF: NAF would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to NAF's loans based on NAF's accurate representation that it had followed the requirements to endorse the loans, including not improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

511.   Therefore the government was expressly clear that a condition of extending insurance coverage to NAF's endorsed loans, and the government's ultimate payment on any losses was that NAF annually certify their compliance with the regulations, including not improperly paying commissions to underwriting employees, overriding government-required conditions on files, allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

512.    The government, in reliance on these false statements by NAF in their certifications to the government, extended government insurance coverage to the government home loans endorsed by NAF.

513.    The government extended that insurance based on NAF's certification that it was in compliance with all government regulations, including not improperly paying commissions to underwriting employees, overriding government-required conditions on files,   allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and failing to maintain sufficient quality control processes.

514.    Without NAF's certifications, the government would not have allowed NAF to participate in the Government Programs, as NAF knew.

515.    As NAF also knew, the government has on numerous occasions commenced enforcement proceedings against mortgagees who fail to comply with the government regulations.

516.    Without NAF's certification, the government would not have extended insurance coverage to files endorsed by NAF, and certainly not at the rates guaranteed by the government.

517.    Without NAF's certification, the government would not have been liable for the insured losses on loans endorsed by NAF and covered by the government.

518.    Had NAF truthfully told the government that NAF was not in compliance with the government regulations, and specifically the regulations relating to: improperly paying commissions to underwriting employees, overriding government-required conditions on files,   allowing sales employees who did not have the proper qualifications required to decision government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appraisal scheme, and maintain a proper quality control program, NAF would not have been allowed to endorse any loans for the FHA.

*Loan-level certifications*

519.    As set forth above, the purpose of the regulations, and the purpose of NAF's certifications on each endorsed FHA loan files that there was "no defect in connection with [the]

1   approval of this mortgage," and that it had been "approved in accordance with FHA requirements,"
2   was to was to ensure that NAF was providing conforming FHA underwriting services to the
3   government.

4       520.    Similarly, the purpose of NAF's  certifications on each VA loan that it endorsed that
5   "all verifications of employment, deposit, and other income and credit verification documents have
6   been processed in compliance with 38 CFR part 36" and that the loan "meets the underwriting
7   standards recited in chapter 37 of title 38 United Sates Code and 38 CFR part 36" was to ensure that
8   NAF was providing conforming VA underwriting services to the government.

9       521.    A reasonable person would not have extended loan insurance, and certainly not
10  provided it at lower rates offered in the government programs, if she knew that there were defects in
11  regards to the underwriting process as it relates to the approval of the mortgage, and that the approval
12  had not been in accordance with the government's requirements, including defects such as ***.

13      522.    NAF knew that the government attached importance to these loan-level certifications
14  that there were no defects in regards to the approval of the mortgage and they had been approved in
15  accordance with the government's requirements.

16      523.    Among other things, the government required these certifications before extending
17  insurance coverage to NAF's endorsed loans.

18      524.    The entire purpose of compliance with the relevant government regulations was the
19  essence of the bargain between the government and NAF: NAF would only provide underwriting
20  services following the regulations, and only endorse loans that met the regulations' requirements, and
21  the government would only extend insurance to NAF's loans based on NAF's accurate representation
22  that it had followed the regulatory requirements in endorsing the loans, including not having defects
23  such as the improper calculation of borrower's income in violation of the government's rules
24  regarding overtime and bonus income and improperly excluding borrowers' debt obligations.

25      525.    Therefore the government was expressly clear that a condition of extending insurance
26  coverage to NAF's endorsed loans and ultimate payment on any losses was that NAF's loan
27  certifications that there were no defects in regards to the approval of the mortgage and it had been
28  approved in accordance with FHA requirements, including the improper calculation of borrower's

Case 2:19-cv-01630-PSG-JPR   Document 1   Filed 08/02/17   Page 62 of 70   Page ID #:62

income in violation of the government's rules regarding overtime and bonus income and improperly excluding borrowers' debt obligations.

526. The government, in reliance on these false statements by NAF in their certifications to the government, extended government insurance coverage to the government home loans endorsed by NAF.

527. The government extended that insurance based on NAF's loan-level certifications that were no defects in the underwriting process and that the loans had been approved in accordance with FHA requirements, including not having defects such as the improper calculation of borrower's income in violation of the government's rules regarding overtime and bonus income and improperly excluding borrowers' debt obligations.

