**CUTTER LAW PC**
C. Brooks Cutter, SBN 121407
John R. Parker, Jr., SBN 257761
401 Watt Avenue
Sacramento, CA 95864
Telephone:  (916) 290-9400
Emails:  bcutter@cutterlaw.com
           jparker@cutterlaw.com

**GRANT & EISENHOFER P.A.**
Kyle J. McGee, *Pro Hac Vice*
Laina M. Herbert, *Pro Hac Vice*
123 Justison Street
Wilmington, DE  19801
Telephone:  (302) 622-7000
Emails:  kmcgee@gelaw.com
           lherbert@gelaw.com

**THOMAS & SOLOMON LLP**
J. Nelson Thomas
Jonathan W. Ferris
Michael J. Lingle
Annette M. Gifford (CA Bar 270777)
693 East Avenue
Rochester, New York 14607
Tel.:  (585) 272-0540
nthomas@theemploymentattorneys.com
jferris@theemploymentattorneys.com
mlingle@theemploymentattorneys.com
amgifford@gmail.com

*Attorneys for Relator Malou Tutanes-Luster*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. MALOU TUTANES-LUSTER, <br><br> Plaintiff, <br><br> v. <br><br> BROKER SOLUTIONS, INC. d/b/a NEW AMERICAN FUNDING, <br><br> Defendant. | Case No. 3:17-cv-04384 (JST) <br><br> **RELATOR'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** <br><br> Date:   February 14, 2019 <br> Time:   2:00 p.m. <br> Courtroom:  9 <br> District Judge:  Jon S. Tigar |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................II

INTRODUCTORY STATEMENT........................................................................................1

FACTUAL BACKGROUND ................................................................................................2

ARGUMENT .........................................................................................................................5

I.       LEGAL STANDARD. ..............................................................................................5

II.     THE COMPLAINT ADEQUATELY ALLEGES FALSE CLAIMS......................................6

        A.     The Complaint Asserts A Promissory Fraud Theory Of FCA Liability. ....................................................................................................6

        B.     The Complaint Adequately Alleges Promissory Fraud................................9

III.    THE COMPLAINT ADEQUATELY ALLEGES MATERIALITY....................................11

IV.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER. ...........................................15

        A.     NAF Knew Or Recklessly Disregarded That Its Certifications Were False..........................................................................................................15

        B.     NAF Knew Or Recklessly Disregarded That The Requirements It Violated Were Material. .........................................................................18

V.     THE COMPLAINT SATISFIES RULE 9(B)..........................................................19

VI.    THE COMPLAINT ADEQUATELY ALLEGES NAF'S PROMISSORY FRAUD ON THE VA. ......................................................................................................25

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................5

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................5

*Ebeid ex rel. United States v. Lungwitz,*
  616 F.3d 993 (9th Cir. 2010) ..............................................................6, 11, 12, 25

*United States ex rel. Calderon v. Carrington Mortgage Services. LLC,*
  2018 WL 372348 (S.D. Ind. Jan. 10, 2018) ................................................10

*United States ex rel. Campie v. Gilead Sciences, Inc.,*
  862 F.3d 890 (9th Cir. 2017) .....................................................................7, 9, 11

*Cooper v. Pickett,*
  137 F.3d 616 (9th Cir. 1997) ....................................................................12, 25

*United States ex rel. Fisher v. Ocwen Loan Servicing, LLC,*
  2016 WL 2992229 (E.D. Tex. May 24, 2016) ............................................10

*United States ex rel. Hagood v. Sonoma County Water Agency,*
  929 F.2d 1416 (9th Cir. 1991) ....................................................................7

*United States ex rel. Hendow v. University of Phoenix,*
  461 F.3d 1161 (9th Cir. 2006) ............................................................7, 8, 9, 11, 25

*United States ex rel. Main v. Oakland City University,*
  426 F.3d 914 (7th Cir. 2005) ......................................................................8

*United States ex rel. Rose v. Stephens Institute,*
  909 F.3d 1012 (9th Cir. 2018) ................................................................8, 13, 19

*Siebert v. Gene Security Network, Inc.,*
  2013 WL 3052882 (N.D. Cal. June 17, 2013) (Tigar, J.) ............................5, 6

*United States ex rel. Silingo v. WellPoint, Inc.,*
  904 F.3d 667 (9th Cir. 2018) ............................................................... *passim*

*Swartz v. KPMG LLP,*
  476 F.3d 756 (9th Cir. 2007) ....................................................................6, 19

*United States ex rel. Thrower v. Academy Mortgage Corp.,*
  No. 3:16-cv-2120-EMC, 2018 WL 4053484 (N.D. Cal. Aug. 24, 2018).......................... *passim*

*United States v. Academy Mortgage Corp.*,
    2018 WL 4852377 (N.D. Cal. Oct. 3, 2018) ..........................................................8, 9

*United States v. Academy Mortgage Corp.*,
    2018 WL 6592782 (N.D. Cal. Dec. 14, 2018) ......................................................9, 11

*United States v. Americus Mortgage Corp.*,
    2013 WL 4829271 (S.D. Tex. Sept. 10, 2013).............................................10, 23, 25

*United States v. Americus Mortgage Corp.*,
    2014 WL 4274279 (S.D. Tex. Aug. 29, 2014) ..........................................................12

*United States v. Miller*,
    645 F.2d 473 (5th Cir. 1981) ...................................................................................24

*United States v. Movtady*,
    13 F. Supp. 3d 325 (S.D.N.Y. 2014) .......................................................................10

*United States v. Quicken Loans, Inc.*,
    239 F. Supp. 3d 1014 (E.D. Mich. Mar. 9, 2017)................................................ *passim*

*United States v. Reunion Mortgage, Inc.*,
    2013 WL 5944252 (N.D. Cal. Nov. 5, 2013) ..........................................................11

*United States v. Safran Group, S.A.*,
    2017 U.S. Dist. LEXIS 8408 (N.D. Cal. Jan. 19, 2017)......................................12, 13

*United States v. Spicer*,
    57 F.3d 1152 (D.C. Cir. 1995)...................................................................................12

*United States v. TXL Mortgage Corp.*,
    2016 WL 5108019 (D. D.C. Sept. 20, 2016) ...........................................................12

*United States v. Veneziale*,
    268 F.2d 504 (3d Cir. 1959) .....................................................................................10

*United States v. Wells Fargo Bank, N.A.*,
    972 F. Supp. 2d 593 (S.D.N.Y. 2013) .............................................10, 12, 18, 23, 25

**Statutes and Rules**

Federal Rule of Civil Procedure 9(b) ................................................................ *passim*

Federal Rule of Civil Procedure 12(b)(6).............................................................5, 6

31 U.S.C. § 3729(a) .....................................................................................................6

31 U.S.C. § 3729(b).....................................................................................................16

**INTRODUCTORY STATEMENT**

Defendant Broker Solutions, Inc. d/b/a New American Funding's ("Defendant" or "NAF") motion to dismiss runs directly counter to well-established False Claims Act ("FCA") jurisprudence in the Ninth Circuit and beyond.   Relator alleges that NAF, a certified Federal Housing Administration ("FHA") Direct Endorsement ("DE Program") lender and Veteran Affairs Home Loan Guaranty Program ("VA Program") lender permitted to underwrite and endorse eligible residential mortgages for government insurance, has systematically defrauded the U.S. Department of Housing and Urban Development ("HUD") and Department of Veteran Affairs ("VA") by knowingly or recklessly violating numerous mandatory, material certifications it made to those agencies.   NAF seeks dismissal on the basis that Relator purportedly fails to specify any "actual claims for payment" NAF submitted to the government.   Def. Br. at 1.   But controlling law makes unmistakably clear that NAF's alleged conduct gives rise to promissory fraud liability under the FCA.

