**CUTTER LAW PC**
C. Brooks Cutter (121407)
bcutter@cutterlaw.com
John R. Parker, Jr. (257761)
jparker@cutterlaw.com
401 West Avenue
Sacramento, CA  95864
Telephone:  (916) 290-9400
Facsimile:  (916) 669-4499

**GRANT & EISENHOFER P.A.**
Kyle J. McGee, *Pro Hac Vice*
kmcgee@gelaw.com
Laina M. Herbert, *Pro Hac Vice*
lherbert@gelaw.com
123 Justison Street
Wilmington, Delaware  19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100

**THOMAS & SOLOMON LLP**
J. Nelson Thomas, *Pro Hac Vice*
nthomas@theemploymentattorneys.com
Jonathan W. Ferris, *Pro Hac Vice*
jferris@theemploymentattorneys.com
Michael J. Lingle, Pro Hac Vice
mlingle@theemploymentattorneys.com
Annette M. Gifford (270777)
amgifford@gmail.com
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
Facsimile: (585) 272-0574

*Attorneys for Relator Malou Tutanes-Luster*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* MALOU TUTANES-LUSTER,<br><br>             *Plaintiff,*<br><br>      *v.*<br><br>BROKER SOLUTIONS, INC. d/b/a NEW AMERICAN FUNDING,<br><br><br>             *Defendant.* | **Case No. 2:19-cv-01630-PSG-JPR**<br><br><br>**FIRST AMENDED QUI TAM COMPLAINT AND DEMAND FOR A JURY TRIAL**<br><br><br>Hon. Philip S. Gutierrez |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. I

I.    INTRODUCTION ........................................................................................... 1

II.   JURISDICTION AND VENUE .......................................................................... 7

III.  THE PARTIES ................................................................................................. 7

IV.   GENERAL FACTUAL ALLEGATIONS ............................................................ 8

    A.   HUD's FHA Mortgage Insurance Program ............................... 8

    B.   HUD's Direct Endorsement Program ....................................... 11

    C.   The FHA's Due Diligence Requirements ................................. 13

    D.   Certifications And Endorsements For FHA Insurance .............. 17

        1.   NAF's Initial Certifications to HUD ............................. 17

        2.   FHA Annual Certification Requirements ..................... 18

        3.   NAF's Annual Certifications To The FHA Concerning Its Operations Are Important To The Government ................ 20

        4.   FHA Individual Loan Certifications ............................. 21

    E.   The VA's Home Loan Guaranty Program ................................ 24

    F.   NAF's VA Loan Certifications ................................................ 26

    G.   NAF's Certifications To The Government Programs On Individual Loans Are Important To The Government ................................ 28

    H.   Defaulted Loans Result In Losses To The Government ............ 28

V.    NAF'S NATIONAL SCHEME TO DEFRAUD HUD AND THE VA THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE LOANS ....................................................................................... 31

    A.   Commission-Based Compensation Policy: NAF Falsely Represented To The Government That It Was Not Paying Employees Performing Underwriting Duties On A Commissions Basis ........................... 33

    B.   Management Exception Policy: NAF Falsely Represented To The Government That It Did Not Override Government Loan Requirements, And Encouraged Employees To Override Government Loan Requirements ..................................................................... 36

    C.   Value Appeals: NAF Falsely Certified To The Government That It Was Performing Accurate Appraisals Of Properties ................. 46

D.      Gaming The System: NAF Falsely Represented To The Government That It Was Not Manipulating Variables In The AUS/Total System In Order To Endorse FHA Loans For Unqualified Buyers.........................51

E.      Inflating Borrower Income: NAF Improperly Inflated Borrowers' Income Using Unallowable Exceptions To Income Calculations .............53

F.      Minimizing Borrower Debt: NAF Deliberately Excluded Debt Obligations In Order To Obtain Approvals ...................................56

G.      Quality Control Deficiencies: NAF Falsely Certified To The Government That It Maintained A Sufficient Quality Control Process ...........................................................................................59

VI.     ADDITIONAL ALLEGATIONS OF PROMISSORY FRAUD .........................62

VII.    ADDITIONAL ALLEGATIONS OF MATERIALITY .......................................63

VIII.   CLAIMS MADE ON THE GOVERNMENT ......................................................68

IX.     CAUSES OF ACTION .......................................................................................72

FIRST CAUSE OF ACTION 31 U.S.C. § 3729(A)(1)(A) CAUSING FALSE CLAIMS ............................................................................................................72

SECOND CAUSE OF ACTION 31 U.S.C. § 3729(A)(1)(B) USE OF FALSE STATEMENTS ....................................................................................................73

X.      DEMAND FOR JURY TRIAL ..........................................................................75

Plaintiff-Relator Malou Tutanes-Luster ("Relator") brings this *qui tam* action in the name of the United States of America ("United States" or the "Government"), by and through her undersigned attorneys, and alleges as follows:

## I.    INTRODUCTION

1.    This is a civil fraud action by *qui tam* Relator Malou Tutanes-Luster on behalf of the United States, against Broker Solutions, Inc. d/b/a New American Funding ("Defendant" or "NAF") to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for damages sustained by the United States Department of Housing and Urban Development ("HUD"), the Federal Housing Administration ("FHA"), and the United States Department of Veteran Affairs ("VA") in connection with NAF's origination, underwriting, and quality control of FHA and VA home loans (collectively, "Government Loans") under the FHA and VA mortgage lending programs (individually and collectively, the "Government Programs").

2.    Relator was employed by NAF as a loan processor in 2016.  As part of her normal job duties, Relator worked on Government Loans originated by NAF under the Government Programs.  During the course of her employment with NAF, she observed NAF and its management using and implementing a range of practices, policies, and conduct prohibited by federal law in connection with the Government Programs.

3.    Through the Government Programs, private lenders—such as NAF—are authorized to originate and underwrite residential mortgage loans insured by the Government.  The Government conducts no independent assessment of the loans but simply becomes liable to the mortgage holder in the event the loan defaults.  Accordingly, private lenders are obligated to ensure each loan meets stringent underwriting criteria and federal regulations, and must make certain certifications in order to participate in the Government Programs and to submit an individual loan for Government insurance coverage.

4.     NAF made the requisite certifications to participate in the Government Programs, and made individual loan-level certifications to obtain Government insurance coverage on each loan it originated under those Programs. As alleged in detail below, NAF's certifications were false.

5.     The FHA promotes American homeownership through its Direct Endorsement ("DE") Lender Program ("DE Program").

6.     FHA is a part of HUD and is one of the largest mortgage insurers in the world. HUD insures the full value (100%) of loans originated through the DE Program.

7.     Similarly, the VA promotes home ownership for veterans, active duty personnel, certain surviving spouses, and reservists through the VA Home Loan Guaranty Program ("VA Program").

8.     Under the VA Program, the VA provides a guarantee of up to 50% of the loan, which protects the lender against loss up to the amount guaranteed.

9.     Under the Government Programs, if a homeowner defaults on a Government Loan and the mortgage holder forecloses on the property, the Government Programs will pay the mortgage holder the balance of the loan (or in the case of VA loans, up to 50% of the loan) and assume ownership and possession of the property.

10.    By protecting mortgage holders against defaults on mortgages, the Government Programs encourage lenders to make loans to millions of creditworthy citizens who might not otherwise be able to secure a home loan under conventional underwriting criteria.

11.    Government insurance is also valuable in the secondary markets, as Government Loans are expected to have met stringent underwriting requirements and because they are backed by the full faith and credit of the United States.

12.    Approved private lenders—such as NAF—have a financial incentive to maximize the number of loans originated under the Government Programs regardless of underwriting quality, because they may be sold on the secondary market for profit and

because such lenders may generate fees or other revenue in servicing such loans. Lenders do not bear the risk of loss; the Government does.

13.     Unfortunately, NAF has allowed its financial interests to outweigh its legal obligations and fiduciary duties to the Government by implementing policies and practices designed to manipulate the Government Programs, circumvent their regulatory restrictions, and deceive the Government as to the quality of the loans it originates.

14.     Since at least 2011, NAF has annually certified to the Government, and has certified on each individual loan it has originated pursuant to the Government Programs, that it was complying with relevant regulations.

15.     Both NAF's annual certifications and its loan-level certifications were materially false.

16.     NAF's annual certification to HUD stated that NAF "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]," and that NAF "conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval."

17.     Had NAF not made such certifications, NAF could not participate in the DE Program.

18.     NAF also certified its compliance with VA Program requirements.  NAF submitted VA Form 26-8736, titled "Application for Authority to Close Loans on an Automatic Basis—Non-Supervised Lenders" to participate in the VA Program, which certified that it would comply with VA regulations and directives, originate only loans reviewed and approved by appropriately licensed underwriters, and take responsibility for all borrower credit information.

19.     Had NAF not made such certifications, NAF could not participate in the VA Program.

20.     With respect to individual loans under both Government Programs, NAF also issued certifications to HUD-FHA or VA.   The specific language in these

certifications appears elsewhere in this Complaint (*see* paragraphs 125-126, 131-132, 135-136).  In general, in these loan-level certifications, NAF attests to the integrity of the data submitted, the adequacy of the lender's due diligence, compliance with the HUD-FHA or VA underwriting rules, and the eligibility of the loan for Government insurance.

21.   Had NAF not made such loan-level certifications, the Government would not have insured the loans.

22.   NAF's FHA and VA certifications were false.  Among other things, as Relator's investigation revealed, NAF was engaged in the following unlawful practices specifically prohibited by the regulations with which NAF certified its compliance at the time it made each certification:

a.   Compensating employees performing underwriting activities on a commission basis—for example, if an employee got 20 loans approved in a 30-day period, NAF paid a commission of $2,500; for 30 loans, it paid $4,500; for 35 loans, it paid $5,500; for 40 loans, it paid $10,000;

b.   Implementing a "management exception policy" by which NAF managers or salespersons (paid on a commission basis) would override Government Loan requirements and force unqualified loans, or loans for which required documentation was lacking, through for endorsement;

c.   Taking various steps to improperly increase the appraised value of properties, including making inappropriate "value appeals" to appraisers and effectively blacklisting uncooperative appraisers;

d.   Manipulating inputs in the Government's electronic underwriting system to game the system in favor of an acceptance;

4

e.   Manipulating borrower overtime and bonus income figures to increase the likelihood of loan approval, including using present income as historical income;

f.   Manipulating borrower debt and debt-to-income figures to increase the likelihood of loan approval, including improperly excluding known debts from borrowers' debt-to-income analyses; and

g.   Implementing a policy of withholding from the Government known underwriting deficiencies, inaccuracies, and errors in completed loan files subsequently discovered by quality control auditors.

23.    Each of the foregoing policies and practices is prohibited by the HUD-FHA and VA regulations with which NAF has certified its compliance.

24.    The HUD-FHA and VA regulations that NAF has violated were material to the Government.  These are not mere technical rules but the core regulations serving to shield the Government from undue financial risk and to protect the viability of the Government Programs, which make homeownership possible for many Americans.

25.    NAF's certifications of compliance with these regulations were necessary conditions to NAF's ability to originate and endorse loans under the Government Programs, and were therefore plainly material to the Government's decision to insure NAF-originated loans and to pay out subsequent claims for insurance when NAF originated loans defaulted.

26.    The materiality of these regulations is further underscored by the Government's extensive history of enforcement, particularly in the wake of the 2008 financial crisis stemming, in large part, from the reckless origination of subprime mortgages.

27.    Since 2008, the Government has sanctioned a host of financial institutions for violating the very same regulations at issue in this case.  Such enforcement efforts include actions against J.P. Morgan Chase & Co., Bank of America Corp., Citigroup Inc., Ally Financial Inc., and Wells Fargo & Co. (collectively, $25 billion in

settlements); General Electric ($1.5 billion); Wells Fargo Bank ($1.2 billion); SunTrust Mortgage ($968 million); J.P. Morgan Chase & Co. ($614 million); Allied Home Mortgage Capital Corp. and Allied Home Mortgage Corp. ($296 million); Flagstar Bank ($132.8 million); M&T Bank Corp. ($64 million); Finance of America Mortgage ($14.5 million); Universal American Mortgage Co. LLC ($13.2 million); and TXL Mortgage Corp. ($2.3 million).

28.     Due to its unlimited willingness to risk taxpayer money for its own benefit, reflected in its single-minded focus on pushing through any Government Loan whatsoever—regardless of quality and regardless of the regulations governing it—NAF generated millions of dollars in annual revenues stemming from its activities in the Government-insured residential mortgage business.  But when the loans defaulted (and continue to default), taxpayers, not NAF, were left holding the bag, resulting in substantial monetary losses to the Government.

29.     As a result of NAF's false certifications, NAF obtained significant Government benefits (*i.e.*, Government insurance of mortgage loans), and the Government assumed liability for the loans NAF originated.

30.     As shown by Relator's investigation, many Government-insured loans originated by NAF have defaulted and resulted in claims made against the Government. Under the False Claims Act, NAF is liable for all losses to the Government arising out of these claims.

31.     As a result of NAF's false certifications to HUD-FHA and VA, every loan endorsement under the Government Programs is a fraudulently obtained extension of a Government benefit.  Accordingly, each and every claim made to the Government on any loan endorsed under NAF's fraudulent certifications is tainted, constituting a separate false claim under the False Claims Act.

32.     Therefore, Relator, on behalf of the United States, seeks treble damages and all available civil penalties under the False Claims Act for losses arising out of NAF's unlawful practices in connection with the Government Programs.

## II.   JURISDICTION AND VENUE

33.   This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733.

34.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732.

35.   This Court has personal jurisdiction over NAF, and venue is proper in this District, because NAF can be found and transacts business in the Central District of California.  NAF maintains its principal place of business in Tustin, California, which lies in this District.