528. Without NAF's loan-level certification, the government would not have extended insurance coverage to files endorsed by NAF, as NAF knew, and certainly not at the rates guaranteed by the government.

529. Without NAF's loan-level certification, as NAF knew, the government would not have been liable for the insured losses on loans endorsed by NAF and covered by the government.

530. Had NAF truthfully told the government that there were defects in regards to the approval of the mortgage and it had not been approved in accordance with FHA requirements, and specifically there were defects such as the improper calculation of borrower's income in violation of the government's rules regarding overtime and bonus income and improperly excluding borrowers' debt obligations, the government would not have insured NAF's endorsed loan files.

531. In addition, the purpose, as well as the actual outcome, of NAF's underwriting operations was to have NAF's employees endorse loans in which NAF knew the applicant fell below government's requirements for insuring the loans as described above.

532. This prohibited conduct therefore induced material false representations to the government as set forth above and NAF is independently liable for such materially false statements knowingly induced by their policies.

533. Additionally, the endorsement of unqualified borrowers also constituted a material false statement on the loan-level certifications.

-62-

534.   A reasonable person would not have extended loan insurance on an endorsed loan, and certainly not provided it at lower rates offered in the government home loan programs, if she knew that the borrower was not qualified for the loan as wrongly certified by the defendants.

535.   NAF knew that the government attached importance to these loan-level certifications that the loan files accurately reflected that the borrower was qualified for the mortgage.

536.   Without NAF's certification, the government would not have allowed NAF to participate in the Government Programs, as NAF knew.

537.   Among other things, the government required these certifications before extending insurance coverage to NAF's endorsed loans.

538.   The entire purpose of compliance with the relevant government regulations was the essence of the bargain between the government and NAF: NAF would only provide underwriting services following the regulations, and only endorse loans that met the regulations' requirements, and the government would only extend insurance to NAF's loans based on the Defendants' accurate representation that they had followed the regulatory requirements in endorsing the loans, including not having defects such as improper calculations of borrowers' income in violation of the government's rules regarding overtime and commissions earnings and improper calculation of borrowers' debt-to-income ratios by improperly excluding debt obligations.

539.   Therefore the government was expressly clear that a condition of extending insurance coverage to NAF's endorsed loans, and ultimate payment on any claims, was that NAF's loan-level certifications were accurate, and specifically that the applicant was qualified for the loan.

540.   The government, in reliance on these false statements by NAF in their loan-level certifications to the government, extended government insurance coverage to the government home loans endorsed by NAF.

541.   The government extended that insurance based on NAF's certification that the information provided about the applicant was accurate, and that the applicant met the government's criteria.

542. Without NAF's loan-level certification, the government would not have extended insurance coverage to files endorsed by NAF, as NAF knew, and certainly not at the rates charged by the government.

543. Without NAF's loan-level certification, the government would not have been liable for the insured losses on loans endorsed by NAF and covered by the government.

544. Had NAF truthfully told the government that the information in the file was not accurate, and that the applicant was not qualified, the government would not have insured NAF's endorsed loan files.

### Claims on the government

545. The False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

546. Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that: (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2)(A) (2010).

547. The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct qualifies as a "claim" under the False Claims Act. See *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

548. As set forth above, loans endorsed by the Defendants caused the government to sustain claims against it.

549. The damages sustained by the United States as a result claims on the government resulting from NAF's conduct takes two forms.

550. First, the United States has sustained losses in the form of "net losses" whereby the amount of proceeds received by the government from reselling the foreclosed properties, or from bundling the loans for sale to an investor, is deducted from the loan or claim amount.

551. Additionally, any costs associated with foreclosure, resale, or sale of the note, such as marketing expenses, real estate taxes, and maintenance costs, are added to the claim amount.

552. In other words, the loss to the government on the loans is adjusted for any proceeds received by the government from the sale of the foreclosed property, and for any costs associated with the disposition of the property.

553. Had NAF truthfully certified to the government that it was not in conformance with governmental underwriting requirements, the government would not have insured these loans and would not have been liable for claims arising from these improperly approved loans.

554. Similarly, had NAF not knowingly and falsely certified to the government that there was no defect in connection with the improperly approved mortgage, the government would not have insured any of it loans and would not have been liable for claims arising from these improperly approved loans.