Indeed, this identical argument, responding to substantially similar allegations of misconduct in the government-backed mortgage industry, was very recently rejected by Judge Edward M. Chen in *United States ex rel. Thrower v. Academy Mortgage Corp.*, No. 3:16-cv-2120-EMC, 2018 WL 4053484 (N.D. Cal. Aug. 24, 2018)—in fact, the very same arguments rejected in that case are recycled here, often directly copied and pasted from Academy Mortgage's motion, by NAF.[1]   NAF makes no attempt to distinguish Judge Chen's reasoning in *Thrower*, nor does it even acknowledge the opinion rejecting the motion to dismiss.   NAF's motion relies on little more than mischaracterizations of fact and erroneous statements (and telling omissions) of controlling law.

Relator has plausibly alleged that NAF has, since at least 2011, engaged in egregiously fraudulent misconduct in originating and endorsing government-insured mortgage loans and falsely certifying its compliance with specific, material HUD and VA requirements.   NAF certified its compliance with specific government requirements (including the National Housing Act, HUD

---

[1] Academy Mortgage, the defendant in *Thrower*, is represented by the same counsel representing NAF in this litigation.

regulations, HUD-FHA handbooks, mortgagee letters, Title I letters and policies, and VA handbooks, pamphlets, and regulations) in applying for approval as a DE Program and VA Program lender, in annually recertifying its compliance with those regulations, and in submitting each individual endorsed loan for government insurance.  As a result, *every* loan endorsement under these programs is a fraudulently obtained extension of a government benefit, and accordingly, *each claim* made to the government on any loan endorsed under NAF's fraudulent certification is tainted, constituting a separate false claim under the FCA.  This is a classic case of promissory fraud.  NAF's motion should be denied.

## FACTUAL BACKGROUND

Under the DE and VA Programs, the government permits approved lenders to originate residential mortgage loans and, where the lender certifies that the loan meets established criteria, to shift liability for the risk of default to the government.  Under the DE Program, the government, which does not conduct its own assessment of the loan, becomes fully liable to the mortgage holder for any endorsed DE Program loan that defaults, and 50% liable for VA Program loans that default.  The government's decision to outsource the underwriting process to private lenders creates both opportunity and a potential conflict for such lenders.  The lenders are financially incentivized to maximize the number of loans originated (because they may be sold on the secondary market for profit), regardless of underwriting quality, but the lenders must comply with extensive legal regulations and serve as government fiduciaries in endorsing insured loans.  Unfortunately, some lenders have allowed their financial interests to outweigh their legal obligations by implementing policies designed to manipulate the DE and VA Programs, circumvent their regulatory restrictions, and deceive the government as to the quality of the loans they originate.  NAF is one such lender.

NAF has, since 2011, annually certified to the government, and certified on each individual loan it has originated and submitted, that it was complying with relevant regulations.  NAF's annual certification to HUD stated, in part, that NAF "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of

any agreements entered into with [HUD]," and that NAF "conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval" (Compl. ¶ 136).

With respect to individual FHA loans, NAF issued one of two certifications, depending on the loan.  When NAF underwrites a loan, it may use HUD's electronic underwriting system called TOTAL to review the loan application.  TOTAL processes loan information and rates loans as "accept/approve" or "refer/caution."  For "accept/approve" loans, NAF issued a certification stating, in part, that it "certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program," and that "I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4" (Compl. ¶ 160).  For "refer/caution" loans, or loans not processed using TOTAL, NAF issued a certification stating, in part, that it "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage," and that "this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement Program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4" (Compl. ¶ 161).  HUD Handbook 4000.4 includes certifications that the mortgage complies with the government's underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters, including certifications of the lender's due diligence and truthfulness and the borrower's ability to pay on the loan (Compl. ¶¶ 162-163).

NAF has similarly certified its compliance with VA requirements.  NAF submitted a Form 26-8736 to participate in the VA Program, which certified that it would, *inter alia*, comply with VA regulations and directives, originate only loans reviewed and approved by appropriately licensed underwriters, and take responsibility for all borrower credit information (Compl. ¶¶ 180-183).  NAF also submitted loan-level certifications affirming that it conducted specified due diligence tasks with respect to each endorsed loan to ensure its compliance with VA underwriting rules, as well as

a Form 26-1820 affirming compliance with regulations concerning insurance of loans to veterans (Compl. ¶¶ 184-186).

NAF's FHA and VA certifications were false.  Among other things, as Relator's extensive first-hand allegations demonstrate, NAF was engaged in the following practices at the time it made each certification:

(1) compensating underwriting employees on a commission basis (for 20 loans approved in a 30-day period, NAF paid a commission of $2,500; for 30 loans, $4,500; for 35 loans, $5,500; for 40 loans, $10,000), such that employees could *double* their annual salaries by forcing enough loans through for endorsement (Compl. ¶¶ 231-258);

(2) implementing a "management exception policy" by which NAF managers or salespersons (paid on a commission basis) would override government loan requirements and force unqualified loans, or loans for which required documentation was lacking, through for endorsement (Compl. ¶¶ 259-351);

(3) taking various steps to improperly increase the appraised value of properties, including making inappropriate "value appeals" to appraisers and effectively blacklisting uncooperative appraisers (Compl. ¶¶ 352-382);

(4) manipulating inputs in the electronic underwriting system to game the system in favor of an "accept/approve" rating (Compl. ¶¶ 383-404);

(5) manipulating borrower overtime/bonus income figures to increase the likelihood of loan approval, including using present income as historical income (Compl. ¶¶ 405-427);

(6) manipulating borrower debt and debt-to-income figures to increase the likelihood of loan approval, including improperly excluding known debts from borrowers' debt-to-income analyses (Compl. ¶¶ 428-465); and

(7) implementing a policy of withholding from the government known underwriting deficiencies, inaccuracies, and errors in completed loan files subsequently discovered by quality control auditors (Compl. ¶¶ 466-484).

Each of these policies and practices is prohibited by the HUD-FHA and VA regulations with which NAF has certified its compliance.  Due to its unlimited willingness to risk taxpayer money for its own benefit, reflected in its single-minded focus on pushing through any government loan whatsoever—regardless of quality and regardless of the regulations governing it—NAF generated millions of dollars in annual revenues stemming from its activities in the government-insured residential mortgage business.  But when the loans default, taxpayers, not NAF, are left holding the bag, resulting in substantial monetary losses to the government.