36.   This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4), but rather upon information from Relator.

37.   In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined in the False Claims Act.

38.    Relator has direct and independent knowledge of NAF's fraudulent activities.

39.   Relator has also voluntarily provided this information to the Government prior to filing this action as required under 31 U.S.C. § 3730(e)(4)(B).

40.   Relator has served on the United States a copy of the original complaint in this action and a written disclosure statement setting forth and enclosing all material evidence and information she possesses, pursuant to the requirements of 31 U.S.C § 3730(b)(2).

## III.   THE PARTIES

41.   Defendant Broker Solutions, Inc. d/b/a New American Funding is a Direct Endorsement Lender registered with both HUD-FHA and VA under the Government

7

Programs, and is authorized to, and in fact does conduct business in the Central District of California.

42.     Defendant Broker Solutions, Inc. is a California corporation with its principal place of business at 14511 Myford Road, Suite 100, Tustin, California 92780.

43.     Broker Solutions, Inc. participates in HUD's FHA program under Institution ID 21221 and lists a home office of 14511 Myford Road, Suite 100, Tustin, California 92780.

44.     Relator was employed by NAF in NAF's San Jose, California branch in 2016.

45.     Relator was employed by NAF as a loan processor and worked on Government Loans.

46.     Although Relator was physically located in San Jose, Relator worked with NAF's locations in multiple states around the country and observed that NAF's policies and practices described in this Complaint were national in scope.

47.     As such, Relator is familiar with NAF's national policies as they relate to the improper issuance of Government Loans.

48.     Through her past work experiences and education, Relator has extensive knowledge of the rules and regulations applicable to Government Loans.

## IV.   GENERAL FACTUAL ALLEGATIONS

### A.   *HUD's FHA Mortgage Insurance Program*

49.     HUD is a cabinet-level agency of the United States.

50.     Its mission is to create strong, sustainable, inclusive communities and quality affordable homes for all.

51.     HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable rental homes, utilize housing as a platform for improving quality of life, and build inclusive and sustainable communities free from discrimination.

52.     FHA is a part of HUD and is one of the largest mortgage insurers in the world.

53.     Pursuant to the National Housing Act of 1934, FHA offers several mortgage insurance programs that have insured more than 40 million home loans since FHA's inception.

54.     Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans made to single family homebuyers that were originated and held by approved lenders, or mortgagees.

55.     If a homeowner defaults on an FHA-insured mortgage (*i.e.*, stops repaying the loan), the holder of the mortgage may submit a claim to HUD.

56.     HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default, and has in fact done so repeatedly for NAF's loans.

57.     NAF, or whoever may purchase the loan from NAF, therefore suffers no loss when a borrower is unable to repay a Government loan—only the Government suffers the loss.

58.     This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase.

59.     Government mortgage insurance programs therefore help many creditworthy low- and moderate-income families as well as first-time homebuyers become homeowners.

60.     A lender, like NAF, must apply to be a Government Lender and must be approved by the Government to underwrite Government-insured mortgage loans on the Government's behalf.

61.    This is an important responsibility because the Government "does not review applications for mortgage insurance before the mortgage is executed or issue conditional or firm commitments." 24 C.F.R. § 203.5(a).

62.    Instead, the Government Lender underwrites mortgage loans on the Government's behalf and is required to truthfully certify to the Government whether a borrower presents an acceptable credit risk for the government.

63.    Thus, in underwriting the mortgage loan, the lender is required to certify that the borrower and the mortgage loan meet the Government's requirements for insurance and to certify that the "proposed mortgage is eligible for insurance under the applicable program regulations," and submit required documentation to HUD. *Id.*

64.    The Government Lender—such as NAF—must decide whether or not to approve the borrower for a Government-insured mortgage loan.

65.    After the Government Lender approves a borrower for a Government-insured mortgage loan, the lender may submit the mortgage loan for Government insurance (referred to as "endorsing" the loan) and as part of the submission process must also certify that the mortgage loan itself, as well as the lender's entire mortgage loan program, is fully compliant with Government requirements, and thus can be insured by the Government insurance fund in the event that the borrower cannot repay the loan.

66.    Thus, the Government Lender must certify that the loan meets all of the Government's requirements, and the Government relies on the Lender's certification to endorse the loan for Government insurance.

67.    When a Government Lender submits a mortgage for insurance coverage, HUD performs a limited inspection to confirm that the Government Lender has supplied the necessary certifications, and it is only "following this review" that HUD will "endorse the mortgage for insurance by issuance of a Mortgage Insurance Certificate." *Id.* § 203.255(c).

68.     Certain Government Lenders, such as NAF, apply to and participate in the HUD-FHA DE Program, in which the mortgagees themselves endorse the mortgage for Government insurance and retain all documentation supporting the mortgage.  24 C.F.R. § 203.6.

69.     The lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to the Government only upon request. *See* Mortgagee Letter 2005-36; HUD Handbook 4000.1, II.A.1.a.i; HUD Handbook 4155.2, 8.B.1.d.

70.     A Government Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with the Government.

71.     "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein,* 533 F.2d 775, 797 (2d Cir. 1976) (citing *First Nat'l Bank Henrietta v. Small Bus. Admin.,* 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Coop. Bank v. Gleason,* 367 F.2d 289, 293 (1st Cir. 1966)).

72.     As a result, in addition to the specific regulatory duties addressed below, the Government Lender owes both a fiduciary duty and a duty of reasonable care to the Government.

**B.     *HUD's Direct Endorsement Program***

73.     The success of the DE Program depends upon proper underwriting of loan files.

74.     The DE Program is voluntary and gives lenders access to borrowers and revenue streams lenders would be unlikely to access without the support of HUD programming and FHA insurance.

75.     Participating lenders have to determine the eligibility of borrowers and loans for FHA insurance under the Government's requirements, and ensure the integrity of the data relied upon to make such determinations.

76.     Under the DE Program, HUD relies on the expertise and knowledge of the lenders, such as NAF, and relies on their certification that their processes and decisions comply with the Government's requirements.  For DE Program loans, the Government itself conducts no assessment of the loans submitted for endorsement (hence "*direct endorsement*").

77.     The Government relies on the truthfulness of the certification the lender, such as NAF, completes on each loan, which certifies that the loan is eligible for Government insurance, as well as NAF's annual certification that it is complying with all Government-required processes.

78.     As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

79.     As further evidence of the importance of these certifications to HUD, HUD has published a "Pre-Endorsement Review Checklist" that specifically directs the relevant HUD employee to confirm that the Government Lender has submitted the signed certifications.  As the Government has explained in other mortgage fraud litigation, "HUD relies on those certifications.  Indeed, such reliance is the *sine qua non* of the Direct Endorsement program."  *See United States v. Allquest Home Mortg. Corp.*, Case No. 4:12-cv-02676, Dkt. No. 317 at 5 (S.D. Tex. Sept. 19, 2016).

80.     Thus, the DE Lender, in exchange for the Government's loan guarantee, provides underwriting mortgage services for HUD and determines whether a borrower presents an acceptable credit risk for HUD.  Determining whether a loan presents an acceptable credit risk for HUD necessarily requires lenders to confirm that each loan meets Government underwriting criteria, which specify what HUD considers an acceptable credit risk.

81.     After the DE Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the mortgage loan to HUD to "endorse" the mortgage loan for FHA insurance, meaning that the mortgage loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan.

82.     A DE Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage.  NAF's responsibility includes performing due diligence and ensuring the accuracy of loans it endorses.

83.     These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of the Government when endorsing loans for Government insurance, including among other things: reviewing the loans for quality control purposes, reporting defective loans, and submitting claims. *See* HUD Handbook 4000.1, V.A.2.c; HUD Handbook 4155.2, 1.B.8.a-c.

84.     NAF, as a Government Lender, always remains responsible for the actions of its employees that participate in Government transactions. *See* FHA Annual Certifications, *infra* ¶¶ 111-114; *see also* HUD Handbook 4000.1 I.A.6.i; HUD Handbook 4155.2, 9.D.6.b.

### C.     *The FHA's Due Diligence Requirements*

85.     Proper due diligence on the part of the Government Lender is a critical component of the DE Program.  Federal regulations and HUD Handbooks impose specific due diligence responsibilities on Government Lenders.

86.     The entire scheme of Government mortgage guaranties presupposes an honest mortgagee performing the credit investigation with due diligence and making the judgment to lend in good faith after due consideration of the facts found.

87.     In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders' knowledge, good faith, integrity, and candor.

88.     HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

89.     As a result of this fiduciary relationship, the Direct Endorsement Lenders owe the Government a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with the Government.

90.     A lender's due diligence should (1) "determine a borrower's ability and willingness to repay the mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine the property offered as security for the loan to determine if it is sufficient collateral." HUD Handbook 4155.1, REV-5, ch. 2-1; *see also* HUD Handbook 4000.1, II.A.5.d.ii; HUD Handbook 4155.2, 2.A.4.b.

91.     Proper due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral.  In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to "exercise the same level of care which it would exercise in obtaining and verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment." 24 C.F.R § 203.5(c).

92.     HUD has established specific rules for due diligence predicated on sound underwriting principles.  Compliance with these rules is a mandatory and material condition to participate in the DE Program.

93.     In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Government Lenders and with which the Government expects the Government Lender to fully comply. *See* HUD Handbook 4000.1, V.A.2.b.i(A)(1)(a); HUD Handbook 4155.2, 2.A.4.b.

94.     At various times, the Government has promulgated several handbooks detailing the rules and regulations for lenders underwriting Government loans.

95.     Currently, the operative handbook is the HUD Handbook 4000.1-FHA Single Family Housing Policy Handbook ("HUD Handbook 4000.1") which went into effect on approximately September 14, 2015.

96.     Prior to the implementation of HUD Handbook 4000.1, the operative handbook was the HUD Handbook 4155.1 Mortgage Credit Analysis for Mortgage Insurance on One-to-Four Family Properties ("HUD Handbook 4155.1") which was issued in approximately May 2009.

97.     These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. 24 C.F.R. § 203.5(c).

98.     HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C; *see also* HUD Handbook 4000.1, I.B.3.a; HUD Handbook 4155.2, 2.A.3.a.

99.     When ensuring that a borrower is creditworthy, a Direct Endorsement Lender must comply with governing requirements, such as those set forth in the HUD Handbooks.  *See* HUD Handbook 4000.1, II.A.5.a; HUD Handbook 4155.2, I.A.2.a.

100.    The rules set forth in HUD Handbook 4155.1 exist to ensure that a Direct Endorsement Lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

101.    HUD has informed Direct Endorsement Lenders that past credit performance serves as an essential guide in determining a borrower's attitude toward credit obligations and in predicting a borrower's future actions.

102.    The Direct Endorsement underwriter must assume the following responsibilities:

    a.    compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

    b.    the review of appraisal reports, compliance inspections and credit analyses performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

c.   the decisions relating to the acceptability of the appraisal, the inspections, the buyer's capacity to repay the mortgage and the overall acceptability of the mortgage loan for HUD insurance;

d.   the monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program; and

e.   awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

103.   Additionally, Direct Endorsement Lenders are required to comply with the following HUD guidelines:

a.   Direct Endorsement Lenders may only engage in business practices that conform to generally accepted practices of prudent mortgage lenders. *See* FHA Title II Mortgagee Approval Handbook 4060.1, Section 2-10 D. (REV-2, August 14, 2006).

b.   Direct Endorsement Lenders may not engage in practices that demonstrate irresponsibility. *Id.*

c.   Direct Endorsement Lenders may only pay fees for services permitted by HUD program policy. *Id.* at Section 2-22.

d.   Direct Endorsement Lenders are required to function so as to protect the FHA from unacceptable risk. *Id.* at Section 7-2.

104.   The underwriter must "evaluate the mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d). Mortgagees must also employ underwriters who can detect warning signs that may indicate irregularities, as

16

well as detect fraud; in addition, underwriting decisions must be performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* HUD Handbook 4000.1, V.A.2.c.i; HUD Handbook 4155.2, 2.A.4.b.

105.   The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters. *See* HUD Handbook 4000.1, I.A.3.c.iv(B)(3)(b)(ii); HUD Handbook 4060.1 REV-2, 2-9A.   Any staff performing underwriting activities may not be compensated on a commission basis.

### D.   *Certifications And Endorsements For FHA Insurance*

106.   HUD requires Government Lenders to certify their compliance with the fiduciary, due diligence, quality control, and reporting requirements discussed herein.

107.   Direct Endorsement Lenders are required to certify their compliance with the FHA's programmatic and individual loan rules by certifying their compliance with Government requirements, as well as governmental rules and regulations during their initial application to the Government, on an annual basis, and on an individual loan-by-loan basis.

### 1.   NAF's Initial Certifications to HUD

108.   Prior to 2011, NAF submitted an application to HUD to become an FHA lender and to participate in the DE Program, and thus to endorse loans for Government insurance on the Government's behalf.   NAF certified that it would fully comply with HUD requirements, including HUD regulations, FHA handbooks, mortgagee letters, and Title I letters and policies:

> I [NAF] certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks,

mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

109.   Unless NAF submits a truthful initial certification to the Government, NAF would not be entitled to obtain or maintain its status as a Government Lender or to endorse loans for Government insurance.

**2.     FHA Annual Certification Requirements**

110.   Even once NAF was initially certified, NAF was required to, and did, annually re-certify that it is complying with the Government's program requirements, including due diligence in underwriting, adhering to all governmental underwriting requirements, and had implemented a mandatory quality control plan.

111.   Since 2010, NAF was required to, and did, annually certify:

I [NAF] certify that I know, or am in the position to know, whether the operations of [NAF] conform[s] to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of [NAF]. I certify that [NAF] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, [NAF] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [NAF] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [NAF] . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification

on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

112. As of approximately August 1, 2016, a corporate officer of NAF was further required to annually certify:

I certify that I . . . have known, or have been in the position to know, whether the operations of [NAF] conformed to all HUD regulations and requirements necessary to maintain the Mortgagee's FHA approval as codified by 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by the Mortgagee Letter, and any agreements entered into between [NAF] and HUD.