555. Another independent way in which NAF triggered claims against the government was through the government payments of losses on any of NAF's loans.

556. Had NAF not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured any of NAF's loans and thus would not have been liable for claims arising from any of NAF's loans.

557.    Another independent way in which NAF triggered claims against the government was through the government subsidized insurance that the government provided to all of the loans endorsed by NAF, subsidized insurance which constitutes a "claim" under the FCA.

558.    Had NAF not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured NAF's loans and thus would have provided the government subsidized insurance to NAF's governmental loans.

559.    Similarly, had NAF not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured those loans and would not have been liable for claims arising from these improperly approved loans.

560.    Another independent way in which NAF triggered claims against the government was through the lower premium rates charged on NAF's loans.

561.    The premium rates charged by the government are premised on mortgagees only endorsing loans that meet governmental requirements.

562.    Had NAF not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have insured NAF's loans at the rates it did.

563.    Similarly, had NAF not knowingly and falsely certified to the government that there was no defect in connection with improperly approved mortgages, the government would not have insured NAF's loans at the rates it did.

564.    Thus, NAF triggered a claim against the government by having its loans insured at lower premium rates than was justified.

565.    Another independent way in which NAF triggered claims against the government was through the additional administrative costs to the government on loans that had been endorsed by NAF.

566.    Had NAF not knowingly and falsely certified to the government that it was in conformance with governmental underwriting requirements, the government would not have borne the additional administrative costs from servicing and supporting NAF's loans.

**FIRST CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(A)**
**Causing False Claims**

567.    The United States repeats and realleges the allegations above as if fully set forth herein.

568.    The Government seeks relief against NAF under 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act.

569.    As set forth above, NAF knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented, to an officer or employee of the Government, false and fraudulent claims for payment or approval in connection with its endorsement of government-insured mortgages.

570.    The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by NAF because of NAF's wrongful conduct.

571.    By reason of the false claims of NAF, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

**SECOND CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(B)**
**Use of False Statements**

572.    The United States repeats and realleges the allegations above as if fully set forth herein.

573.    The Government seeks relief against NAF under 31 U.S.C. § 3729(a)(1)(B) of the False Claims Act.

574.    As set forth above, NAF knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, made, used, or caused to be made or used, false records and/or

statements material to false or fraudulent claims in connection with NAF's endorsement of government-insured mortgages.

575.    The Government paid insurance claims, and incurred losses, related to government-insured mortgages wrongfully endorsed by NAF because of NAF's wrongful conduct.

576.    By reason of the false claims of NAF, the Government has been damaged in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by law for each false statement.

**THIRD CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(G)**
**Reverse False Claims**

577.    United States repeats and realleges the allegations above as if fully set forth herein.

578.    The Government seeks relief against NAF under 31 U.S.C. § 3729(a)(1)(G) of the False Claims Act.

579.    As set forth above, NAF knowingly made, used or caused to be made or used false records and/or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

580.    The Government paid insurance claims, and incurred losses, relating to government-insured mortgages wrongfully endorsed by NAF because of NAF's wrongful conduct.

581.    By virtue of the false records or statements made by NAF, the Government suffered damages in a substantial amount to be determined at trial, and is entitled to a civil penalty as required by each false statement.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

    a.    A judgment against NAF in an amount equal to three times the amount of damages the United States has sustained as a result of NAF's violations of the False Claims Act;

    b.    A judgment against NAF for a civil penalty of $11,000 for each of Defendant's violations of the False Claims Act;

    c.    That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.    That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.    That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f.    That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g.    That a trial by jury be held on all issues so triable;

h.    An award of pre-judgment interest; and

i.    Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

1       **PLAINTIFF DEMANDS A JURY TRIAL.**

2

3       Dated: July 31 , 2017

4
                                              **THOMAS & SOLOMON LLP**
5
                                      By:
6                                             J.    Nelson Thomas, Esq. (to be
                                              admitted *pro hac vice*)
7                                             Michael  J.  Lingle,  Esq.  (to  be
                                              admitted *pro hac vice*)
8                                             Jonathan W. Ferris (to be admitted
                                              *pro hac vice*)
9                                             Annette M. Gifford (270777)

10                                            *Attorneys for Relator*
                                              693 East Ave
11                                            Rochester, New York 14607
                                              Telephone: (585) 272-0540
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28