Simply put, absent NAF's fraud, the government would not have insured loans underwritten, originated, or endorsed by NAF, and would therefore not have had to pay when such loans defaulted.  Moreover, the favorable insurance premiums that the government provided to loans endorsed by NAF should not have been provided, as these rates are premised on mortgagees only endorsing loans meeting government requirements (Compl. ¶¶ 560-564).  Finally, the government incurred significant administrative costs in servicing and supporting loans endorsed by NAF (Compl. ¶¶ 565-566).  All of these benefits and losses are recoverable from NAF.  Accordingly, NAF's violations of the FCA have resulted in millions of dollars in damages to the government.

## ARGUMENT

## I.    LEGAL STANDARD.

On a motion to dismiss under Rule 12(b)(6), the Court must "accept[] the material facts alleged in the complaint, together with all reasonable inferences to be drawn from those facts, as true." *Siebert v. Gene Sec. Network, Inc.*, 2013 WL 3052882, at *2 (N.D. Cal. June 17, 2013) (Tigar, J.) (citing *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face" to overcome the motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "In the Ninth Circuit, 'if there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to

dismiss under Rule 12(b)(6).   Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible.'" *Siebert*, 2013 WL 3052882, at *2 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)) (emphasis in original).

Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake."   Rule 9(b) requires a plaintiff to provide enough factual information to give the defendant notice of the misconduct alleged to constitute fraud such that the defendant may defend against the charge.  *Siebert*, 2013 WL 3052882, at *2 (citing *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985)).  A plaintiff satisfies Rule 9(b) by providing "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (internal quotation marks omitted), but "intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Rule 9(b) does not require relators "to identify representative examples of actual false claims," which is merely "one way to satisfy the heightened pleading requirement."  *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 678-79 (9th Cir. 2018); *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010).  Instead, "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'"  *Ebeid*, 616 F.3d at 998-99 (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

## II.     THE COMPLAINT ADEQUATELY ALLEGES FALSE CLAIMS.

### A.     The Complaint Asserts A Promissory Fraud Theory Of FCA Liability.

Relator asserts causes of action under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B).[2]   In general, there are "three types of 'false or fraudulent claims.'"  *Thrower*, 2018 WL 4053484, at *7

---

[2] Section (a)(1)(A) imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  Section (a)(1)(B) imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Relator consents to dismissal without prejudice of her third cause of action under § 3729(a)(1)(G).

(citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1161, 1171 (9th Cir. 2006); *United States ex rel. Campie v. Gilead Sci., Inc.*, 862 F.3d 890, 900-02 (9th Cir. 2017)).  The first is a claim for payment to the government that is "literally false or fraudulent," as where a contractor overcharges a government agency.  The next is "promissory fraud," where "the contract or extension of government benefit" under which a claim is submitted "was originally obtained through false statements or fraudulent conduct."  *Hendow*, 461 F.3d at 1170, 1173.  The third is express or implied "false certification," in which a claimant falsely certifies compliance with a statutory, regulatory, or contractual requirement as a condition to government payment.  *Id.* at 1171.  Concerning any type of claim, the FCA is to be "construe[d] … broadly, as it is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  *Campie*, 862 F.3d at 899 (quoting *Hendow*, 461 F.3d at 1170).

Relator alleges that NAF's conduct constitutes promissory fraud.  To prevail on a promissory fraud theory of FCA liability, a relator must prove "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."[3]  *Hendow*, 461 F.3d at 1174.  Under such a theory, "'subsequent claims are false because of an *original fraud*,' which may include 'a certification or otherwise.'"  *Thrower*, 2018 WL 4053484, at *8 (quoting *Hendow*, 461 F.3d at 1173) (emphasis in original).

As in *Thrower*, another government-insured mortgage loan case asserting FCA violations, "[h]ere, the original fraud can be found in either the annual certification or a loan-level certification."  *Id.*  With respect to a false or fraudulent loan-level certification, "any claim made [to the government] on that loan would be a false claim under the promissory fraud theory."  *Id.*  With respect to false or fraudulent annual certifications, the theory of liability broadens considerably: "Because [NAF]'s participation in the DE program for a particular year is premised on the annual certification, every loan endorsement under the DE program would be a fraudulently obtained

---

[3] Nevertheless, actual damages need not be shown.  *See, e.g.*, *United States ex rel. Hagood v. Sonoma Cty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) ("No damages need be shown in order to recover the [civil] penalty" under the FCA) (citing *Rex Trailer Co. v. United States*, 350 U.S. 148, 153 n.5 (1956)).

'contract or extension of government benefit'—including those individual loans that were otherwise properly underwritten and endorsed." *Id.* (quoting *Campie*, 862 F.3d at 902).  Accordingly, "each claim on a loan endorsed in the year of the fraudulent annual certification would be tainted and constitute a false claim," even if the loans that have defaulted otherwise meet relevant underwriting criteria. *Id.* (internal quotation omitted).

Although promissory fraud and false certification theories may overlap slightly (*i.e.*, both theories may be grounded in a false certification), promissory fraud is "somewhat broader," *Hendow*, 461 F.3d at 1173, and may succeed even where a false certification or other theory fails. *See United States v. Acad. Mortg. Corp.*, 2018 WL 4852377 at *2 (N.D. Cal. Oct. 3, 2018) (denying *Thrower* defendant's reconsideration bid and explaining that, "[t]he falsity element under a promissory fraud theory, unlike with an implied false certification theory, can be met with a showing 'of an original fraud (*whether a certification or otherwise*)' upon which subsequent claims for government benefits are premised.") (quoting *Hendow*, 461 F.3d at 1173) (emphasis in original); *see also United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916-17 (7th Cir. 2005) (upholding promissory fraud claim even where district court rejected false certification claim).  Since liability arises out of the original fraud (such as a certification made to obtain a contract or government benefit), it is unnecessary to show that subsequent requests for payment under that contract or benefit were accompanied with new representations about the thing for which payment is requested or additional certifications of compliance.  In brief, an implied false certification claim requires a request for payment along with a specific representation about the good or service provided, and the defendant's failure to disclose material non-compliance with government requirements, *see United States ex rel. Rose v. Stephens Institute*, 909 F.3d 1012, 1018 (9th Cir. 2018) (citing *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)), but a promissory fraud claim will lie where a contract or government benefit was extended on the basis of an original fraud and requests for payment are only subsequently made. Accordingly, NAF's reliance on *Rose* and other implied certification cases is misplaced—as, indeed, Judge Chen explained in distinguishing *Thrower* from *Rose*.  *See Acad. Mortg.*, 2018 WL

4852377, at *2-3 (concluding that *Rose* did not change the falsity analysis in promissory fraud cases); *see also United States v. Acad. Mortg. Corp.*, 2018 WL 6592782, at *1 (N.D. Cal. Dec. 14, 2018) (observing that "while [*Rose*] shed light on the requirements for proving falsity under an implied false certification theory, it did not address the promissory fraud theory").

In its motion, NAF spuriously focuses on literal falsity and implied certification, which are not at issue. NAF's arguments seek ultimately to eradicate the promissory fraud theory of FCA liability by conflating it with literal falsity or implied certification. NAF's arguments are inconsistent with Ninth Circuit law and must fail.