113. NAF also certifies annually that it is responsible for the actions of its employees, including managers, supervisors, originators, underwriters and processors:

I acknowledge that [NAF] is responsible for all actions of its officers, partners, directors, principals, managers, supervisors, loan processors, loan underwriters, loan originators, and other employees of [NAF], and for the actions of any Affiliates participating in the FHA programs for or on behalf of [NAF].

114. NAF also certifies annually that it has been and remains in compliance with all applicable HUD rules and requirements to serve as a Government Lender:

I certify that, to the best of my knowledge and after conducting a reasonable investigation, [NAF] does now, and did at all times throughout the Certification Period, comply with all HUD regulations and requirements necessary to maintain [NAF's] FHA approval as codified in 24 CFR § 202.5, HUD Handbook 4000.1 Sections I and V, as amended by Mortgagee Letter, and any agreements entered into between [NAF] and HUD, except for those instances of non-compliance, if any, that [NAF] reported to HUD

and for which [NAF] received explicit clearance from HUD to continue with the certification process. Each of my certifications is true and accurate to the best of my knowledge. I understand that if I have made any false, fictitious, or fraudulent statement(s), representation(s), or certification(s) knowingly on this form, I may be subject to administrative, civil and/or criminal sanctions, including damages, penalties, fines, imprisonment, and debarment under applicable federal law. I acknowledge that [NAF] is now, and was at all times throughout the Certification Period, subject to all applicable HUD regulations, Handbooks, Guidebooks, Mortgagee Letters, Title I Letters, policies and requirements, as well as Fair Housing regulations and laws including but not limited to 24 CFR § 5.105, Title VIII of the Civil Rights Act of 1968 (the Fair Housing Act) and Title VI of the Civil Rights Act of 1964.

### 3. NAF's Annual Certifications To The FHA Concerning Its Operations Are Important To The Government

115. Absent a truthful annual certification, NAF is not entitled to endorse FHA loans for Government insurance.  Such annual certifications are essential prerequisites to NAF's participation in the DE Program.

116. Absent NAF's submission of the statements in the annual certification described above, NAF cannot endorse loans for Government insurance.

117. Unless NAF had submitted truthful annual certifications, NAF is not entitled to receive the Government's financial backing of any mortgage it originates pursuant to the Government Programs, including the pledge of the Government's full faith and credit for backing such mortgages.

118. The annual certification is material to the Government's decision to allow NAF to participate in the Government Programs and to the payment of any claim submitted under the Government Programs.

119.   As alleged above, the Government does not independently review lenders' operations; instead, it relies on lenders such as NAF to comply with the Government's operational requirements and to ensure that the operational requirements are met.

120.   The certifications are required for NAF to enter and remain in the Government Programs.

121.   NAF's certifications are critical to the Government's ability to ensure that only qualified and eligible loans are endorsed for Government insurance and that NAF has met the government requirements on both a programmatic and individual loan basis.

122.   NAF's certifications are essential for a claim on a NAF-originated loan to be submitted for Government insurance.

123.   NAF's certifications are needed to protect the Government insurance fund from undue risk and loss.

### 4.   FHA Individual Loan Certifications

124.   In addition to its initial and annual certifications of compliance, NAF must also submit a separate certification to the Government for each individual loan that it endorses for Government insurance ("loan-level certifications").

125.   Loan-level certifications are certifications to HUD stating that the individual loan complies with HUD rules and is "eligible for HUD mortgage insurance," as specified in Form HUD 92900-A.

126.   Form HUD 92900-A is a form created by HUD for lenders to use when certifying loans for FHA insurance under the DE Program.  The form requires, among other things, an underwriter or other qualified employee to certify that the "mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program" and "make all certifications required for this mortgage as set forth in HUD Handbook 4000.4."   In addition, the form requires an officer of the lender to "make all certifications required for this mortgage as set forth in HUD Handbook 4000.4" and verify that "statements made in [the] application for insurance and in this Certificate" are "true and correct."  *See* Form HUD 92900-A.

127.   The specific loan-level certification that NAF makes to the Government depends on two factors: (i) whether it is using a Government-approved automated underwriting system ("AUS") to review loan applications; and (ii) if it is using such an AUS, whether the AUS classifies the loan as "accept/approve" or "refer/caution."

128.   Beginning in July 2008, the Government required NAF to electronically process eligible loan requests through an automated underwriting system, or AUS.

129.   An AUS is a software system that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL."

130.   Requirements promulgated by the Government explain how NAF must calculate each data point and what documentation it needs to support each data point.

131.   For each loan that was underwritten with an AUS, NAF must certify "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *See* Form HUD 92900-A; HUD Handbook 4000.1 II.A.4.a.iii(A)(1); HUD Handbook 4155.2 2.A.3.d.

132.   NAF must further certify that "there was no defect in connection with the approval of this mortgage such that the result reached in TOTAL should not have been relied upon and the mortgage should not have been approved in accordance with FHA requirements." *See* Form HUD 92900A3.

133.   The automated underwriting system processes information entered by NAF and rates loans as either "accept/approve" or a "refer/caution."

134.   Therefore, a loan receiving a TOTAL "Accept/Approve" decision is only eligible for FHA's insurance endorsement if "the data entered into the AUS [is] true, complete, properly documented, and accurate." *See* Exhibit 3 (FHA TOTAL Mortgage Scorecard User Guide, p. 8, dated December 2004).

135.   It is NAF's responsibility to ensure the integrity of the data relied upon by TOTAL. *See* Mortgagee Letter 2004-1. In cases where NAF used a Government-

approved AUS, and the system rates a loan as an "accept" or "approve," NAF made the following certification:

> This mortgage was rated as an "accept" or "approve" by FHA's Total Mortgage Scorecard. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

136.   Where NAF uses a Government-approved AUS, and the system rates a loan as "refer" or "caution," or when NAF does not use a Government-approved AUS, NAF makes the following certification, in sum and substance:

> This mortgage was rated as a "refer" or "caution" by FHA's Total Mortgage Scorecard, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement Underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4.

137.   The certifications in HUD Handbook 4000.4, incorporated by reference in both loan-level certifications above, include NAF's certification that the mortgage complies with the Government's underwriting requirements contained in all outstanding Handbooks and Mortgagee Letters.

138.   Specifically, NAF certified that, for each individual loan endorsed:

i.      The proposed mortgage meets the income and credit requirements of the governing law in the lender's judgment.

ii.     NAF used due diligence in underwriting the mortgage.

iii.    That the statements made in its application for insurance are true and correct.

iv.     NAF's statements made in the Lender's Certificate as part of the Direct Endorsement Approval for a HUD/FHA Insured Mortgage are true and correct.

v.      NAF's underwriter makes all certifications required by Direct Endorsement Handbook, which include:

1.   The mortgagor's monthly mortgage payments will not be in excess of his or her reasonable ability to pay. 24 C.F.R. § 203.21.

2.   The mortgagor's income is and will be adequate to meet the periodic payments required to amortize the mortgage submitted for insurance. 24 C.F.R. § 203.33.

3.   The mortgagor's general credit standing is satisfactory. 24 C.F.R. § 203.34.

**E.   *The VA's Home Loan Guaranty Program***

139.   Pursuant to the Servicemen's Readjustment Act of 1944, the VA offers mortgage assistance through the VA Program.

140.   Like FHA loans, VA-guaranteed loans are made by private lenders, such as banks and mortgage companies.   To obtain a VA loan, a veteran must apply to a Government Lender such as NAF.

141.   If the loan is approved, the VA will guarantee a portion of the loan, which protects the VA Lender against loss up to the amount guaranteed. The maximum amount that the VA guarantees is 50% of the loan.

142.   By partially guaranteeing loans against default, the VA loan guarantee encourages lenders to make loans to veterans, and makes the resulting loans more valuable on the secondary market.

143.   Many VA Lenders, including NAF, are authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for the VA, and approve loans for the VA guarantee without prior review or approval by the VA.

144.   To qualify for the VA guarantee, a mortgage must meet all of the applicable VA underwriting requirements.

145.   Much like the HUD underwriting requirements, the VA underwriting requirements relate to such factors as the borrower's income and assets, the borrower's credit history, and the valuation of the subject property.

146.   In underwriting loans and evaluating whether to approve loans for the VA guarantee, VA Lenders are required to follow the VA's applicable underwriting guidelines.

147.   These guidelines are set forth in the VA Lenders' Handbook, *See* VA Pamphlet 26-7 at Ch. 4, and are incorporated into regulations at 38 C.F.R. § 36.4340.

148.   The VA's underwriting guidelines contain rules that must be followed to ensure that each borrower's "present and anticipated income and expenses, and credit history[,] are satisfactory" such that the borrower "is a satisfactory credit risk." 38 C.F.R. § 36.4340.

149.   Further, for a loan to be entitled to coverage under the VA Program, the VA requires that all loans be underwritten by an underwriter with a Staff Appraisal Reviewer ("SAR") number, signifying that he or she is a VA-approved underwriter in the VA program.

150.   Under the VA regulations, a SAR underwriter must have at least three years in processing, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, § 4.a.

151.   Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. *Id.*

### F.   *NAF's VA Loan Certifications*

152.   Like HUD-FHA, the VA relies on Government Lenders to conduct due diligence on loans before approving them for the VA guarantee.  *See* 38 C.F.R. § 36.4340(j).

153.   To satisfy this due diligence requirement, VA Lenders must, among other things, develop all credit information; obtain all required verifications and a credit report; ensure the accuracy of all information on which the loan decision is based; and comply with all of the applicable VA underwriting guidelines. *Id.; see* VA Pamphlet 26-7 at 4-3; VA Form 26-1820.

154.   To participate in the VA Program, each VA lender is required to certify compliance with the VA regulations for underwriting VA loans by submitting VA Form 26-8736.  VA Form 26-8736 is an application for a lender to underwrite VA loans on an automatic and non-supervised basis.

155.   NAF submitted a Form 26-8736 in order to participate in the VA Program.

156.   As part of the express certifications made in this form, each VA lender, including NAF, agreed and certified that it would, amongst other things: comply with Title 38 of the United States Code, VA regulations and other directives issued by the VA; notify the VA of any change in its corporate structure, operations, or financial condition which would have a bearing on its qualifications to automatically underwrite loans; not process loans that it does not itself intend to make; that all prospective VA loans to be closed on an automatic basis will be reviewed and either approved or rejected by an approved underwriter; and take responsibility for all credit information, *i.e.*, credit report, verifications of employment, and deposit, and disclose the sources of such information.

157.   VA Form 26-8736 must be signed by the president or principal officer for each VA lender.   Upon information and belief, NAF's president or principal officer signed NAF's Form 26-8736.

158.   Additionally, for each individual loan that a VA Lender approves for the VA guarantee or refinancing, the lender must certify that it conducted due diligence to ensure that the mortgage complies with the applicable VA underwriting rules. *See* 38 C.F.R. § 36.4340(k).

159.   Pursuant to VA regulations, each loan approved for the VA guarantee or refinancing incorporates the following certification:

> The undersigned lender certifies that the (loan) (assumption) application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 CFR part 36; that all credit reports obtained or generated in connection with the processing of this borrower's (loan) (assumption) application have been provided to VA; that, to the best of the undersigned lender's knowledge and belief the (loan) (assumption) meets the underwriting standards recited in chapter 37 of title 38 United States Code and 38 CFR part 36; and that all information provided in support of this (loan) (assumption) is true, complete and accurate to the best of the undersigned lender's knowledge and belief.

*Id.* at § 36.4340(k)(2)(i).

160.   Additionally, for each loan that a VA Lender approves for the VA guarantee or refinancing, the lender must execute VA Form 26-1820, pursuant to which it further certifies, among other things, that "[t]he loan conforms with the applicable provisions of Title 38, U.S. Code, and the Regulations concerning guaranty or insurance of loans to veterans." NAF submitted VA Form 26-1820 for each individual loan it endorsed under the VA Program.

27

### G.  *NAF's Certifications To The Government Programs On Individual Loans Are Important To The Government*

161.  Absent a truthful loan application certification, NAF is not entitled to endorse a particular loan for Government insurance.

162.  Absent the applicable certifications for an individual loan as described above, NAF cannot endorse that loan for Government insurance.

163.  Unless NAF had submitted a truthful loan-level certification for each loan, NAF is not entitled to receive the Government's financial backing of that mortgage, including the pledge of the Government's full faith and credit for backing such mortgages.

164.  Each of the foregoing loan-level certifications is material to the Government's decision to insure each loan and to payment of any claim submitted under the Government Programs.

165.  As alleged above, the Government does not review Government loans for approval prior to the loan being endorsed for insurance; instead, it relies on lenders such as NAF to comply with the Government's requirements and to ensure that every loan is in fact eligible for Government insurance.

166.  NAF's loan-level certifications are critical to the Government's ability to ensure that only qualified and eligible loans are endorsed for Government insurance.

167.  NAF's loan-level certifications are essential for a claim on a loan to be submitted for Government insurance.

168.  NAF's loan-level certifications are needed to protect the Government insurance fund from undue risk and loss.

### H.  *Defaulted Loans Result In Losses To The Government*

169.  Once a loan is endorsed by NAF, it is insured by the Government on the basis that NAF has followed the Government requirements and has submitted accurate certifications, and that the loan is eligible for Government insurance.

170.   Additionally, NAF's annual certifications ensure that NAF has met all of the Government's requirements on both a programmatic and individual loan basis.

171.   Without those requirements being met, any loan submitted by NAF is not eligible for Government insurance.

172.   It is only because a Government Lender such as NAF has endorsed a loan for Government insurance that the holder of the mortgage is able to submit a claim to the Government for any losses arising out of the mortgage.