**B.     The Complaint Adequately Alleges Promissory Fraud.**

Blithely ignoring settled principles of promissory fraud liability, NAF insists that Relator fails to state a claim because "none of the certifications identified by Relator are submitted during the claim process." Def. Br. at 24. This is irrelevant because liability "attach[es] to each claim submitted to the government under a contract, when the contract or extension of the government benefit was *originally obtained through false statements or fraudulent conduct*." *Campie*, 862 F.3d at 902 (quoting *Hendow*, 461 F.3d at 1173) (emphasis added). The government receives a demand for payment from the holder of the insured loan (which may be NAF or a third party acquiring the loan after NAF sold it) only after the loan defaults, but the promissory fraud theory turns on NAF's "original fraud," *i.e.*, the use of false certifications to obtain a government benefit. *Hendow*, 461 F.3d at 1173. Accordingly, Relator has adequately alleged promissory fraud claims.

Not a single similar HUD-FHA or VA mortgage insurance fraud case suggests a different result. *See, e.g.*, *Thrower*, 2018 WL 4053484, at *12 (sustaining FCA claims on promissory fraud theory against Direct Endorsement lender accused of making false annual and loan-level certifications to HUD); *United States v. Quicken Loans, Inc.*, 239 F. Supp. 3d 1014, 1036-37 (E.D. Mich. Mar. 9, 2017) (sustaining FCA claims based on Direct Endorsement lender's contravention of HUD certifications by originating loans that did not meet HUD requirements and otherwise breaching HUD regulations); *United States ex rel. Fisher v. Ocwen Loan Servicing, LLC*, 2016 WL 2992229, at *8 (E.D. Tex. May 24, 2016) (sustaining FCA claims based on lender's contravention

of annual FHA certifications to HUD); *United States v. Movtady*, 13 F. Supp. 3d 325, 330-31 (S.D.N.Y. 2014) (sustaining FCA claims based on Direct Endorsement lender's contravention in "individual-loan and annual certifications" of HUD requirements); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 623-24 (S.D.N.Y. 2013) (sustaining FCA claims on promissory fraud (or "fraudulent inducement") theory based on Direct Endorsement lender's contravention of annual and loan-level HUD certifications by originating loans that did not meet HUD requirements) (citing *United States v. Eghbal*, 548 F.3d 1281, 1283 (9th Cir. 2008)); *United States v. Americus Mortg. Corp.*, 2013 WL 4829271, at *7-8, *12 (S.D. Tex. Sept. 10, 2013) (sustaining FCA claims based on lender's use of false representations in loan-level and annual FHA certifications to HUD, and finding allegations sufficient to plead that lender "induce[d] [HUD] to insure loans that it otherwise would not have insured"); *see also United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) (finding that, where false statement in bank loan application was "an essential inducement to the Federal Housing Administration guaranty" on which the government subsequently paid upon default, FCA claims would lie; "it has long since been settled that a fraudulently induced contract may create liability under the [FCA] when that contract later results in payment thereunder by the government, whether to the wrongdoer or someone else.") (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943)).

The sole case NAF cites to resist this mountain of compelling authority is an out-of-circuit district court opinion dismissing FCA claims under legal standards not applicable here. *See United States ex rel. Calderon v. Carrington Mortg. Servs. LLC*, 2018 WL 372348 (S.D. Ind. Jan. 10, 2018). In that case, the theory of liability was implied false certification, not promissory fraud, and the Indiana federal court relied on other Indiana and Illinois district courts to require specific examples of requests for payment submitted by the defendant and to impose the falsity and materiality standards applicable to implied certification cases, as enunciated in *Escobar*. *Id.* at *5 (discussing applicable standards and "actual example requirement"), *7 (discussing materiality requirement). Because *Carrington* did not consider a promissory fraud theory, and applied legal

standards at odds with those required by the Ninth Circuit—including in *Silingo*, *Hendow*, *Campie*, and *Ebeid*—it is of no utility to NAF or this Court.[4]

Consequently, NAF can only resort to mischaracterizations of Relator's allegations and seek to engraft the pleading requirements applicable to implied false certification (or literal falsity) theories onto Relator's promissory fraud theory. This tactic fails. Controlling law clearly supports Relator's claims. Thus, NAF's motion should be denied.

## III.    THE COMPLAINT ADEQUATELY ALLEGES MATERIALITY.

"Under the False Claims Act, a falsehood is material if it has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *Campie*, 862 F.3d at 904-05 (quoting 31 U.S.C. § 3729(b)(4)). NAF argues that Relator fails to allege that its misconduct was material. Def. Br. at 16-19. In particular, NAF maintains that there are no allegations about the government's payment of claims on defaulted loans, and that its alleged violations amount to mere "technical violations of a few regulatory or contractual requirements among thousands[.]" Def. Br. at 18-19. These arguments fail.

As an initial matter, every court to have squarely ruled on the issue has concluded that HUD regulations are material. *See, e.g.*, *Thrower*, 2018 WL 4053484, at *11 ("[T]he false annual and loan-level certifications were material to HUD's payment of claims. [Defendant's] participation in the DE program and therefore its ability to endorse loans and make claims on them was conditioned on [defendant's] annual certification. Likewise, a loan-level certification was required for

---

[4] NAF may attempt to rely on *United States v. Reunion Mortgage, Inc.*, 2013 WL 5944252 (N.D. Cal. Nov. 5, 2013), in maintaining that its position has a basis in the law. Such reliance would be inapt. The *Reunion* plaintiff did not assert a promissory fraud theory grounded in false annual certifications, but rather sought to establish liability only with respect to "the allegedly false individualized certification of *each* individual loan." *Id.* at *6 (emphasis in original). Thus, the court noted that "whether [defendant] separately submitted an annual certification of compliance to the FHA is inapposite for purposes of the instant motion." *Id.* Consequently, the *Reunion* case only considered FCA claims under an implied certification theory. As Judge Chen explained in rejecting Academy Mortgage's motion for interlocutory review following his ruling in *Thrower*, "the section of *Reunion Mortgage* discussing annual certifications is dicta," and because that court was not presented with a promissory fraud theory, it "did not consider whether the outcome would have been different under a promissory fraud theory[.]" *Acad. Mortg.*, 2018 WL 6592782, at *4.

individual loans to be endorsed.  In addition, the violated regulations are material to HUD's decision to insure the loans, because the regulations are necessary to shield the Government from undue financial risk and protect the viability of the DE program."); *Quicken*, 239 F. Supp. 3d at 1040 ("[T]he existence of a lender's certification to FHA requirements is a prerequisite to the endorsement of FCA insurance.  Absent the certification, the mortgage loan would be ineligible for FHA insurance in the first place.  These allegations plausibly assert that the certification requirement is material") (internal citations omitted); *United States v. TXL Mortg. Corp.*, 2016 WL 5108019, at *2 (D. D.C. Sept. 20, 2016) (finding that "the Government has adequately demonstrated that [defendant] . . . violated key FHA underwriting requirements, which then fraudulently induced the Government into endorsing the loans and paying out subsequent claims for insurance."); *United States v. Americus Mortg. Corp.*, 2014 WL 4274279, at *11 (S.D. Tex. Aug. 29, 2014) (holding that annual and loan-level certifications to HUD under the Direct Endorsement program were "requisite to the mortgages receiving FHA insurance and to [defendant] maintaining its HUD-approved mortgagee and [DE status]," such that certifications were material); *Wells Fargo*, 972 F. Supp. 2d at 625 (HUD requirements are material to government decision to insure loans); *United States v. Spicer*, 57 F.3d 1152, 1159 (D.C. Cir. 1995).