173.   If the borrower defaults, the holder of the mortgage can submit a claim to the Government for any loss arising from the default.

174.    The holder submits a claim for insurance by using HUD's electronic claim system.

175.   Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number.

176.   If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim.

177.   The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

178.   FHA pays these insurance claims in two parts.

179.   First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest.

180.   Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (*e.g.*, foreclosure costs), plus interest. HUD Handbook 4330.4, REV-I, ch. 2-4(B).

181.   These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically.

182.   The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments (such as a no-pay flag or indemnification agreement) to paying the claim.

183.   After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

184.   The damages sustained by the United States as a result of claims on the Government resulting from NAF's conduct takes several forms.

185.   First, the United States sustains losses in the form of "net losses" whereby the amount of proceeds received by the Government from reselling the foreclosed properties, or from bundling the loans for sale to an investor, is deducted from the loan or claim amount.

186.   Additionally, any costs associated with foreclosure, resale, or sale of the note, such as marketing expenses, real estate taxes, and maintenance costs, are added to the claim amount.

187.   In other words, the loss to the Government on defaulted loans is adjusted for any proceeds received by the Government from the sale of the foreclosed property, and for any costs associated with the disposition of the property.

188.   Thus, for each loan underwritten, the Government extended its full faith and credit to insure the loan, and that governmental insurance, and the concomitant risk to the Treasury for default, was extended on every endorsed loan, whether the loan defaulted or not.

189.   In addition, the taxpayer has been required to fund the insurance premiums for the FHA program.

190.   Further, the Government incurs significant administrative costs in running the FHA program and accepting endorsed loans by NAF.

191.   In addition, the Government paid claims on any loan that defaulted, including loans originated and endorsed by NAF.

192.   As alleged in more detail below, HUD data shows that *at a minimum*, sixty-six (66) claims have been made to the Government as a result of defaulted FHA loans that NAF originated and endorsed.   *See* Exhibit 1 (Single Lender – Direct Endorsement Lender Spreadsheet).

193.   These data significantly understate the volume of claims actually made on the Government as a result of defaulted FHA loans that NAF originated and endorsed. In particular, the 66 claims identified in the HUD data arose out of loans that defaulted ***within two years of their origination***—*i.e.*, these loans were so poorly underwritten that they failed immediately and resulted in rapid losses to the Government.

194.   According to the same HUD data, two thousand five hundred forty-four (2,544) NAF-originated loans were classified as "seriously delinquent" within the first two years after issuance.

195.   NAF has originated and endorsed hundreds of thousands, or millions, of loans since 2011 under the Government Programs, a significant percentage of which have defaulted and resulted in claims made on the Government.   Discovery is required to specify the total number of claims made.

## V.   NAF'S NATIONAL SCHEME TO DEFRAUD HUD AND THE VA THROUGH DELIBERATELY AND RECKLESSLY APPROVING INELIGIBLE LOANS

196.   NAF knew, deliberately ignored, and recklessly disregarded the fact that it was far from compliant with HUD-FHA rules and requirements necessary to participate in the DE Program, and that many of its loans did not comply with the Government's underwriting requirements and were thus ineligible for Government mortgage insurance.   Relator personally observed the implementation of NAF policies and practices that plainly violate NAF's certifications to the Government.

197.   NAF's focus was on maximizing these profit-making schemes across all locations in the company so it made sure all locations followed these policies.

198. NAF conducted formal and informal training to make sure the company's policies and practices were uniform across the company.

199. The policies described in this complaint reflect NAF's nationwide loan and underwriting polices which are used interchangeably at all its locations.

200. Since at least 2011, NAF has engaged in a regular policy and practice of reckless origination and underwriting of its Government loans and falsely certified to the Government that those loans were eligible for Government insurance.

201. Furthermore, NAF knowingly implemented certain underwriting processes that deliberately ignored and recklessly disregarded Government requirements, resulting in NAF endorsing materially deficient loans for Government mortgage insurance.

202. Additionally, NAF pushed for increased loan volume that came at the expense of loan quality.

203. But NAF's management failed to take effective action to address the seriously deficient loan originations and underwriting that it knew was occurring.

204. NAF instituted a series of policies that replaced their fiduciary obligation with self-interest, maximizing their profits and sales at the Government's expense.

205. NAF's interest was underwriting as many Government loans as possible, secure in the knowledge that if it was not caught, the Government would pay for any defaulted loans.

206. NAF's unlawful policies and practices in violation of its certifications to the Government include at least the following seven categories:

       a. Compensating employees performing underwriting activities on a commission basis—for example, if an employee got 20 loans approved in a 30-day period, NAF paid a commission of $2,500; for 30 loans, it paid $4,500; for 35 loans, it paid $5,500; for 40 loans, it paid $10,000;

       b. Implementing a "management exception policy" by which NAF managers or salespersons (paid on a commission basis) would

override Government Loan requirements and force unqualified loans, or loans for which required documentation was lacking, through for endorsement;

    c.    Taking various steps to improperly increase the appraised value of properties, including making inappropriate "value appeals" to appraisers and effectively blacklisting uncooperative appraisers;

    d.    Manipulating inputs in the Government's electronic underwriting system to game the system in favor of an acceptance;

    e.    Manipulating borrower overtime and bonus income figures to increase the likelihood of loan approval, including using present income as historical income;

    f.    Manipulating borrower debt and debt-to-income figures to increase the likelihood of loan approval, including improperly excluding known debts from borrowers' debt-to-income analyses; and

    g.    Implementing a policy of withholding from the Government known underwriting deficiencies, inaccuracies, and errors in completed loan files subsequently discovered by quality control auditors.

**A.**     *Commission-Based Compensation Policy: NAF Falsely Represented To The Government That It Was Not Paying Employees Performing Underwriting Duties On A Commissions Basis*

207. Government regulations do not allow a Government Lender to compensate an employee who performs underwriting functions with commissions. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(ii).

208. Therefore, NAF "must not compensate employees who perform underwriting … activities on a commission basis." *Id.*

209. This rule helps to ensure that employees performing underwriting functions are making decisions completely on the merits of the individual file and are not incentivized to approve mortgages because of the potential to be paid a commission.

210.   FHA regulations also prohibit an employee from having multiple sources of compensation, either directly or indirectly, from a single FHA-insured transaction. HUD Handbook 4000.1 I.A.3.c.iv.(B)(3)(b)(v).   If an NAF employee receives both a salary and a commission in connection with the same FHA-insured loan, NAF is in violation of this rule.

211.   As alleged above, NAF represented to the Government that it was following such regulations.

212.   NAF, however, as part of its scheme to profit off of Government subsidized mortgage insurance, knowingly compensated its employees who performed underwriting activities on governmental files on a commission basis precisely in order to incentivize its employees to maximize the number of endorsed loans, even when those loans did not meet the Government's requirements.

213.   NAF employees were only paid the commission if the employees performing underwriting functions approved the file.

214.   This amounted to a "kickback" from NAF to their employees when a loan was approved and created a conflict of interest because the employee's compensation was dependent on both supposedly meeting Government requirements, as well as trying to get the loan endorsed even if it did not meet those requirements.

215.   The compensation plan was company-wide in scope and applied at all of NAF's offices at which underwriting occurred.

216.   The plan applied to a variety of different employees performing underwriting functions, including underwriters, processors, and closers.

217.   Although the amounts paid to each employee varied under the terms of the plan, the plan paid a commission to employees performing underwriting functions when they approved a file, regardless of the quality of the file.

218.   Therefore, NAF's commission compensation plan was designed by NAF to put financial pressure on employees to approve a Government loan file in order to increase their compensation.

219.   Significantly, NAF did not specially compensate employees, with commissions or otherwise, for adhering to Government requirements in underwriting Government loans.

220.   Instead, commissions were only paid if Government loans were approved, and were paid regardless of whether the file complied with Government requirements or not.

221.   By implementing this commission compensation plan, NAF incentivized employees performing underwriting functions to approve as many Government-insured loans as possible, even if it meant endorsing deficient files.

222.   The terms of the commission compensation plan were quite generous.

223.   For example, Relator recalls that if in 30 days, an employee approved 20 loans, she would receive a commission of $2,500; 30 files, $4,500; 35 files, $5,500; 40 files, $10,000.

224.   During conversation with Relator, other employees performing underwriting functions told Relator that their pay could be *more than double* their base salary, based on the commission payments they received for approving loans.

225.   Because they were paid so much for approving loans, the employees stated that they would attempt to approve as many files as they could, without regard to the file's qualifications.

226.   Similarly, when Relator received an email in or about August 2016 explaining the size of NAF's bonuses for approved files, and an "extra surprise bonus" that was paid out in addition to the commissions paid based on the number of files approved, Relator called another employee who had been at NAF longer, Denidita Timberlake, to ask if NAF really paid these amounts.

227.   Ms. Timberlake said that NAF absolutely did.

228.   Relator asked how was it even possible to underwrite that many files and Ms. Timberlake said that at NAF, the best way to maximize any bonus was to send "all

files through for approval," regardless of whether they actually met all the qualifications.

229.   Ms. Timberlake noted that employees had learned that, provided there was the bare minimum of income, credit, and asset documents, the Government was unlikely to ever catch the other underwriting violations in the file, and thus they could be sent through for approval with no risk of being caught, and the employees would receive the bonus from NAF.

230.   Upon information and belief, NAF's policy of paying commissions based on the approval of files was applied at all of its branches.

231.   For example, underwriters and/or processors were paid commissions based on the number of loans that they approved at any number of locations, including Irvine, California; Riverside, California; Tustin, California (NAF's headquarters); and also for those underwriters working remotely.

232.   Given that NAF knew, or should have known, that their commission compensation plan motivated the endorsement of non-qualified applicants, regardless of the regulations' requirements, NAF's conduct was highly improper for a Government Lender.

233.   Further, NAF's representations to the Government that it was not engaging in such conduct are false.

**B.**   ***Management Exception Policy: NAF Falsely Represented To The Government That It Did Not Override Government Loan Requirements, And Encouraged Employees To Override Government Loan Requirements***

234.   Government regulations only allow for the endorsement of loans that meet all of the Government's lending requirements. *See* HUD Handbook 4000.1, I.B.3.a. and II.A.

235.   As set forth above, for each FHA loan NAF endorsed, NAF also certified that, as to the loan, there was "no defect in connection with the approval of this mortgage," and also certified that, as to that loan, it was not the case that "the mortgage

1  should not have been approved in accordance with FHA requirements." *See* Form HUD
2  92900-A3.

3     236.   Additionally, for each VA loan that NAF endorsed, NAF certified that "all
4  verifications of employment, deposit, and other income and credit verification
5  documents have been processed in compliance with 38 CFR part 36," and that the loan
6  "meets the underwriting standards recited in chapter 37 of title 38 United Sates Code
7  and 38 CFR part 36."

8     237.   Despite being required to comply with all such Government requirements,
9  NAF instead created a management override process under which NAF management
10 would dictate that loans should be endorsed even if they did not meet the Government's
11 requirements.  In other words, NAF instituted a policy for systematically violating the
12 Government's underwriting criteria and NAF's own certifications to the Government.

13     238.  For a loan to be entitled to coverage under the FHA program, the FHA
14 requires that all loans be endorsed by a licensed underwriter with a Computerized
15 Homes Underwriting Management System ("CHUMS") ID number, signifying he or
16 she is a FHA-approved underwriter in the DE Program.

17     239.  Under the FHA regulations, the underwriter "must have a minimum of
18 three years full-time recent experience (or equivalent experience) reviewing both credit
19 applications and property appraisals." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-
20 4.A.3; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

21     240.  The FHA underwriter must also be a "reliable and responsible professional
22 skilled in mortgage evaluation," and "must be able to demonstrate his or her knowledge
23 and experience regarding the principles of mortgage underwriting." HUD Handbook
24 4000.4, REV-1, CHG-2, ch. 2-4.A.l; *see also* HUD Handbook 4155.2 ch. 2.A.4.a.

25     241.  Further, as alleged above, for a loan to be entitled to coverage under the
26 VA Program, the VA requires that all loans be underwritten by an underwriter with a
27 SAR number, signifying that he or she is a VA-approved underwriter in the VA
28 Program.

242.   Under the VA regulations, a SAR underwriter must have at least three years in processing, pre-underwriting, or underwriting mortgage loans, and at least one year of the most recent three years must have included underwriting decisions involving VA loans. VA Pamphlet 26-7, Ch. 1, § 4.a.

243.   Additionally, the SAR underwriter must have an Accredited Residential Underwriter designation from the Mortgage Bankers Association and must be familiar with the VA's credit underwriting standards. *Id.*

244.   In addition, as discussed above, FHA regulations completely bar employees whose compensation depends on how many loan close from performing any underwriting functions. *See* HUD Handbook 4000.1, 1.A.3.c.iv.(B)(3)(b)(ii).

245.   Despite being required to comply with all HUD-FHA and VA requirements, NAF instead created a management override process under which management would dictate that loans be endorsed even when they did not meet the Government Programs' requirements.

246.   The policy was created by NAF, and helped to make the widespread endorsement of unqualified loans a foregone conclusion when coupled with the tremendous commission-based bonuses employees could receive for originating Government-insured loans.

247.   This policy resulted in multiple endorsements of unqualified loans that the Government insured.

248.   This policy was standard and long-standing, and pre-dated Relator's employment with NAF.

249.   This policy was standard operating procedure at NAF.

250.   Relator reviewed files from around the country and observed that, at all locations across the country, NAF management was empowered in the same way to override underwriting decisions.

251.   The policy was so standard and had been so long established that it was common, from the first moment Relator began work at NAF, to hear loan officers and

others demand that management override unfavorable credit decisions on Government loans.