Attempting to dodge these compelling authorities, NAF claims that, to plead materiality, Relator must allege specific instances in which the government decided to pay claims on NAF-originated loans that went into default.  But the law imposes no such requirement.  Under longstanding Ninth Circuit law, relators need not "describe in detail a single specific transaction," *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997), or "identify representative examples of actual false claims[.]"  *Silingo*, 904 F.3d at 678-79; *Ebeid*, 616 F.3d at 998.

NAF relies on *United States v. Safran Group, S.A.*, 2017 U.S. Dist. LEXIS 8408 (N.D. Cal. Jan. 19, 2017), to claim that a relator must allege specific government payments resulting from a false representation of compliance, but this reliance is totally misplaced.  In *Safran*, Judge Lucy H. Koh dismissed claims where a defendant's allegedly false certification of compliance with the Trade Agreements Act was simply not connected to the government's purchase of its products.  *Id.*

at \*36.  In *Safran*, relators alleged generally that various unidentified salespersons employed by the defendant represented on unspecified occasions over eight years that the company complied with the statute in unspecified communications, and failed to show that any such representation was made in connection with the sale of products to the government.  *Id.* at \*28-35.  The Court contrasted the relators' case (where compliance with a statute was not a contract requirement) against one in which a government contract required Trade Agreements Act compliance, which *would* support an FCA claim.  *Id.* at \*36 (citing *United States ex rel. Folliard v. Govplace*, 930 F. Supp. 2d 123, 127 (D. D.C. 2013)).  Unlike *Safran*, here, the defendant's non-compliance, and false certification of compliance, with HUD-FHA and VA requirements is directly and causally connected to the government benefits obtained.  Moreover, *Safran* assessed an implied false certification theory, not a promissory fraud theory, as here.

Far from asserting merely that "any violation of any regulation may set the table for a valid false claim," Def. Br. at 18, or that NAF violated mere technical rules, *id.* at 19, Relator alleges that NAF breached the core regulations serving to shield the HUD and VA from undue financial risk and to protect the viability of the DE and VA Programs.  NAF's certifications of compliance with those regulations was a necessary condition to endorse loans under the DE and VA Programs, and were therefore material to HUD's and VA's decisions to insure NAF-originated loans and to pay out subsequent claims for insurance.  *See, e.g.*, *Thrower*, 2018 WL 4053484, at \*11; *Quicken*, 239 F. Supp. 3d at 1040-41.  Indeed, these regulations are designed to reduce the default risk on government-insured loans; in the context of the government's decision to outsource the mortgage underwriting process to private companies and accept liability for loans that default, it is difficult to conceive of any kind of regulation more material than those NAF is accused of violating.

The materiality of the applicable regulations is further underscored by the government's extensive history of enforcement, particularly in the wake of the 2008 financial crisis stemming in large part from the reckless origination of subprime mortgages.  *See, e.g., Rose,* 909 F.3d at 1020-21 (consulting defrauded government agency's "past enforcement habits in similar cases" in assessing materiality, and determining that "[t]here is evidence … that the Department *did* care

about violations of the [applicable requirements]") (emphasis in original); *see also* Declaration of Kyle J. McGee ("McGee Decl.") Exs. 1-2 (detailing FCA settlements with J.P. Morgan Chase & Co., Bank of America Corp., Citigroup Inc., Ally Financial Inc., and Wells Fargo & Company totaling $25 billion for similar fraudulent mortgage lending practices); Exs. 3-4 (detailing FCA settlement with Wells Fargo Bank for $1.2 billion for similar fraudulent mortgage lending practices); Exs. 5-6 (detailing FCA settlement with SunTrust Mortgage for $968 million for similar conduct); Exs. 7-8 (detailing FCA settlement with J.P. Morgan Chase for $614 million for similar fraudulent mortgage lending practices); Exs. 9-10 (detailing award of $296 million final judgment in FCA case against the entities formerly known as Allied Home Mortgage Capital Corporation and Allied Home Mortgage Corporation and more than $25 million judgment against its president and chief executive officer for fraudulent mortgage practices, trebling an unanimous jury verdict award of $92 million and imposing statutory penalties); Exs. 11-12 (detailing FCA settlement with Flagstar Bank for $132.8 million for similar fraudulent mortgage lending practices); Exs. 13-14 (detailing FCA settlement with M&T Bank Corp. for $64 million to resolve similar FHA-insured mortgage lending practices); Exs. 15-16 (detailing settlement with Finance of America Mortgage for $14.5 million to resolve FCA liability involving FHA mortgage lending); Ex. 17 (detailing settlement with Universal American Mortgage Co. LLC for $13.2 million to resolve FCA allegations related to loan guarantees); Ex. 18 (entering a default judgment for more than $2.3 million against TXL Mortgage Corp. after finding the United States had stated a FCA claim for fraudulent mortgage lending practices).  The financial institutions targeted in these proceedings engaged in substantially similar misconduct as NAF.  The regulatory violations at stake, in other words, are not mere garden variety or technical lapses, but are part and parcel of a systemic fraud that threatens to undermine the government-insured mortgage program as a whole.[5]  NAF's motion should be denied.

---

[5] NAF's contention that its misconduct is best remediated under HUD's and/or VA's in-house administrative review procedures, Def. Br. at 19, rather than in litigation under the FCA, is a red herring and, in any event, has no bearing on the materiality of its alleged misconduct.  Whether HUD or VA or any other agency undertakes to review NAF's conduct makes no difference to its liability under the FCA for defrauding the government.

### IV.      THE COMPLAINT ADEQUATELY ALLEGES SCIENTER.

Relator alleges that NAF knew or recklessly disregarded that its certifications were false and that the requirements it violated were material to the government's decision to insure NAF's endorsed loans and, thus, to pay subsequent claims made on those loans.  Scienter may be alleged generally, *see* Fed. R. Civ. P. 9(b), and may be established by alleging "that a defendant knew a claim for payment was false, or that it acted with reckless disregard or deliberate indifference as to the truth or falsity of the claim."  *Silingo*, 904 F.3d at 679-80 (citing *United States v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011)).  Relator's allegations satisfy this requirement.

### A.      NAF Knew Or Recklessly Disregarded That Its Certifications Were False.

NAF implemented a bevy of company policies and standardized practices that run afoul of the HUD-FHA and VA requirements with which NAF certified its compliance in order to endorse loans under the DE and VA Programs and thus obtain government insurance on such loans.  These policies and practices are not mere mistakes, but are "clear instances of deliberate misbehavior" sufficient to plead scienter.  *Thrower*, 2018 WL 4053484, at *12.  Among other things, NAF created a commission-based compensation policy for employees performing underwriting activities (Compl.  ¶¶ 231-258), a "management exception policy" enabling NAF managers to push unqualified loans through for endorsement (Compl. ¶¶ 259-351), and a policy of concealing and withholding subsequently discovered underwriting deficiencies from the government (Compl. ¶¶ 466-484), as well as implementing a variety of inappropriate standard practices, such as making "value appeals" to property appraisers and manipulating borrower income, debt, and debt-to-income figures (Compl. ¶¶ 352-465).  It is implausible that these nationwide, company-wide policies and practices of long standing fell into place by accident.