252.   The management overrides would occur in a variety of ways.   Relator provides three examples here.

253.   First, Loan Officer Managers and Processing Managers were allowed to override underwriting decisions on files at the request of a loan officer.

254.   At NAF, when a loan file did not qualify for FHA insurance, a loan officer would first ask the underwriter to approve the file anyway.

255.   If the underwriter did not agree to underwrite the non-qualifying file under NAF's policies, the loan officer could then take the disagreement to the Loan Officer Manager or the Processing Manager, who would reach out to the underwriter.

256.   If underwriting did not change its decision, NAF's policy allowed the Loan Officer Manager or Processing Manager to take the issue to the Regional Manager (also employed on the sales side of the business rather than the underwriting side), who was empowered to override the decision of underwriting and have the loan approved.

257.   Relator saw this management override happen repeatedly.

258.   For example, starting in August 2016, and in every following month during her employment with NAF, Relator observed multiple Government loan files that did not qualify for coverage being submitted by loan officers.

259.   In particular, she remembers Mario Martinez, Jamie Del Bosque, and Leola Edmond submitting non-qualifying files for Government insurance.

260.   All three individuals are employed on the sales side of the business, are not trained as underwriters, and do not have the requisite CHUMS or SAR certifications necessary to underwrite Government loans.

261.   When those non-qualifying files were rejected, following NAF's policy, the loan officers approached Loan Officer Manager Michael Garcia to have those files accepted.

262.   Mr. Garcia was paid on a commission basis for having files approved.

39

263.   If Mr. Garcia did not succeed in having the decision on those files reversed, he would take the files to Kevin English, Processing Manager, and Mr. English would then typically have the non-qualifying files underwritten.

264.   Mr. English only declined to force such files through for approval if the file, on its face, lacked basic support in the three areas of income, asset, or credit documents, because that is all that NAF needed (per its defective internal policy) for an approval.

265.   Mr. English's job performance was measured on the basis of the number of loans his group closed, and not on the quality of those loans.

266.   In fact, Mr. English was constantly emphasizing the importance of having loans approved each month.

267.   At 5:00 p.m. at the end of each month, NAF would publicize whether Mr. English and the employees who worked for him had exceeded the number of approved files that they had approved the month before, and he would circulate the results to his group.

268.   Further, Mr. English was called by NAF loan officers around the country to have unqualified files approved, which he did, because NAF's policy was nationwide in scope.

269.   The second way in which the management override policy operated was to have management approve problematic loans even before they were initially denied by underwriting.

270.   Mr. English told Relator that NAF tried to avoid even initial rejections by underwriting and the subsequent appeals by loan officers.

271.   Mr. English told Relator, in or around August 2016, that if Relator saw a file that did not meet underwriting requirements, then she was to take the file out of the normal process before it was declined, and bring the file to him, or to her Team Lead, Joseph Garcia.  Mr. English made clear that this was NAF policy.

272.   Mr. English would review any file Relator brought to him that appeared to fall short of underwriting requirements.

273.   Only if the file lacked basic documentation in regards to income, assets, or credit would Mr. English decline to take any action to avert a denial; otherwise, he would have the file approved.

274.   Even when Relator pointed out to him clear problems in the file stemming from deficiencies in other requirements, Mr. English would have the file sent through for approval.

275.   Pursuant to NAF policy, and as instructed by Mr. English, Relator also took non-qualifying loan files to Mr. Garcia.

276.   She would do so multiple times a week between September 2016 and December 2016.

277.   If the file actually did meet the underwriting guidelines, Mr. Garcia would explain why.

278.   Most of the time, though, the files Relator brought to Mr. Garcia did not meet the underwriting criteria.

279.   When the file did not meet the underwriting requirements and Mr. English was having it approved anyway, Mr. Garcia would say, in words or substance, "I'll just have it pushed through," or "Ok, we're fine—just send it off."   Mr. Garcia made such statements at least weekly between September, and December 2016 in response to unqualified files brought to his attention by Relator.

280.   Mr. Garcia would then have the non-qualifying file approved per NAF policy.

281.   Relator also recalls that after Messrs. Garcia or English would send the non-qualifying files through for approval, the underwriters on the files would often discuss with Relator how dangerous it was to be approving such bad files.

282.   As just one example, NAF employee Merrill Schultz, on or around the third week in September 2016, told Relator she was very upset, and was visibly upset, about

41

the fact that files got approved under the management override policy, and she also remarked that this happens "a lot around here."

283.   As another example, NAF employee Judy Burley, on or about the last week of September 2016, told Relator that sales had too much influence over underwriting decisions at NAF because of the management override policy.

284.   Ms. Burley also stated that she and the other underwriters were frequently lobbied by the loan officers to approve loans, which was not permitted at her previous employer.

285.   From the date of the August 2016 conversation with Mr. English on forward, every Government loan file that Relator reviewed that did not meet the Government Programs' requirements ended up being endorsed to the Government through the management override process, provided there was minimal income, credit, and asset documentation in the file.

286.   Further, this management override policy was long-standing.

287.   In fact, multiple long-term NAF employees told Relator that this was the way NAF processes had always worked.

288.   As one example, NAF employee Loretta Bonander told Relator on or around December 7, 2016, that she could not believe that there had been a management override on a highly unqualified FHA loan, but she then noted that this was the way NAF had done things for years.

289.   At the time, Ms. Bonander had been employed by NAF for a total of approximately five years.

290.   As another example, on or about September 6, 2016, Relator had a conversation with NAF employee Ruby Dandha in which Relator expressed surprise at the management override policy.

291.   Ms. Dandha, who had been employed at NAF for approximately five years at the time, said that "that happens a lot around here."

292.   In fact, on or about November 29, 2016, NAF employee Maria Pineda said that she had originally started as a loan processor at NAF, but because the sales team had so much control over the underwriting process, she moved over to become a loan officer approximately five years ago.

293.   The third way in which the management override policy operated involves NAF's "condition approval" policy.   Under NAF's condition approval policy, an underwriter conducts an initial review of pending loan applications, and approves a subset of loans for Government insurance with "conditions."

294.   These conditions—which relate to all aspects of the loans, including the borrower's income, assets, and credit—must be satisfied before the loans can close and be endorsed for Government insurance consistent with the Government Programs' underwriting rules.

295.   A "condition" is a particular Government requirement for a loan to be approved, and if the condition is not met, the file cannot be approved.

296.   Because a condition represents a Government requirement for the file to be approved, the review and decision on whether a condition is met must be made by the CHUMS or SAR underwriter herself, and not by other employees.

297.   NAF allowed Processing Managers to approve the files by removing the conditions, instead of that review being performed by properly certified (*e.g.*, CHUMS or SAR) underwriters.

298.   These individuals lack the qualifications necessary to be underwriters on Government loans, and their performance of underwriting activities constitutes a clear violation of the HUD-FHA and VA requirements concerning appropriate licensure of underwriting employees.

299.   Moreover, because NAF measured their performance on the basis of the number of loans approved, it created a financial incentive for such employees to force loans through for approval, not to have the loans underwritten correctly.

300.   Additionally, the policy also allowed the unqualified employees to "move" a condition to post-close, whereby the loan would be funded and closed without having anyone approving that the condition had been met.

301.   Thus, despite what NAF certified to the Government, NAF empowered unqualified and unlicensed employees to approve Government loans whenever there was a "condition" on that file, cutting the Government-approved underwriters out of the process.

302.   For example, in late September, Relator had a conversation with NAF employee Barbara (last name unknown), an experienced underwriter, in which Barbara stated that "conditions" are normally and routinely removed by Kevin English, even though the conditions were not satisfied.

303.   Barbara said it is very difficult to see in the NAF computer system when this happened, but that it happened frequently under the NAF condition approval policy.

304.   This management override policy was nationwide in scope.

305.   Relator worked with NAF's locations in multiple states around the country, and the same management override policy covered the various offices and was implemented at each.

306.   In addition, other NAF underwriters and processors around the country witnessed similar instances in which NAF improperly waived conditions or made management exceptions to files.

307.   For example, an underwriter who worked for NAF in its Irvine, California and Riverside, California branches and as a remote underwriter, was told by her manager, Lorenda Lozano, in approximately 2015 or 2016, that "we don't need to get" or "we'll be okay without" documents that were required conditions for FHA and VA loans.

308.   Additionally, this underwriter recalls that when documents were required as conditions for FHA and VA loans, such as verifications of rent, Ms. Lozano would

refer to waiving the conditions as a "business decision" and would allow the loan to be closed despite the fact that not all the required documents had been obtained.

309.   As another example, when a loan processor who worked at the Tustin, California headquarters told the loan officers that their files could not be approved with the income figures that had been used, the loan officers would complain to the sales managers in order to get the sales managers to waive the conditions that had been set by the underwriting team.

310.   For example, this Tustin-based loan processor witnessed a situation in which a loan officer had impermissibly used Social Security income for a son whose father was deceased even though the son was more than eighteen years old, which had the effect of inflating the borrower's income.

311.   After the loan processor informed the loan officer that the Social Security income could not be used, the loan officer complained to the loan processor and lobbied to have a sales manager allow the Social Security income to be used for purposes of borrower income.

312.   This same loan processor also witnessed her Processing Managers, Kevin English and Natalie Welch, frequently waiving conditions on files, especially towards the end of the month—*i.e.*, for the purpose of pushing files through for approval to meet monthly company requirements or quotas.

313.   Another loan processor who worked for NAF in Orange County, California, was also told by the Processing Manager, Natalie Welch, in approximately the second half of 2014 or first half of 2015, that she could "push" conditions by moving them to post-closing, or in some cases, waive them altogether.

314.   The examples above illustrate just some of the ways NAF improperly employed "management override" policies to flatly reject or ignore the very underwriting requirements with which NAF had certified its compliance.

315.   Consistent with NAF's profit-maximizing goals, NAF's subordination of underwriting management to its sales goals was meant to, and did in fact, result in the

endorsement of loan applications in which the applicant's qualifications did not conform to the Government's requirements, yet still received Government insurance.

316.  Because of the management overrides, NAF succeeded in its goal of underwriting more guaranteed loans even though those loans did not qualify for insurance coverage.

317.  Given that NAF knew, or should have known, that NAF's subordination of underwriting management to its sales goals would result in the endorsement of unqualified loans, NAF's conduct was highly improper for a Government Lender.

### C.  *Value Appeals: NAF Falsely Certified To The Government That It Was Performing Accurate Appraisals Of Properties*

318.  As described above, NAF's policies were designed to allow the underwriting of loans that did not comply with the Government Programs' requirements.

319.  However, as described above, NAF wanted even non-compliant loans to appear to meet certain basic requirements of income, credit, and assets, so that it was less likely that the bad loans would be discovered by the Government.

320.  One of the ways NAF caused non-compliant loans to appear to meet certain basic requirements  was to falsely inflate the value of the loan collateral, through a "value appeal" process.

321.  FHA regulations require that a Government Lender prohibit "any person who is compensated on a commission basis upon the successful completion of a Mortgage … from … ordering or managing an appraisal assignment." HUD Handbook 4000.1, II.A.1.a.iv.C.1.a.

322.  The purpose of this regulation is to protect the integrity of appraisal values, and to make sure that employees ordering or managing appraisals are not being incentivized to modify, manipulate, or otherwise interfere with property values in order to get a loan approved.

323.   The person ordering or managing an appraisal has both direct and indirect power or influence over the person conducting an appraisal, and such influence is so hard to detect that the Government simply prohibits lenders, such as NAF, from using any employee paid on a commission basis from ordering or managing appraisals.

324.   In addition, the lender must "have the property appraised in accordance with [the] standards and requirements" prescribed by HUD.  *See* 24 C.F.R. § 203.5(e).

325.   HUD's standards and requirements for appraisals prohibit each of the following:

    a.    withholding or threatening to withhold timely payment or partial payment for an appraisal report;

    b.    conditioning the ordering of an appraisal report or the payment of an appraisal fee, salary, or bonus on the opinion, conclusion or valuation to be reached, or on a preliminary value estimate requested from an Appraiser;

    c.    ordering, obtaining, using, or paying for a second or subsequent appraisal or Automated Valuation Model (AVM) in connection with a Mortgage financing transaction unless:

        1.    there is a reasonable basis to believe that the initial appraisal was flawed or tainted and such belief is clearly and appropriately noted in the mortgage file; or

        2.    such appraisal or AVM was completed pursuant to a written, pre-established bona fide pre- or post-Disbursement appraisal review or quality control process or underwriting guidelines and the Mortgagee adheres to a policy of selecting the most reliable appraisal, rather than the appraisal that states the highest value;

    d.    withholding or threatening to withhold future business from an Appraiser, or demoting or terminating or threatening to demote or

47

terminate an Appraiser in order to influence an Appraiser to arrive at a predetermined or desired value;

e.    making express or implied promises of future business, promotions or increased compensation for an Appraiser in order to influence an Appraiser to arrive at a predetermined or desired value;

f.    requesting that an Appraiser provide an estimated, predetermined or desired valuation in an appraisal report prior to the completion of the appraisal report, or request that an Appraiser provide estimated values or comparable sales at any time prior to the Appraiser's completion of an appraisal report;

g.    providing to the Appraiser an anticipated, estimated, encouraged or desired value for a subject Property or a proposed, or target amount to be loaned to the Borrower, except that a copy of the sales contract for purchase and any addendum must be provided; or

h.    performing any other act or practice that impairs or attempts to impair an Appraiser's independence, objectivity, or impartiality, or that violates any applicable law, regulation, or requirement.

HUD Handbook 4000.1 II.A.1.iii.(B)(6)(d).

326.   Additionally, a Government Lender "must accept responsibility, equally with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held accountable by HUD for the quality of the appraisal." *See* HUD Mortgagee Letter 1994-54.

327.   The appraisal is important to the eligibility of the loan for Government insurance because HUD places limits on the eligible loan amount based on the appraised value of the property.