Moreover, Relator has provided numerous specific instances of NAF managers (*e.g.*, Processing Manager Kevin English and Loan Officer Manager Michael Garcia) actually making use of the management override process to force unqualified loans through for endorsement (Compl. ¶¶ 278-309), as well as discussions with other NAF underwriters (Merrill Schultz, Judy Barley, Loretta Bonander, Ruby Dandha, Maria Pineda) who each objected and protested about this policy directly to Relator (Compl. ¶¶ 310-324).  Similarly, Relator has provided specific details about the

commissions inappropriately paid by NAF to employees performing underwriting activities, including amounts paid (Compl. ¶ 248) and averments from employees that, due to the compensation opportunity, "they would attempt to approve as many files as they could, without regard to qualifications" (Compl. ¶ 250).  As one former NAF employee (Denidita Timberlake) informed Relator, "at NAF the best way to maximize any bonus [i]s to send 'all files through for approval,' regardless of whether they actually met all the qualifications" (Compl. ¶ 253).  The complaint is replete with similar, highly plausible allegations showing that NAF's company policies and practices were no mistake, but a calculated effort to maximize the number of endorsed loans. In response, NAF merely rehashes its argument that Relator fails to allege NAF made an "actual claim for payment" in connection with these obviously improper and unlawful policies and practices.  Def. Br. at 21-22.  As explained above (§ II), this argument fails as a response to Relator's promissory fraud theory of liability.

NAF also suggests in conclusory fashion that its underwriting program may have been structured on the basis of an "erroneous," but not "objectively unreasonable," interpretation of the HUD-FHA and VA requirements.  Def. Br. at 20 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69 (2007)).  This suggestion lacks merit and is entirely devoid of support.  *Safeco* offers NAF "no solace."  *Quicken*, 239 F. Supp. 3d at 1028 (explaining *Safeco* "involved a statute whose language was ambiguous—giving rise to the test whether the defendant's reading of the statute was objectively unreasonable; here, no ambiguity with the False Claims Act is alleged, making the *Safeco* test irrelevant.").  Moreover, "knowingly" merely requires that NAF knew what it was filing and what its filing said; "knowingly" does not mean NAF knew it was breaking the law.  Nowhere does the FCA require actual knowledge or "specific intent to defraud."  *See* 31 U.S.C. § 3729(b). The relevant requirements could not be clearer, and NAF's policies and practices could not be more antithetical to their directives.  For example:

- HUD Handbook 4000.1 states that lenders "must not compensate employees who perform underwriting . . . activities on a commission basis" (Compl. ¶ 232);

- HUD Handbook 4000.1 similarly prohibits an employee from obtaining multiple sources of compensation from any single FHA-insured transaction (Compl. ¶ 235);

- The FHA and VA also plainly prohibit endorsement of loans not meeting government lending requirements (Compl. ¶¶ 259-261), which NAF flouted by empowering management to override those very requirements and force bad loans through for endorsement;

- Concerning NAF's improper use of "value appeals," FHA regulations are clear that anyone "compensated on a commission basis" may not "order[] or manag[e] an appraisal assignment," HUD Handbook 4000.1 (Compl. ¶ 355), that the property must be "appraised in accordance with [the] standards and requirements" prescribed by HUD (Compl. ¶ 358), and that lenders must not interfere in any way with the valuation process (Compl. ¶ 359);

- HUD Handbook 4000.1 requires lenders to "cease [their] use of the AUS [automated underwriting system] and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage," such as mortgages given a "refer/caution" rating when initially run through the system (Compl. ¶ 392), and HUD Mortgagee Letter 2005-15 prohibits lenders from "willfully manipulating the application variables . . . to obtain an accept/approve risk classification" (Compl. ¶ 393);

- HUD Handbook 4000.1 and VA Pamphlet 26-7 prohibit use of a borrower's overtime and bonus income except where such income has been received for the past two years and it is reasonably likely to continue, and where such income is used, it must be averaged across the prior two years (Compl. ¶¶ 409-412);

- HUD Handbook 4000.1 and VA Pamphlet 26-7 also set acceptable debt-to-income ratios (43% for FHA, 41% for VA) and specify what kinds of assets and liabilities must be included in the debt-to-income calculation (Compl. ¶¶ 429-436); and

- HUD Handbooks 4060.1 and 4700.2 require that the lender's quality control function be independent of its origination and servicing functions, that the quality control program audit closed loan files to ensure compliance with the government's requirements, that discrepancies be explored to ensure no deficiencies exist, and that deficiencies be corrected and/or reported to the government (Compl. ¶¶ 468-475).

NAF flouted each and every one of these clear requirements, despite certifying its compliance with each of them on an annual basis and upon the endorsement of each individual loan. It did not have a reasonable alternative interpretation of the requirements—and indeed, in its brief, it utterly fails to explain how its alleged policies and practices could plausibly be construed as mere errors or mistaken interpretations of these requirements. Indeed, these allegations are directly in line with other FCA cases in the same industry, in which courts have held that scienter is adequately pleaded where a complaint "specifically alleges the practices by which [a lender] sought to increase its loan originations without regard to whether the practices or the loans themselves complied with HUD regulations, the resulting increase in loans that evidenced material violations of these regulations, [the lender's] decision to continue its loan origination practices, despite knowledge of these violations, and its motive for doing so." *Wells Fargo*, 972 F. Supp. 2d at 616-17 (internal citations omitted); *see also Thrower*, 2018 WL 4053484, at *12 (alleged use of management exception policy and concealment of underwriting deficiencies suffice to plead scienter); *Quicken*, 239 F. Supp. 3d at 1034 (stating that the "focus on management actions and intent is relevant on the question of recklessness"). Accordingly, NAF's motion should be denied.

## B. NAF Knew Or Recklessly Disregarded That The Requirements It Violated Were Material.

NAF argues that Relator fails to allege its knowledge that the HUD-FHA and VA requirements it violated were material to the government. Def. Br. at 22-23. As shown above, NAF's annual and loan-level certifications were necessary to participate in the DE and VA Programs and submit loans for government insurance, and as NAF undisputedly did certify its compliance, join the programs, and submit loans under the programs, it knew that such compliance was absolutely necessary to do so—and thus was material to the government. *See Thrower*, 2018

WL 4053484, at *12 (rejecting identical argument and holding, "Since Academy did in fact certify compliance and join the [DE] program, it presumably (and therefore plausibly) knew that certification and compliance were necessary and therefore material to its ability to endorse loans and make claims on them.").  Moreover, as NAF knew or should have known, the government had previously commenced litigation or enforcement proceedings against other lenders for substantially similar underwriting misconduct in violation of HUD requirements, clearly demonstrating the materiality of these requirements.  *See, e.g.*, McGee Decl. Exs. 1-18; *see also Rose*, 909 F.3d at 1020-21 (noting relevance of prior enforcement history).  Accordingly, NAF's motion should be denied.