328.   The maximum eligible loan amount is determined by HUD's loan-to-value limits, which compare the loan amount to the appraised value.

329.  Using loan-to-value limits is one method by which HUD limits its exposure in the event of default.

330.  Even though NAF represented to the Government that it was in compliance with these appraisal policies, NAF's internal appraisal policies flatly contradicted the Government's policies.

331.  NAF routinely pressured appraisers with "value appeals," whereby NAF loan officers pressured the appraisers to come up with an inflated property value to enable the loan to go through.

332.  First, NAF policy provides that the loan officer would contact the appraiser that was to perform the appraisal, even though NAF had certified to the Government that loan officers (who are paid commissions) played no role in the ordering or managing of appraisals.

333.   A loan officer received a substantial commission if he or she could get the appraiser to value the property at a sufficiently high dollar amount, yet that loan officer was the one arranging for the appraisal.

334.  Second, NAF's computer systems made the scheduling of the appraisal visible to the loan officer, so that the loan officer could physically attend the appraisal or otherwise be present at the property at the same time the appraiser was there.

335.  NAF used a vendor to retain appraisers, and the vendor's internal website was accessible to and used by NAF loan officers.  The vendor was responsible for assigning appraisers to handle appraisals for NAF.

336.  In September, October, and November of 2016, Relator observed loan officers commenting that they had been present at the property while the appraiser was performing the inspection, and that they attended for the purpose of ensuring the appraisal resulted in a "good" value for the property.

337.  Third, NAF's loan officers made clear internally, as well as to the appraisers themselves, that they would only use "cooperative" appraisers, *i.e.*, appraisers

who would come in with numbers at the level the loan officers had set for the value appeal.

338.   When appraisers did not do so, the loan officers would use the vendor's internal website to record comments such as "please use a different appraiser" or "appraiser comes in too low" when the appraiser in question did not offer the desired appraisal value.

339.   NAF loan officers' comments criticizing the outcome of the appraisals would steer business away from appraisers who attempted to act with integrity in conducting appraisals rather than simply giving in to NAF's "value appeals."

340.   Because the potential pool of appraisers was small, NAF loan officers were able to exercise great control by weeding out the appraisers who did not give in to their value appeals.

341.   For example, Relator remembers NAF employees Loretta Bonander and Grace Olivetti, both loan officer assistants, recording such comments on behalf of their loan officers in or about September to November 2016.

342.   To make matters worse, if a loan officer did not like the appraisal number, the loan officer could have NAF personnel contact the appraiser and demand to know why the appraised value was so low—essentially intimidating appraisers into bending to NAF's will.

343.   Indeed, Relator remembers seeing comments in files such as "ask appraiser to explain low value."  These comments were made by loan officer assistants on numerous files.

344.   Fourth, during all these appraisals, NAF underwriters had limited involvement in ordering or managing appraisals; the process was left almost entirely to loan officers and their assistants, *i.e.*, to employees with a financial incentive to interfere with the appraisal value.

345.   Consistent with the NAF's profit-maximization goals, NAF's use of value appeals was meant to, and did in fact, result in the endorsement of loan applications in

which the applicant's qualifications did not conform to the Government's requirements, yet still received Government insurance.

346.  Given that NAF knew, or should have known, that NAF's use of value appeals would result in the endorsement of unqualified applicants, NAF's conduct was highly improper for a Government Lender.

**D.**  ***Gaming The System: NAF Falsely Represented To The Government That It Was Not Manipulating Variables In The AUS/Total System In Order To Endorse FHA Loans For Unqualified Buyers.***

347.  As part of its scheme to approve as many Government loans as possible, regardless of quality, NAF instructed employees to systemically manipulate the data that was entered into NAF's automated underwriting system, or AUS, to determine variables that would lead to an approval.

348.  As alleged above, the proprietary HUD algorithm, Technology Open to Approved Lenders, or "TOTAL," rates loans as either "accept/approve" or "refer/caution" based on data points that NAF employees enter into NAF's AUS, including, for example, the dollar value of the borrowers' income and assets.

349.  Loans that receive an "accept/approve" rating are subject to less stringent documentation requirements and underwriter scrutiny than loans that receive a "refer/caution" rating.

350.  Direct Endorsement Lenders are not permitted to manipulate the information they enter into an AUS/TOTAL to determine what specific variable amounts would result in an "accept/approve" rating.  Instead, if the system provides a "refer/caution" rating, the loan must be manually underwritten.

351.  In order to avoid additional documentation and loan scrutiny that "refer/caution" ratings require, NAF schemed to defraud the Government by predetermining data variables that would result in an "accept/approve" rating.

352.  When an NAF employee initially runs a loan through NAF's AUS, he or she enters variable amounts consistent with the borrower's representations and/or the documents in the loan file.

353.   However, if a loan receives a "refer/caution" rating, the NAF employee would isolate one or more variables, including most commonly the borrower's income or monthly debt obligations.  The NAF employee would then systematically increase or decrease the variable(s) during successive AUS/TOTAL runs over a short period of time to identify the variable amount(s) that would result in an "accept/approve" rating.

354.   As made clear by HUD Handbook 4000.1, "[i]f a determination is made that the Mortgage must be downgraded to manual underwriting, the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting when underwriting a downgraded Mortgage." HUD Handbook 4000.1, II.A.4.(B)vi. NAF regularly violated this requirement by resubmitting loans with modified income, asset, or debt variables in order to game the system in favor of an "accept/approve" rating.

355.   Lenders are not permitted to "willfully manipulat[e] the[] application variables ... to obtain an accept/approve risk classification." HUD Mortgagee Letter 2005-15; HUD Handbook 4000.1, II.A.4.B.iv.

356.   The Government's prohibition on entering unsubstantiated or manipulated data points into an AUS exists, among other reasons, to protect against fraud.

357.   Additionally, non-underwriters, such as loan officers, are not supposed to be using the AUS system.

358.   The purpose of the system is to allow underwriters to determine whether they need to manually underwrite a loan or not.  It is not intended to be used to reverse engineer an approval to which a loan is not entitled, nor is such use permitted by HUD.

359.   For instance, if a Government Lender entered factually unsupported income or asset amounts into an AUS—and thereby determined the precise amount of income or assets necessary to obtain an "accept/approve" rating from the AUS, the lender could falsify loan documents to state that the borrower possesses the required amount of income or assets.  In other words, this fraudulent use of the AUS/TOTAL system enables a lender to cover its tracks.

360.   That is why the regulations require that a Government Lender's employees cease using AUS/TOTAL as soon as the result is a "refer/caution."

361.   Relator witnessed on numerous occasions NAF loan officers manipulating data in the AUS system after the loan file received a "refer/caution" rating.

362.   As just one example, in the second week of November 2016 on NAF's internal File No. 120016109350, an FHA file, the AUS was run twenty-two (22) times after a Decline (*i.e.*, a "refer/caution" rating) so that the loan officer, Travis Dungca, could reverse engineer and find out what data needed be fabricated in order to return an approval using false asset information.

363.   Mr. Dungca used the incorrect, false asset information to get the file approved.

364.   Consistent with the NAF's profit-maximization goals, NAF's policy and practice of gaming the AUS/TOTAL system in this fashion was meant to, and did in fact, result in the endorsement of loan applications in which the applicant's qualifications did not conform to the Government's requirements, yet still received Government insurance.

365.   Given that NAF knew, or should have known, that NAF's policy and practice of gaming the AUS/TOTAL system would result in the endorsement of unqualified applicants, NAF's conduct was highly improper for a Government Lender.

**E.    *Inflating Borrower Income: NAF Improperly Inflated Borrowers' Income Using Unallowable Exceptions To Income Calculations***

366.   NAF falsely certified to the Government that it was properly calculating borrowers' income in determining whether to approve a governmental loan even though it knew it was not doing so.

367.   NAF's policy and practice of improperly calculating a borrower's income manifested itself in a variety of ways, including not properly averaging a borrower's bonus and overtime earnings over the required regulatory time period in order to inflate a borrower's income.

368.   NAF's policy and practice of improperly calculating borrowers' income was applied nationally in scope.

369.   Given the significance of a borrower's income to the borrower's ability to make continued payments on a loan, the Government Programs' guidelines set strict standards for the proper calculations of income to be made.

370.   For example, under HUD Handbook 4000.1 II.A.4.c.v.B, a lender may only use a borrower's overtime and bonus income if the borrower has received that income for the past two (2) years and it is reasonably likely to continue.

371.   Furthermore, under HUD Handbook 4000.1 II.A.4.c.v.C, for borrowers with overtime or bonus income, the lender may only use the average of any overtime or bonus income earned over the previous two (2) years.

372.   Under the HUD regulations, the lender must establish that the overtime and bonus income are likely to continue. *See* HUD Handbook 4000.1, II.A.4.c.v.B; *see also* HUD Handbook 4155.1, 4.D.2.b.

373.   Similarly, under the VA's relevant regulations, income from overtime and bonuses can only be used if it has continued and been verified for at least two (2) years, must be regular and predictable, and must be reasonably likely to continue in the foreseeable future. VA Pamphlet 26-7, ch. 4, 2.h.

374.   Despite these requirements, NAF routinely used impermissible income calculations related to bonuses and overtime.

375.   For example, instead of using the borrower's average income calculation for the preceding two years, NAF would routinely extrapolate the borrower's income for the *following* two years based on their current earnings.

376.   In other words, instead of using a two-year history of the borrower's income, NAF used the borrower's present earnings as their "historical" earnings.  This has the effect of significantly inflating borrower income.

377.   Relator recalls that her manager Kevin English told underwriters in emails that they should use the borrower's "rolling 24 month" income, which meant that

employees should use only the borrower's present income in projecting out the borrower's income for the following two years.

378. Additionally, Relator recalls that NAF would use the historical earnings, overtime, and year-end bonuses for tomato pickers in California. Due to the climate in California, the earnings (including year-end bonuses) of the tomato pickers in California would fluctuate greatly. Despite these fluctuations that made the income unpredictable, Kevin English instructed NAF's underwriting staff to use the "rolling 24 month" income and treat the borrowers' income as if it would be consistently earned from year to year, which was untrue.

379. As another example, Relator recalls a situation in which a borrower who was a bank teller earning a salary of $24,000 per year was promoted to management and earned a $98,000 one-time bonus as part of the promotion. For this loan, the loan officer wanted to impermissibly factor in the one-time bonus as part of the borrower's earnings. However, since the bonus was a one-time promotion bonus, it could not be included in calculating the borrower's income as it was unlikely to, and in fact would not, continue. Despite this prohibition, NAF used the bonus as part of a "rolling 24 month" income by averaging it over two years, despite violating the baseline requirement that the bonus must be likely to continue in the future.

380. In other situations, NAF would also impermissibly use bonuses that had not yet been earned to inflate the borrowers' income. For example, if a borrower did not qualify under Government underwriting criteria, but they were expecting to receive a bonus payment soon, the loan officer would test whether the loan would be approved by running the loan on NAF's AUS, including the yet-to-be earned bonus. If the bonus was enough to get the borrower to qualify using the AUS, the loan would be approved even though the money from the future bonus was not actually there, and may never arrive.

381.   Relator is aware that NAF regularly submitted loans to the Government Programs despite such loans' blatant non-compliance with the income-related regulations listed above.

**F.**   ***Minimizing Borrower Debt: NAF Deliberately Excluded Debt Obligations In Order To Obtain Approvals***

382.   NAF also falsely certified to the Government that borrowers' debt obligations were within the ratios allowed by the Government in order to obtain approvals by deliberately excluding certain debts of borrowers.

383.   For example, under the FHA's applicable regulations, if a borrower has a credit score of 500 to 579, or no credit score at all, the borrower's total debt-to-income (or "DTI") ratio may not exceed 43% and the payment-to-income ratio may not exceed 31%. *See* HUD Handbook 4155.1, 4.C.3.c; HUD Handbook 4000.1 II.A.5.d.viii.

384.   Additionally, under the VA's applicable regulations, a borrower's total debt-to-income ratio may not exceed 41%.  VA Pamphlet 26-7, ch. 4, 10.b.

385.   NAF's policy and practice of minimizing borrower debts and manipulating borrower debt-to-income ratios was carried out in a number of ways, including improperly excluding certain debts and contingent liabilities of borrowers.

386.   NAF's policy and practice of minimizing borrower debts and manipulating borrower debt-to-income ratios to approve ineligible Government loans was applied nationally in scope.

387.   Under HUD Handbook 4000.1, II.A.4.b.iv.A, in calculating the DTI ratio, the borrower must include all applicable monthly liabilities in determining the borrower's debt obligations unless such debts will be paid off within ten months and the cumulative payment of such debts is less than or equal to five (5) percent of the borrower's monthly gross income.

388.   Similarly, under the relevant VA regulations, debts and obligations must be deducted from the effective income when those debt obligations have a remaining term of 10 months or more, or where any debt obligations of less than ten months would

cause a severe impact on a family's resources for a period of time. *See* VA Pamphlet 26-7, ch. 4, 5.c.

389.   Despite these regulations, NAF impermissibly waived borrowers' debt obligations that were required to be calculated in the debt-to-income ratios for Government loans.

390.   As just one example, for NAF's internal file 137316088706, Relator ran a soft credit report through Equifax shortly before the loan was set to close.

391.   When Relator reviewed the report, the credit report showed that the borrower had credit card debts, a new personal loan (which were previous credit card debts), had refinanced her car, and had a timeshare.

392.   As a result of these debts, the borrower's debt-to-income ratio was above the permissible amount.

393.   Despite the fact that the borrower's total monthly debt obligations had increased by more than $100 per month, NAF did not re-submit the loan for evaluation in the AUS.

394.   If NAF had properly run the loan through AUS, including the debts, the loan would have been rejected because it exceeded the maximum allowable debt-to-income ratios.