## V.     THE COMPLAINT SATISFIES RULE 9(B).

NAF challenges the sufficiency under Rule 9(b) of each of the seven company policies and practices alleged to constitute a fraudulent scheme to defraud the government.  Def. Br. at 11-15.  But each challenge fails because NAF overlooks, downplays, or mischaracterizes Relator's actual allegations.  Relator satisfies Rule 9(b).

Rule 9(b) is satisfied where a relator alleges the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz*, 476 F.3d at 765.  Here, Relator has specified the content of the false annual and loan-level certifications NAF made to HUD-FHA and VA (*see, e.g.*, Compl. ¶¶ 133-139 (initial and annual FHA certifications), 149-163 (loan-level FHA certifications), 178-186 (VA certifications)), together with comprehensive explanations of the reasons these certifications were false.  Relator thoroughly describes her "first-hand experience of the scheme unfolding," and therefore has properly alleged an actionable scheme to submit false claims.  *Silingo*, 904 F.3d at 679 (quoting *Grubbs*, 565 F.3d at 192).  Rule 9(b) requires nothing more.  Nevertheless, Relator responds to each of NAF's arguments below.

***Commission-based compensation policy.***  NAF argues that Relator's commission-based compensation policy allegations are based on "conjecture" and "hearsay," and that Relator fails to identify the underwriting requirements this alleged policy violates or to connect the policy to

specific actions by underwriters.  Def. Br. at 11.  NAF is wrong.  HUD Handbook 4000.1 clearly prohibits NAF from "compensat[ing] employees who perform underwriting. . . activities on a commission basis" and from providing employees with multiple sources of compensation on any single FHA-insured transaction (Compl. ¶¶ 231-235).  Relator alleges that NAF's compensation policy directly resulted in NAF endorsing unqualified loans under the DE Program and that employees benefiting from the policy—some of whom Relator even names—would simply push all files through for approval regardless of underwriting deficiencies to maximize their compensation (Compl. ¶¶ 237-258).  Moreover, this policy interacts with the management exception policy in that certain managers benefiting from commission-based compensation (such as Mr. Garcia) would force loans that did not meet government requirements through for approval under the exception policy (Compl. ¶¶ 283-309).

Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Thrower*, 2018 WL 4053484, at *11 (finding that, "incentivizing underwriters to facilitate the making of bad loans through payment of commission go[es] to the heart of the DE lender's duty to the Government under the program.  It is highly plausible that HUD would not have continued to insure Academy's loans if Academy had been forthright about these violations instead of falsely certifying its compliance with HUD regulations.").

***Management exception policy.***   NAF argues that Relator's allegations about its management exception policy fail under Rule 9(b) because Relator fails to specify which government requirements are violated by this policy, and fails to specify examples of loans that were improperly underwritten.  Def. Br. at 12.  This policy could not be more antithetical to the government's lending requirements, which plainly prohibit endorsement of loans that do not meet FHA or VA underwriting standards (Compl. ¶¶ 259-261), impose specific requirements on DE lenders' underwriting staff qualifications (Compl. ¶¶ 263-268), and prohibit any employees whose compensation depends on the number of loans he or she closes from performing underwriting activities (Compl. ¶ 269).  Each of these requirements is violated by NAF's management exception

policy, which allows unlicensed managerial staff lacking a CHUMS or SAR certification,[6] lacking the requisite professional experience, and possessing a financial incentive to maximize endorsed loan volume, to perform underwriting activities.

Courts have found similar allegations to satisfy the pleading standard. *See, e.g.*, *Quicken*, 239 F. Supp. 3d at 1029-31 (allegation of management exception policy overriding government's borrower income and income verification requirements allowed for "the reasonable inference that the underwriters had either the actual knowledge that the particular loan did not satisfy FHA requirements or, at a minimum, sufficiently alleged scienter"; observing further, "[g]iven the allegations about the purpose of the management-exception process, it logically follows that an underwriter would not have sought a management exception unless the loan did not satisfy FHA underwriting requirements in the first place.  Why else would the management exception be sought?").

***Interference with appraisal values.***  NAF seeks dismissal under Rule 9(b) because Relator purportedly fails to allege that "NAF had authority or control over [its] third party appraisers," or to specify appraisers affected by NAF's practices.  Def. Br. at 12-13.  These arguments fail.  Relator alleges that NAF violated key proscriptions, including HUD's requirement that persons compensated on a commission basis not be permitted to order or manage appraisal assignments (Compl. ¶ 355), and not take steps to interfere with the appraisal process (Compl. ¶ 359).  The appraisal value is critical because it helps determine the maximum available loan, thereby managing the risk to the government.  Relator alleges that NAF implemented policies under which loan officers paid on commission would contact appraisers working on the same file to encourage them to report high property values, and such loan officers would sometimes show up in person at the appraisal (due to NAF making the appraisal schedule available to loan officers) (Compl. ¶¶ 365-369).  Worse still, NAF loan officers effectively blacklisted appraisers who refused

---

[6] CHUMS is a HUD-FHA acronym meaning Computerized Homes Underwriting Management System; SAR is a VA acronym meaning Staff Appraisal Reviewer.  Each is an agency certification or licensure required of underwriters in, respectively, HUD-FHA or VA lending programs.  For pertinent allegations, *see* Compl. ¶¶ 263-268.

to inflate property values by recording negative comments about such appraisers on the internal website of the appraisal service vendor who provided appraisers to NAF (Compl. ¶¶ 370-378). Relator need not positively identify appraisers impacted by these practices to plausibly allege that NAF did, in fact, impermissibly interfere with the appraisal process in these ways.  Nor need Relator allege that NAF had authority or control over the appraisers, since the pressure exerted on them was designed to manipulate and exercise *de facto* control over the appraisal process and results.

Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Quicken*, 239 F. Supp. 3d at 1025-29 (holding allegations of interference with property appraisals, including value appeals to appraisers, allowed for the reasonable inference that such interference violated FHA requirements and that Quicken knew this practice violated FHA requirements).

***Manipulation of AUS/TOTAL inputs.***  NAF contends that Relator's allegations concerning NAF's manipulation of inputs in the automated underwriting system in order to reverse engineer an approval are insufficiently specific. Def. Br. at 13. As NAF acknowledges, Relator alleges that, in one example, a NAF loan officer (Travis Dungca) submitted an FHA loan file no fewer than 22 times, subtly modifying the input criteria to determine weak points, and then used false information to get an "accept/approve" rating (Compl. ¶¶ 401-402).  Though not required, Relator identifies the loan number associated with this misconduct (No. 120016109350), the date (November 2016), and the identity of the loan officer (Mr. Dungca).  Contrary to NAF's assertion, Relator also identifies the regulations prohibiting such manipulation (HUD Handbook 4000.1, HUD Mortgagee Letter 2005-15, HUD Handbook 4155.1) (Compl. ¶¶ 392-393).  NAF's argument boils down to a request that Relator specify which inputs (*e.g.*, borrower income or debt, property value, etc.) were manipulated in the example, what other NAF personnel worked on the file, and whether the loan defaulted and was the subject of a demand for payment to the government.  Neither Rule 9(b) nor the FCA require such allegations.

Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Quicken*, 239 F. Supp. 3d at 1037-38 (finding allegations of use of inaccurate information, or use of

unverified or undocumented information, in automated underwriting system to obtain approvals stated plausible FCA violations).

**Manipulation of borrower incomes.**   According to NAF, Relator's allegation that NAF improperly manipulated borrower incomes to force bad loans through for government insurance is insufficient because Relator does not specify the particular borrower or loans in the examples provided, who else worked on the example files, and whether the loans were approved.  Def. Br. at 14.  The borrower examples provided (California tomato pickers and a bank teller promoted to management) illustrate the company's use of an inappropriate "rolling 24 month" income metric that is inconsistent with HUD-FHA and VA requirements concerning the calculation of income and the use of overtime and year-end bonuses in such calculations (Compl. ¶¶ 409-412, 417-422). Additional details about these examples—such as borrower identity, loan file information, and other personnel working on the files—would not meaningfully improve NAF's notice of the claims against it, and are therefore not required under Rule 9(b).  As to whether these examples resulted in approved loans, Relator has plainly alleged that the whole purpose of NAF's manipulation was to obtain improper approvals, and that the loans would be approved where the improperly calculated income figures (falsely) met the minimum qualification for the loan (*e.g.*, Compl. ¶ 426), so NAF's claim that Relator must provide additional detail on approvals rings hollow.

Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Quicken*, 239 F. Supp. 3d at 1031-34 (finding allegations of borrower income miscalculations and use of unverified and undocumented income information stated plausible FCA violations); *Americus*, 2013 WL 4829271, at *6 (finding that unverified income in loan files supported FCA violations); *Wells Fargo*, 972 F. Supp. 2d at 624 (finding that unverified and undocumented income supported FCA violations).

**Manipulation of borrower debt.**   As with NAF's practice of manipulating borrower income, NAF argues that Relator has insufficiently alleged its practice of manipulating borrower debt by merely attacking Relator's examples.  Def. Br. at 14-15.  NAF claims that Relator was required to plead the identities of NAF underwriters, the amounts of debts improperly excluded, and provide

more information about the intent and knowledge of the underwriters in making such exclusions. Def. Br. at 15.  Not so.  But even if such allegations were necessary—and they absolutely are not— Relator has in fact provided the file number of an affected loan (No. 137316088706), the kinds of debts excluded (credit card, personal loan, car, timeshare) and the amount by which these omitted debts increased the borrower's monthly payment obligations (over $100/month), the identity of the loan manager notified (Joseph Garcia), and the date on which the loan nevertheless closed based on the knowingly inaccurate debt information (September 6, 2016) (Compl. ¶¶ 438-444).  Relator provided other similar examples as well (Compl. ¶¶ 452-459 (omitted car debt), 460-464 (omitted tax debt)).  In each case, Relator also identified the managers pushing the loans through despite the manipulation of debt figures (Messrs. Garcia and English) and their specific knowledge about the improper exclusions.  Such allegations are far beyond what Rule 9(b) requires.

Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *United States v. Miller*, 645 F.2d 473, 474-76 (5th Cir. 1981) (where defendants submitted to FHA applications for mortgage insurance containing false statements about home buyers' "past and present debts," and FHA insured such loans, government stated plausible FCA violation); *Quicken*, 239 F. Supp. 3d at 1037-38 (finding allegations of use of inaccurate debt information, or use of unverified or undocumented debt information, to obtain approvals stated plausible FCA violations).

***Concealing and withholding underwriting deficiencies.***  Finally, NAF claims that Relator is insufficiently particular in alleging that, since NAF was concealing and withholding underwriting deficiencies from the government, the company's quality control auditing process was inconsistent with its certification.  Def. Br. at 15.  Again attacking Relator's examples, NAF complains that Relator has not identified the quality control auditor who uncovered the NAF-directed manipulation of a fact on a loan application (age of a child, changed from 19 to 14 in order to manipulate child support income) or the specifics of a conversation between the auditor and NAF Head of Wholesale Lending, Mike Clary (who the complaint does identify) (Compl. ¶¶ 477-483), as though such information would constitute the difference between inadequate and adequate notice of the claims asserted.  Of course, it does not.  NAF is more than adequately apprised of the claims against it by

virtue of the concrete facts set forth in detail in the complaint showing that NAF intentionally withheld from the government significant underwriting deficiencies that its auditors discovered and its self-interested, commission-focused managers buried.

Courts have found similar allegations to satisfy the pleading standard. *See, e.g.*, *Wells Fargo*, 972 F. Supp. 2d at 624-25 (alleged deficiencies in quality control and self-reporting obligations under HUD regulations, including concealment of adverse loan documentation, supported FCA violations); *Americus*, 2013 WL 4829271, at *5-6. Accordingly, NAF's motion should be denied.

## VI. THE COMPLAINT ADEQUATELY ALLEGES NAF'S PROMISSORY FRAUD ON THE VA.

NAF seeks dismissal of Relator's claims concerning its fraud upon the VA. Def. Br. at 15-16. But Relator alleges that NAF employed the very same unlawful tactics in pushing unqualified FHA and VA loans through for endorsement, and specifies the particular HUD-FHA and VA requirements and regulations that NAF's particular misconduct violates. NAF is left to argue merely that Relator did not specify exemplar loans originated under the VA Program or identify post-default payment requests made to the VA by NAF or third parties holding VA mortgages NAF sold. As explained above, Relator is not required to allege such examples, *see Cooper*, 137 F.3d at 627; *Silingo*, 904 F.3d at 679; *Ebeid*, 616 F.3d at 998, or subsequent payment requests made following an "original fraud" that caused the government to extend a benefit it otherwise would not have extended, *Hendow*, 461 F.3d at 1173. Accordingly, Relator's claims pertaining to NAF's abuse of the VA Program are sufficiently pleaded.

### CONCLUSION

For the foregoing reasons, NAF's motion to dismiss should be denied.

1   Dated:  January 17, 2019

2

**GRANT & EISENHOFER P.A.**

  _/s/  Kyle J. McGee_
Kyle J. McGee, *Pro Hac Vice*
Laina M. Herbert, *Pro Hac Vice*
123 Justison Street
Wilmington, DE  19801
Telephone:  (302) 622-7000
Emails:  kmcgee@gelaw.com
             lherbert@gelaw.com

CUTTER LAW PC
C. Brooks Cutter, SBN 121407
John R. Parker, Jr., SBN 257761
401 Watt Avenue
Sacramento, CA 95864
Telephone:  (916) 290-9400
Emails:  bcutter@cutterlaw.com
         jparker@cutterlaw.com

THOMAS & SOLOMON LLP
J. Nelson Thomas
Jonathan W. Ferris
Michael J. Lingle
Annette M. Gifford (CA Bar 270777)
693 East Avenue
Rochester, New York 14607
Tel.:  (585) 272-0540
nthomas@theemploymentattorneys.com
jferris@theemploymentattorneys.com
mlingle@theemploymentattorneys.com
amgifford@gmail.com