395.   Due to these undisclosed debts, Relator called her manager, Joseph Garcia, and told him about the undisclosed debts that required re-running the loan through the AUS.

396.   Relator is aware that the loan ultimately closed on or about September 6, 2016, despite NAF being aware of the undisclosed and unaccounted-for debt and failing to properly include the debt in the borrower's debt-to-income analysis.

397.   NAF also excluded certain debts from the calculation of the debt-to-income ratio on the basis that such debts were considered excludable contingent liabilities.  A contingent liability refers to a liability that may result in the obligation to repay only when a specific event occurs.  For example, a contingent liability exists when an

individual can be held responsible for the repayment of a debt if another legally obligated party defaults on the payment.

398.   Government Lenders may exclude contingent liabilities only in limited circumstances.

399.   For example, if a Government Lender does not wish to include a co-signed liability in the calculation of a monthly obligation, the Government Lender must obtain documentation to evidence that the other party to the debt has been making regular on-time payments during the previous 12 months, and does not have a history of delinquent payments on the loan.  HUD Handbook 4000.1 II.A.4.L.4.b.

400.   Evidence that the other party on a co-signed debt has been making regular on-time payments would require documentation, such as twelve months of cancelled checks.

401.   Similarly, under the relevant VA regulations, a Government Lender may exclude the contingent liability from the calculation of the net effective income calculation if: (1) there is evidence of loan payments being made by someone else, and (2) there is no reason to believe that the borrower will have to participate in the repayment of the other loan.  VA Pamphlet 26-7, ch. 4, 5.d.

402.   Despite the above regulations, NAF falsely certified on FHA Loan No. 198-05858356-703 that the borrower met the Government Programs' requirements by failing to include a contingent debt obligation.

403.   On this file, Relator's underwriting review revealed that the borrower had an undisclosed debt for a vehicle.

404.   Although the vehicle debt did not show up on the soft credit report, the borrower's bank statements showed recurring monthly payments which Relator determined were for car payments.

405.   Further investigation by NAF revealed that the borrower stated that the debt was a co-signed loan for the borrower's son's car.

406.   Despite the above-cited regulations requiring NAF to obtain satisfactory evidence of the other party's regular on-time payments on the co-signed loan, such as twelve months of cancelled checks from the borrower's son, in order to exclude such debt from the debt-to-income ratio calculation—evidence that NAF did not possess—NAF excluded the debt.

407.   Specifically, manager Kevin English stated that the debt could be waived simply because the borrower said the debt was not his own debt, and the debt had not showed up on the soft credit report.

408.   This loan closed on or about September 24, 2016.

409.   As another example of improperly excluding required debt obligations, NAF excluded debts where the borrower had unpaid income taxes that were required to be included in the calculation of the borrower's debt-to-income ratio.

410.   Under HUD Handbook 4000.1, II.A.4.D.2, a Government Lender must include any debts owed to the federal Government.

411.   Despite this requirement, on FHA File No. 1198-0870544-734, NAF did not include the borrower's unpaid income taxes in the calculation of the borrower's debt-to-income ratio.  Furthermore, the borrower had no payment agreement with the IRS for the payment of such a debt.

412.   This loan closed on or about October 22, 2016.

413.   Relator is aware that NAF regularly submitted loans to the Government Programs despite such loans' non-compliance with the debt obligation regulations listed above.

   **G.**   ***Quality Control Deficiencies: NAF Falsely Certified To The Government That It Maintained A Sufficient Quality Control Process***

414.   NAF falsely certified to the Government that it was properly following audit findings and adopting proper quality control mechanisms, even though NAF knew that it was hiding and destroying such documents.

59

415. NAF's policy and practice of ignoring, disregarding, or failing to follow audit findings and failing to adopt proper quality control mechanisms was applied nationally in scope.

416. The Government requires that "[t]he Quality Control function must be independent of the [lender's] origination and servicing functions." HUD Handbook 4060.1, REV-2, ch. 7-3.B; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.A.

417. A Government Lender's quality control program must be designed to meet the goals of assuring compliance with the Government's requirements, protecting the Government from unacceptable risk, guarding against errors, omissions, and fraud, and assuring swift and appropriate corrective action. HUD Handbook 4060.1, REV-2, ch. 7-2.

418. The quality control program must provide for periodic review of a sample of all closed loan files to ensure they were underwritten in accordance with the Government's guidelines. HUD Handbook 4060.l, REV-2, ch. 7-6.C; *see also* HUD Handbook 4700.2, REV-1, ch. 6-1.D.

419. When a lender reviews a loan file for quality control purposes, the lender must, among other things, review and confirm specific pieces of information and the availability of certain documentation.

420. For instance, "[d]ocuments contained in the loan file should be checked for sufficiency and subjected to written reverification. Examples of items that must be reverified include, but are not limited to, the mortgagor[']s employment or other income, deposits, gift letters, alternate credit sources, and other sources of funds." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2; *see also* HUD Handbook 4700.2 REV-1, ch. 6-3.A.2.

421. If the lender finds discrepancies in conducting these quality control audits, it must explore them to ensure that there are no deficiencies. "Any discrepancies must be explored to ensure that the original documents ... were completed before being

signed, were as represented, were not handled by interested third parties and that all corrections were proper and initialed." HUD Handbook 4060.1, REV-2, ch. 7-6.E.2.

422.   At the end of the quality control review, the lender must assess the significance of any deficiencies.

423.   While NAF did maintain a basic quality control system, the system failed to comply with the Government's basic quality control requirements, including the obligation to address serious quality control problems and to take steps to prevent mortgage fraud.

424.   For example, a Quality Control Auditor that worked at NAF's Tustin, California headquarters witnessed multiple incidents in which NAF's quality control auditors identified fraud or other underwriting deficiencies, but NAF ignored the audit findings.

425.   In auditing an FHA file in approximately 2015, the Quality Control Auditor's review of the file indicated that the borrower had child support income which was used to qualify the borrower's income.   However, the Quality Control Auditor's review indicated that, while that the file indicated the child was 14 years old, the child was in fact 19 years old, and therefore the child support income could not be used to qualify the borrower.

426.   When the Quality Control Auditor contacted the borrower as part of the audit to determine how this loan had been approved, the Quality Control Auditor received information that led him to believe that the borrower had been told by the NAF loan officer to change the child's date of birth to falsely state that the child was younger than s/he actually was, so child support payments could be included in the borrower's income.

427.   On other loans, this same Quality Control Auditor witnessed other deficiencies in Government loans that had already been approved, including files for which NAF had not obtained proper bank statements.   In some instances, the bank

statements did not have the name of the bank account on them, or the number of deposits did not match up, or there were other signs of foul play.

428.   While the loans had such serious quality control issues, NAF's auditing department would ignore these problems and did not act to address these discrepancies and deficiencies.

429.   When the Quality Control Auditor in Tustin raised these issues, he was told by Mike Clary, NAF's Head of Wholesale Lending, that "we're going to do it this way," *i.e.* NAF would ignore the audit results, act as if the loans did not have any deficiencies, and would not crack down on fraud by its own employees.

430.   Upon information and belief, based on Relator's own observations and the reports of the Quality Control Auditor described above, NAF did not self-report these serious deficiencies that it found in its underwriting of Government loans.

## VI.   ADDITIONAL ALLEGATIONS OF PROMISSORY FRAUD

431.   As set forth above, NAF submitted initial certifications to the Government in order to participate in each of the Government Programs, and submitted annual certifications to continue participating in HUD-FHA's DE Program, and submitted individual loan-level certifications for each endorsed loan under both the DE Program and the VA Program.

432.   Because NAF's initial, annual, and loan-level certifications were false, as alleged above, NAF obtained a Government benefit—namely, Government insurance on residential mortgage loans that NAF originated—that would not have been extended to it in the absence of its fraud.

433.   As a result, every loan endorsement under the DE Program and the VA Program that NAF obtained is a fraudulently obtained extension of a Government benefit.

434.  NAF's submission of false certifications to the Government in order to fraudulently obtain Government benefits renders any subsequent claim on the Government under those benefits a "false claim" under the False Claims Act.

435.  With respect to NAF's false loan-level certifications, any claim made to the Government on that particular loan would be a "false claim" under the False Claims Act.

436.  With respect to NAF's false initial and annual certifications, any claim made to the Government on any loan endorsed pursuant to those certifications would be tainted and constitute a "false claim" under the False Claims Act, even if the loans that have defaulted otherwise meet relevant underwriting criteria.

437.  In submitting its initial, annual, and loan-level certifications, NAF had no intention of fulfilling its obligations to comply with HUD-FHA and VA requirements, as alleged above.  Instead, NAF knew that it would implement the policies and practices alleged in section V, above.  Nor did NAF disclose its non-compliance, and intent to continue to fail to comply, with the HUD-FHA and VA requirements to which it certified compliance.

## VII.   ADDITIONAL ALLEGATIONS OF MATERIALITY

438.  NAF's fraudulent conduct, including its false representations and omissions in its initial, annual, and loan-level certifications to the Government, were material in fraudulently inducing the Government to extend insurance coverage to loans endorsed by NAF and to pay claims on Government loans that had been endorsed by NAF.

439.  NAF's participation in the Government Programs, and therefore its ability to endorse loans and make claims on them, was conditioned on its initial and annual certifications.

440.  Similarly, a loan-level certification was required for individual loans to be endorsed under the Government Programs.

441.   The specific HUD-FHA and VA requirements that NAF violated, as alleged above, are necessary to shield the Government from undue financial risk and protect the viability of the Government Programs.

442.   Indeed, the requirements NAF violated—including stringent underwriting criteria set forth in the HUD Handbooks and VA pamphlets, alleged above—are designed to reduce the default risk on Government-insured loans.

443.   The HUD-FHA and VA would not have continued to insure NAF's loans originated under the Government Programs if NAF had been forthright about its violations instead of falsely certifying its compliance with HUD-FHA and VA requirements.

444.   The importance to the Government of these requirements is underscored by the Government's extensive history of enforcement, particularly in the wake of the 2008 financial crisis stemming in large part from the reckless origination of subprime mortgages.

445.   For instance, the Government has sued and entered into consent judgments or stipulations of settlement with a large number of Government Lenders accused of violating the critical underwriting criteria required by the HUD-FHA and the VA, including but not limited to:

  a. Bank of America Corp., J.P. Morgan Chase & Co., Wells Fargo & Co., Citigroup Inc., and Ally Financial, Inc., on or around March 12, 2012;

  b. General Electric, on or around April 12, 2019;

  c. Wells Fargo Bank, N.A., on or around April 8, 2016;

  d. SunTrust Mortgage, Inc., on or around September 30, 2014;

  e. J.P. Morgan Chase Bank, N.A., on or around February 5, 2014;

  f. Allquest Home Mortgage Corp., on or around September 29, 2017;

  g. Flagstar Bank, F.S.B., on or around February 24, 2012;

  h. M&T Bank, on or around May 9, 2016;

i.     Finance of America Mortgage LLC, on or around December 11, 2018; and

j.     TXL Mortgage Corp., on or around September 20, 2016.

446.   Each of the foregoing enforcement actions arising out of lenders' failures to comply with HUD-FHA and VA underwriting and related requirements resulted in multimillion dollar, or in some cases multi-billion dollar settlements with the Government.

447.   A reasonable person would not have extended loan insurance on a loan file, and certainly not provided it at the below-market rates available under the Government Programs, if he or she knew that NAF would, *inter alia*, not follow the required underwriting process, such as by improperly paying commissions to employees performing underwriting activities, overriding Government-required conditions on files, allowing sales employees lacking necessary qualifications or licenses to perform underwriting activities on Government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through a value appeal scheme and otherwise interfering with the appraisal process, and failing to maintain sufficient quality control and self-reporting processes.

448.   A reasonable person would not have allowed NAF to participate in the Government Programs if he or she knew that NAF would, *inter alia*, not follow the required underwriting process, such as by improperly paying commissions to employees performing underwriting activities, overriding Government-required conditions on files, allowing sales employees lacking necessary qualifications or licenses to perform underwriting activities on Government loans, manipulating and hiding critical data that was used to improperly approve loans using NAF's AUS, inflating the value of appraisals through a value appeal scheme and otherwise interfering with the appraisal process, and failing to maintain sufficient quality control and self-reporting processes.

449.   NAF knew that the Government attached importance to each of NAF's initial, annual, and loan-level certifications confirming that NAF was in compliance with the HUD-FHA and VA requirements specified above.

450.   Indeed, the regulations define violations of the required certifications as "material."

451.   Without NAF's false certifications, the Government would not have allowed NAF to participate in the Government Programs, as NAF knew.

452.   Without NAF's false certifications, the Government would not have been liable for the insured losses on loans endorsed by NAF and covered by the Government.

453.   Had NAF truthfully told the Government that NAF would not be complying with the regulations, and specifically the regulations relating to payment of commissions to employees performing underwriting activities, compliance with HUD-FHA and VA underwriting criteria, allowing sales employees lacking proper qualifications and licenses to perform underwriting activities on Government loans, manipulating and hiding critical data used to improperly approve loans using NAF's AUS, inflating the value of appraisals through the value appeal scheme and otherwise interfering with the appraisal process, and failing to maintain a proper quality control and self-reporting program, NAF would not have been allowed to endorse any loans for the FHA or VA.

454.   As alleged above, NAF's knowingly improper origination and underwriting of FHA mortgage loans violated numerous specific rules and requirements published by HUD.  Specifically, NAF violated requirements contained or referenced in one or more of the following documents, which set forth the minimum standards for originating and underwriting FHA insured mortgages and with which HUD regulations required NAF to comply, *see* 24 C.F.R. §§ 203.5(c), (d), (e); 203.255(b)(5):

      a.   HUD Handbook 4155.1 Revision 5 ("REV-5), Mortgage Credit Analysis for Mortgage Insurance, dated October 2003 and Mortgagee Letters amending and clarifying the same;

b.  HUD Handbook 4155.1, Mortgage Credit Analysis for Mortgage Insurance, issued May 2009 and Mortgagee Letters amending and clarifying the same;

c.  FHA Total Mortgage Scorecard User Guide dated December 2004;

d.  HUD Handbook 4000.1-FHA Single Family Housing Policy;

e.  HUD Handbook 4000.4 REV-1, Change 2, Single Family Direct Endorsement Program, issued July 1994 and Mortgagee Letters amending and clarifying the same;

f.  HUD Handbook 4060.1 REV-2, FHA Title II Mortgage Approval Handbook, issued August 2006 and Mortgagee Letters amending and clarifying the same;

g.  HUD Handbook 4000.2 REV-3, FHA Mortgagees' Handbook Application Through Insurance, issued May 2004 and Mortgagee Letters amending and clarifying the same;

h.  HUD Handbook 4155.2, Lender's Guide to Single Family Mortgage Insurance Processing, issued May 2009 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letter 2009-28);

i.  HUD Handbook 4165.1 REV-2, Endorsement for Insurance for Home Mortgage Programs (Single Family), issued April 2005 and Mortgagee Letters amending and clarifying the same;

j.  HUD Handbook 4150.1 REV-1, Valuation Analysis for Home Mortgage Insurance, issued February 1990 and Mortgagee Letters amending and clarifying the same (including, but not limited to, Mortgagee Letters 1994-54 and 1996-26); and

k.  HUD Handbook 4150.2 Change 1, Valuation Analysis for Single Family One- to Four-Unit Dwellings, issued July 1999 and Mortgagee Letters amending and clarifying the same.

455.   Compliance with these Handbooks, Mortgagees Letters, and other documents (such as the TOTAL User Guides), is expressly incorporated into the Code of Federal Regulations and these documents have the force of law. *See* 24 C.F.R. § 203.5(c).

456.   NAF's violations of these authorities as to specific loans rendered NAF's certifications on the loans' HUD Forms 92900-A false.  HUD Form 92900-A, HUD/VA Addendum to Uniform Residential Loan Application, dated June 2005 and revisions of the same; *see*, *e.g.*, 24 C.F.R. § 203.255(b)(5).

## VIII.  CLAIMS MADE ON THE GOVERNMENT

457.   As a result of NAF's promissory fraud on the Government, as alleged above, all claims or requests for payment made to the Government on any loan originated by NAF under the Government Programs—whether made by NAF itself or by any third party that subsequently acquired the loan after NAF sold it—is a "false claim" under the False Claims Act for which NAF is liable.

458.  HUD maintains "Neighborhood Watch," a digital repository of data concerning early delinquencies in Government-insured mortgage loans.  The purpose of the Neighborhood Watch program is "to aid HUD/FHA staff in monitoring lenders and our programs, and to aid lenders and the public in self-policing the industry."  Its focus is on detecting early delinquencies and recording the claim rate for mortgage loans that have defaulted very quickly upon issuance, *i.e.*, within two (2) years of origination.

459.   These data significantly understate the volume of claims actually made on the Government as a result of defaulted FHA loans that NAF originated and endorsed. In particular, the claims identified in the HUD data arose out of loans that defaulted within two years of their origination—*i.e.*, these loans were so poorly underwritten that they failed immediately and resulted in rapid losses to the Government.

460.  HUD's Neighborhood Watch data goes back to the quarter ending December 31, 2015.

461.   According to current HUD data, a total of sixty-six (66) claims for Government insurance were made to the Government on NAF-originated FHA loans since the quarter ending December 31, 2015.  *See* Exhibit 1.

462.   According to the same HUD data, covering the period from the quarter ending December 31, 2015 to the present, there were two thousand five hundred forty-four (2,544) NAF-originated FHA loans classified as "seriously delinquent" within the first two years of origination.  These loans are poised to fail and result in claims on the Government.  *See id.*

463.   Again, these data significantly understate the volume of claims actually made on the Government as a result of defaulted FHA loans that NAF originated and endorsed, because those claims each arose out of loans that defaulted within two years of their origination.

464.   Over the same time period, NAF originated 221,090 total FHA loans.  *See id.*

465.   Since 2011, NAF has originated and endorsed hundreds of thousands, or millions, of loans under the Government Programs, a significant percentage of which have defaulted and resulted in claims made on the Government.

466.   For purposes of illustration, Relator identifies the following specific HUD claims as exemplary:

(a) NAF, from its El Paso, Texas branch, originated an FHA loan for a property located in Canutillo, Texas in or around September 2016, which was endorsed for Government insurance on or around October 27, 2016, in the amount of $266,585.00, which became delinquent by December 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $288,401.95;

(b) NAF, from its El Paso, Texas branch, originated an FHA loan for a property located in Santa Teresa, New Mexico in or around April 2016, which was endorsed for Government insurance on or around April 20, 2016, in the

amount of $164,672.00, which became delinquent by August 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $167,811.03;

(c) NAF, from its El Paso, Texas branch, originated an FHA loan for a property located in El Paso, Texas in or around May 2016, which was endorsed for Government insurance on or around June 14, 2016, in the amount of $98,188.00, which became delinquent by July 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $105,066.45;

(d) NAF, from its Bettendorf, Iowa branch, originated an FHA loan for a property located in Davenport, Iowa in or around March 2016, which was endorsed for Government insurance on or around March 30, 2016, in the amount of $111,721.00, which became delinquent by September 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $47,473.79;

(e) NAF, from its Bettendorf, Iowa branch, originated an FHA loan for a property located in Bettendorf, Iowa in or around April 2016, which was endorsed for Government insurance on or around May 17, 2016, in the amount of $139,428.00, which became delinquent by October 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $46,704.87;

(f) NAF, from its Riverside, California branch, originated an FHA loan for a property located in Apple Valley, California in or around March 2016, which was endorsed for Government insurance on or around April 26, 2016, in the amount of $216,015.00, which became delinquent by June 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $43,218.36;

(g) NAF, from its Encinitas, California branch, originated an FHA loan for a property located in Oceanside, California in or around March 2016, which was endorsed for Government insurance on or around March 24, 2016, in the amount of $391,483.00, which became delinquent by September 2016, and resulted in a HUD claim thereafter, causing a loss to the Government in the amount of $43,482.93;

(h) Relator submits as Exhibit 2 a spreadsheet containing claim detail for hundreds of other NAF-originated FHA mortgages that resulted in claims against HUD that were paid by the Government between 2011 and 2017.

467.   Discovery is required to specify the total number of claims made, but the HUD Neighborhood Watch evidence demonstrates that NAF's promissory fraud has resulted in at least 66 claims or requests for payment made to the Government. *See* Exhibit 1.   Additional HUD data covering a longer duration demonstrates hundreds of additional claims or requests for payment made to the Government on NAF-originated loans.  *See* Exhibit 2.

468.   The Government has sustained substantial damages as a result of NAF's promissory fraud and violations of the False Claims Act.

469.   The damages sustained by the Government as a result of claims on the Government resulting from NAF's misconduct takes two forms.

470.   First, the Government has sustained losses in the form of "net losses," whereby the amount of proceeds received by the Government from reselling the foreclosed properties, or from bundling the loans for sale to an investor, is deducted from the total loan or claim amount.

471.   Additionally, costs associated with foreclosure, resale, or sale of the note, such as marketing expenses, real estate taxes, and maintenance costs, are added to the claim amount.

472.   In other words, the loss to the Government on the NAF-originated loans is adjusted for any proceeds received by the Government from the sale of the foreclosed property, and for any costs associated with the disposition of the property.

473.   A second, independent way in which NAF's fraudulent misconduct triggered claims against the Government was through the below-market premium rates charged on NAF's loans.

474.   The premium rates charged by the Government are premised on Government Lenders, such as NAF, only endorsing loans that meet HUD-FHA and VA requirements, including underwriting requirements.

475.   Had NAF not knowingly and falsely certified to the Government that it was in conformance with HUD-FHA and VA underwriting requirements, the Government would not have insured NAF's FHA and VA loans at the rates it did.

476.   Similarly, had NAF not knowingly and falsely certified to the Government that there was no defect in connection with improperly approved mortgages, the Government would not have insured NAF's FHA and VA loans at the rates it did.

477.   Thus, NAF triggered a claim against the Government by having its loans insured at lower premium rates than was justified.

## IX.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### 31 U.S.C. § 3729(A)(1)(A)
### CAUSING FALSE CLAIMS

478.   Relator, on behalf of the United States, repeats and realleges the preceding allegations as if fully set forth herein.

479.   The Government asserts this cause of action pursuant to 31 U.S.C. § 3729(a)(1)(A).

480.   As set forth above, NAF knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, presented or caused to be presented to an officer or employee of the Government false or fraudulent claims for payment or

72

approval in connection with its endorsement of Government-insured mortgage loans under the Government Programs.

481. NAF submitted to HUD-FHA materially false certifications (including an initial certification, annual certifications from 2011 to the present, and individual loan-level certifications) in order to participate in the DE Program.

482. NAF submitted to VA materially false certifications (including an initial certification and individual loan-level certifications) in order to participate in the VA Program.

483. As a result of NAF's materially false certifications to HUD-FHA and VA, the Government authorized NAF to endorse mortgage loans for Government insurance, and NAF in fact did endorse hundreds of thousands, or millions, of such loans since 2011.

484. NAF's materially false certifications and fraudulent misconduct, as alleged above, were material to the Government's decision to authorize NAF to endorse mortgage loans for Government insurance, and to pay claims related to Government-insured loans originated by NAF.

485. The Government paid insurance claims, and incurred losses, related to Government-insured mortgage loans endorsed by NAF.

486. By reason of NAF's fraudulent conduct and false representations and omissions, as alleged in more detail above, the Government has paid false claims on NAF-originated mortgage loans, suffering damage in amounts to be proven at trial, and is entitled to civil penalties as provided by law.

## SECOND CAUSE OF ACTION
### 31 U.S.C. § 3729(A)(1)(B)
## USE OF FALSE STATEMENTS

487. Relator, on behalf of the United States, repeats and realleges the allegations above as if fully set forth herein.

488. The Government asserts this cause of action pursuant to 31 U.S.C. § 3729(a)(1)(B).

489.   As set forth above, NAF knowingly, or acting with deliberate ignorance and/or with reckless disregard for the truth, made, used, or caused to be made or used false records and/or statements material to false or fraudulent claims in connection with its endorsement of Government-insured mortgage loans under the Government Programs.

490.   NAF submitted to HUD-FHA materially false certifications (including an initial certification, annual certifications from 2011 to the present, and individual loan-level certifications) in order to participate in the DE Program.

491.   NAF submitted to VA materially false certifications (including an initial certification and individual loan-level certifications) in order to participate in the VA Program.

492.   As a result of NAF's materially false certifications to HUD-FHA and VA, the Government authorized NAF to endorse mortgage loans for Government insurance, and NAF in fact did endorse hundreds of thousands, or millions, of such loans since 2011.

493.   NAF's materially false certifications and fraudulent misconduct, as alleged above, were material to the Government's decision to authorize NAF to endorse mortgage loans for Government insurance, and to pay claims related to Government-insured loans originated by NAF.

494.   The Government paid insurance claims, and incurred losses, related to Government-insured mortgage loans endorsed by NAF.

495.   By reason of NAF's fraudulent conduct and false representations and omissions, as alleged in more detail above, the Government has paid false claims on NAF-originated mortgage loans, suffering damage in amounts to be proven at trial, and is entitled to civil penalties as provided by law.

WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:

a. Entry of judgment against NAF and in favor of the United States awarding an amount equal to three times the amount of damages the United States has sustained as a result of NAF's violations of the False Claims Act;

b. Entry of judgment against NAF and in favor of the United States awarding civil penalties in an amount equal to $11,000 for each violation of the False Claims Act;

c. Entry of an order requiring NAF to pay all costs of this action, with interest as permitted by law, including the cost to Relator and the United States for all expenses related to this action;

d. Entry of an order requiring NAF to pay Relator's reasonable attorneys' fees;

e. Entry of an order providing that Relator shall be awarded an amount equal to at least 25% but not more than 30% of the proceeds of this action, pursuant to 31 U.S.C. § 3730(d)(2);

f. An award of pre-judgment interest as permitted by law; and

g.  Such other and further relief to Relator and/or the United States as this Court may deem just and proper.

## X.    DEMAND FOR JURY TRIAL

Relator, on behalf of the United States, respectfully requests a trial by jury on all claims so triable.

Dated: April 15, 2019

By:/s/ C. Brooks Cutter

**CUTTER LAW PC**
C. Brooks Cutter (121407)
bcutter@cutterlaw.com
John R. Parker, Jr. (257761)
jparker@cutterlaw.com
401 West Avenue
Sacramento, CA  95864
Telephone:  (916) 290-9400
Facsimile:  (916) 669-4499

**GRANT & EISENHOFER P.A.**
Kyle J. McGee (*Pro Hac Vice*)
kmcgee@gelaw.com
Laina M. Herbert (*Pro Hac Vice*)
lherbert@gelaw.com
123 Justison Street
Wilmington, Delaware  19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100

**THOMAS & SOLOMON LLP**
J. Nelson Thomas *(Pro Hac Vice)*
nthomas@theemploymentattorneys.com
Jonathan W. Ferris *(Pro Hac Vice)*
jferris@theemploymentattorneys.com
Michael J. Lingle (Pro Hac Vice)
mlingle@theemploymentattorneys.com
Annette M. Gifford (270777)
amgifford@gmail.com
693 East Avenue
Rochester, New York 14607
Telephone: (585) 272-0540
Facsimile: (585) 272-0574

*Attorneys for Relator Malou Tutanes-Luster*