1   Kyle J. McGee (*pro hac vice*)
    Laina Herbert (*pro hac vice*)
2   GRANT & EISENHOFER P.A.
    123 Justison Street
3   Wilmington, Delaware 19801
    Tel: 302-622-7000
4
    C. Brooks Cutter (121407)
5   John R. Parker, Jr. (257761)
    CUTTER LAW PC
6   401 Watt Avenue
    Sacramento, California  95864
7   Tel: 916-290-9400

J. Nelson Thomas (*pro hac vice*)
Jonathan W. Ferris (*pro hac vice*)
Michael J. Lingle (*pro hac vice*)
Annette M. Gifford (270777)
THOMAS & SOLOMON LLP
693 East Avenue
Rochester, New York  14607
Tel: 585-272-0540

8   *Attorneys for Plaintiff*

9                    **UNITED STATES DISTRICT COURT**
10                   **CENTRAL DISTRICT OF CALIFORNIA**

11  UNITED STATES OF AMERICA, ex
    rel. MALOU TUTANES-LUSTER,

12                Plaintiff,                      Case No. 2:19-cv-01630-PSG-JPR

13        v.                                      **PLAINTIFF'S MEMORANDUM
                                                  IN OPPOSITION TO
14  BROKER SOLUTIONS, INC. d/b/a                  DEFENDANT'S MOTION TO
    NEW AMERICAN FUNDING,                         DISMISS THE AMENDED
15                                                COMPLAINT**

16                Defendant.                      **Date:** July 8, 2019
                                                  **Time:** 1:30 pm
17                                                **District Judge:** Philip S. Gutierrez
                                                  **Courtroom:** 6A
18

19

20

21

22

23

24

25

26

27

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

LEGAL STANDARD .............................................................................................. 4

ARGUMENT ........................................................................................................... 5

I.    NAF FRAUDULENTLY OBTAINED GOVERNMENT BENEFITS ................. 5

II.   THE GOVERNMENT PAID CLAIMS PURSUANT TO NAF'S FRAUDULENTLY OBTAINED BENEFITS. ........................................................... 9

III.    RELATOR ADEQUATELY ALLEGES PROMISSORY FRAUD. ............... 11

IV.    EVERY CLAIM MADE ON A LOAN ENDORSED BY NAF UNDER NAF'S FRAUDULENT CERTIFICATIONS IS ACTIONABLE. ........................... 15

V.    NAF'S INITIAL AND ANNUAL CERTIFICATIONS EACH SUPPORT FCA LIABILITY ...................................................................................................... 15

VI.    RELATOR ADEQUATELY ALLEGES FRAUD ON THE VA. ................... 17

VII.    RELATOR ADEQUATELY ALLEGES MATERIALITY. ........................... 17

VIII.     RELATOR ADEQUATELY ALLEGES SCIENTER. ................................. 19

A.    NAF Knew Or Recklessly Disregarded That Its Certifications Were False. 19

B.   NAF Knew Or Recklessly Disregarded That The Requirements It Violated Were Material ......................................................................................................... 21

IX.    RELATOR'S ALLEGATIONS SATISFY RULE 9(B). .................................. 22

CONCLUSION ...................................................................................................... 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*U.S. ex rel. Campie v. Gilead Sci., Inc.*,
862 F.3d 890 (9th Cir. 2017) ................................................................................6, 7, 17

5

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) ..........................................................................................17

6

7

*U.S. ex rel. Fisher v. Ocwen Loan Servicing, LLC*,
2016 WL 2992229 (E.D. Tex. May 24, 2016) ...................................................16, 17

8

*Graybill v. Wells Fargo Bank, N.A.*,
2013 WL 978245 (N.D. Cal. Mar. 12, 2013) ..............................................................15

9

10

*Henderson v. JPMorgan Chase Bank*,
2012 WL 12886831 (C.D. Cal. May 30, 2012) (Gutierrez, J.) ....................................4

11

*U.S. ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) ................................................................................6, 8, 17

12

13

*Hernandez v. Sutter W. Capital*,
2010 WL 3385046 (N.D. Cal. Aug. 26, 2010) ............................................................15

14

*U.S. ex rel. Hopper v. Anton*,
91 F.3d 1261 (9th Cir. 1996) ...................................................................................13, 14

15

16

*U.S. ex rel. Main v. Oakland City Univ.*,
426 F.3d 914 (7th Cir. 2005) ............................................................................................8

17

*U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
822 F.3d 650 (2d Cir. 2016) ....................................................................................13, 14

18

19

*U.S. ex rel. Rose v. Stephens Inst.*,
909 F.3d 1012 (9th Cir. 2018) ..........................................................................8, 9, 18, 22

20

*U.S. ex rel. Silingo v. WellPoint, Inc.*,
904 F.3d 667 (9th Cir. 2018) ................................................................................17, 19, 22

21

22

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ..........................................................................................5

23

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007) .....................................................................................5, 22

24

25

*U.S. ex rel. Thrower v. Acad. Mortg. Corp.*,
2018 WL 4852377 (N.D. Cal. Oct. 3, 2018) ......................................................8, 9, 15

26

*U.S. ex rel. Thrower v. Acad. Mortg. Corp.*,
2018 WL 6592782 (N.D. Cal. Dec. 14, 2018) ........................................................9, 16

27

28

*U.S. ex rel. Thrower v. Academy Mortgage Corp.*,
2018 WL 4053484 (N.D. Cal. Aug. 24, 2018) ................................................................ *passim*

*U.S. v. Americus Mort. Corp.*,
2013 WL 4829271 (S.D. Tex. Sept. 10, 2013) ................................................................25

*U.S. v. Americus Mortg. Corp.*,
2014 WL 4274279 (S.D. Tex. Aug. 29, 2014) ................................................................18

*Ebeid ex rel. U.S. v. Lungwitz*,
616 F.3d 993 (9th Cir. 2010) ........................................................................5, 10, 17

*U.S. v. Miller*,
645 F.2d 473 (5th Cir. 1981) ........................................................................25

*U.S. v. Movtady*,
13 F. Supp. 3d 325 (S.D.N.Y. 2014) ........................................................................17

*U.S. v. Naiman*,
211 F.3d 40 (2d Cir. 2000) ........................................................................14

*U.S. v. Quicken Loans Inc.*,
239 F. Supp. 3d 1014 (E.D. Mich.) ........................................................................ *passim*

*U.S. v. Reunion Mortgage, Inc.*,
2013 WL 5944252 (N.D. Cal. Nov. 5, 2013) ........................................................................16

*U.S. v. Sanford-Brown*,
788 F.3d 696 (7th Cir. 2015) ........................................................................13, 14

*U.S. v. TXL Mortg. Corp.*,
2016 WL 5108019 (D.D.C. Sept. 20, 2016) ........................................................................18

*U.S. v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016) ........................................................................11

*U.S. v. Wells Fargo Bank, N.A.*,
972 F. Supp. 2d 593 (S.D.N.Y. 2013) ........................................................................17, 18, 21, 25

*U.S. ex rel. Unite Here v. Cintas Corp.*,
2008 WL 1767039 (N.D. Cal. Apr. 16, 2008) ........................................................................14

*Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*,
136 S. Ct. 1989 (2016) ........................................................................8, 9, 18

*U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*,
336 F.3d 375 (5th Cir. 2003) ........................................................................13, 14

**Statutes & Other Authorities**

31 U.S.C. § 3729(b) ........................................................................11, 20

24 C.F.R. § 203.5(e) ........................................................................12

Fed. R. Civ. P. Rule 9(b) ................................................................................................ *passim*

Fed. R. Civ. P. Rule 12(b)(6) ..................................................................................... 4, 5

Plaintiff-Relator Malou Tutanes-Luster ("Relator") respectfully submits her memorandum in opposition to defendant Broker Solutions, Inc. d/b/a New American Funding's ("Defendant" or "NAF") motion to dismiss ("Mot.") (ECF No. 97).

## INTRODUCTION

Relator, a former NAF loan processor, alleges NAF, a certified Federal Housing Administration ("FHA") Direct Endorsement ("DE") lender and Veteran Affairs Home Loan Guaranty Program ("VA Program" and, with DE, the "Government Programs") lender permitted to underwrite and endorse eligible residential mortgages for government insurance, has systematically defrauded the U.S. Departments of Housing and Urban Development ("HUD") and Veterans Affairs ("VA") by knowingly or recklessly violating numerous mandatory, material certifications it made to those agencies.  Although NAF certified it did and would continue to comply with specific HUD/VA requirements in originating eligible loans, NAF implemented policies and procedures designed to maximize the sheer quantity of loans processed without regard for their underlying quality.  Had the HUD and VA known NAF was exposing them to unreasonable financial risks by violating their material rules—the very rules intended to protect the agencies from such risks—they would not have allowed NAF to directly endorse mortgage loan applications for government insurance, and would not have paid any claims on loans that defaulted. As Relator's evidence shows, the government paid hundreds of false claims as a direct result of NAF's promissory fraud.

NAF's motion to dismiss contends the Amended Complaint ("Compl.") (ECF No. 94) fails to allege the submission of any false claims to the government and to tie NAF's violations of HUD/VA rules to the submission of such false claims.  NAF is wrong.  The complaint shows HUD has processed and paid at least 66 claims for payment of mortgage insurance on loans originated and endorsed by NAF in just a three-year period (2015-2018).  Compl. Ex. 1.  In addition, Relator submitted

voluminous evidence showing, over a slightly longer period (2011-2018), hundreds of NAF-originated, government-insured mortgage loans have resulted in default, which in turn resulted in claims for payment to the government.  Compl. Ex. 2.  Relator plausibly alleges facts showing these claims are tied to NAF's violations of HUD/VA requirements, such as underwriting criteria.  Every court to have considered the materiality of the rules NAF violated has confirmed they are "material" under the False Claims Act ("FCA").  Common sense, and the experience of the 2008 financial crisis, caused in large part by just the sort of conflict-ridden, reckless underwriting activity NAF engaged in, support no other conclusion.

For the reasons set forth herein, NAF's motion should be denied.

## FACTUAL BACKGROUND

Under the Government Programs, the government permits approved lenders to originate residential mortgage loans and, where the lender certifies the loan meets established criteria, to shift liability for the risk of default to the government.  The government outsources the underwriting process to private lenders such as NAF, who step into its shoes and act as its fiduciary in conducting due diligence.  NAF has, since 2011, annually certified to the government, and certified on each individual loan it has originated and endorsed, it was complying with specific regulations.  Each of those certifications was false.  In its initial certification to HUD to participate in the DE Program, NAF certified in part it "has and will comply with … HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining [NAF's] FHA lender approval."  Compl. ¶108.  NAF made annual re-certifications to HUD to continue participating in the program, further stating, *e.g.*, that NAF "complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]," and "conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [NAF] is fully

responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [NAF]," along with a certification of truth and accuracy.  Compl. ¶¶111, 114.

As the Complaint details, NAF also made specific loan-level certifications to HUD for each government-insured loan it originated and endorsed, which stated the loans comply with HUD rules and are "eligible for HUD mortgage insurance," as specified in Form HUD 92900-A.  Compl. ¶¶125-26, 131-32, 135-38.

NAF similarly certified compliance with VA requirements, submitting a Form 26-8736 to participate in the VA Program, and individual loan-level certifications. NAF's initial certification, a necessary condition to originate VA-insured loans, stated NAF would comply with VA regulations and directives, originate only loans reviewed and approved by appropriately licensed underwriters, and take responsibility for all borrower credit information (Compl. ¶¶154-57).  And NAF's loan-level VA certifications affirmed NAF conducted specified due diligence tasks with respect to each loan to ensure its compliance with VA underwriting rules, and a Form 26-1820 affirming compliance with regulations concerning insurance of loans to veterans (Compl. ¶¶158-60).

Relator's extensive first-hand allegations demonstrate NAF's HUD/FHA and VA certifications were false because, when it made each certification, NAF was engaged in at least the following prohibited practices:

(1) Compensating underwriting employees on a commission basis (for 20 loans approved in 30-day period, NAF paid commission of $2,500; for 30 loans, $4,500; for 35 loans, $5,500; for 40 loans, $10,000) (Compl. ¶¶207-33);

(2) Implementing a "management exception policy" by which NAF managers or salespersons (paid on commission) would override government loan requirements and force unqualified loans through for endorsement (Compl. ¶¶234-317);

(3) Taking various steps to improperly increase the appraised value of properties, including making improper "value appeals" to appraisers and effectively blacklisting uncooperative appraisers (Compl. ¶¶318-46);

(4) Manipulating inputs in the electronic underwriting system to game the system in favor of an "accept/approve" rating (Compl. ¶¶347-65);

(5) Manipulating borrower overtime/bonus income figures to increase the likelihood of loan approval, including using present income as historical income (Compl. ¶¶366-81);

(6) Manipulating borrower debt and debt-to-income figures to increase the likelihood of loan approval, including improperly excluding known debts from borrowers' debt-to-income analyses (Compl. ¶¶382-413); and

(7) Implementing a policy of withholding from the government known underwriting deficiencies, inaccuracies, and errors in completed loan files subsequently discovered by quality control auditors (Compl. ¶¶414-30).

Each of the foregoing practices is expressly prohibited by the specific rules with which NAF was required to, and did, certify its compliance as a condition of serving as a Government Lender. Due to its unlimited willingness to risk taxpayer money for its own benefit, NAF generated millions of dollars in annual revenues from its activities in the government-insured mortgage business. When the loans default—as many already have—taxpayers, not NAF, are left holding the bag, costing the government tens and possibly hundreds of millions of dollars.

## LEGAL STANDARD

A Rule 12(b)(6) motion tests the legal sufficiency of the complaint under a "two-step analysis," first "accept[ing] as true all non-conclusory, factual allegations made in the complaint," and "draw[ing] all possible inferences in favor of the plaintiff." *Henderson v. JPMorgan Chase Bank*, 2012 WL 12886831, at *2 (C.D. Cal. May 30, 2012) (Gutierrez, J.). Second, the Court "must determine whether the complaint alleges a plausible claim for relief." *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). In the Ninth Circuit, "[i]f there are two alternative explanations, one

advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). A complaint "may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Id.* (emphasis in original).

Rule 9(b) requires a complaint to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy the rule, plaintiff may provide "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations," *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation omitted), but "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Under well-established Ninth Circuit law, FCA relators are not required "to identify representative examples of actual false claims," which is merely "one means of meeting the pleading obligation." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Instead, "it is sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" *Id.* at 998-99 (quoting *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

## **ARGUMENT**

## I. **NAF FRAUDULENTLY OBTAINED GOVERNMENT BENEFITS.**

Relator alleges NAF obtained authorization to stand in the shoes of the federal government for purposes of originating government-insured residential mortgage loans by engaging in fraud. Relator also alleges many of the insured loans NAF originated subsequently defaulted, and the owners of the notes (whether NAF or a third party to which NAF sold it) made claims for insurance money to the government. Relator has filed records showing amounts HUD paid on NAF-

originated loans in response to such claims.  Compl. Ex. 2.  Relator alleges because NAF obtained government insurance on these loans (and the ability to stand in the government's shoes for this limited purpose) on the basis of fraud, NAF is liable under the FCA for the government's losses on the loans NAF originated.

NAF contends the FCA does not reach the circumstance in which the government's extension of a benefit to a private party (such as government insurance on a loan), and the government's receipt of claims for payment pursuant to that benefit, are separate events.  NAF leans heavily on the fact that any "claims" made to the government are, of necessity, submitted *after* the alleged fraud has occurred, and are not submitted with new false statements or false certifications.  Although such a fact pattern is distinguishable from run-of-the-mill billing frauds, in which service providers simply overcharge for or mis-describe the services for which payment is sought, the FCA indeed reaches this variety of misconduct under the promissory-fraud or fraudulent-inducement theory.

Effectively identical factual allegations were the subject of the defendant's unsuccessful motion to dismiss in *U.S. ex rel. Thrower v. Academy Mortgage Corp.*, 2018 WL 4053484 (N.D. Cal. Aug. 24, 2018).  As that court explained, in general, there are "three types of 'false or fraudulent claims'" under the FCA.  *Id.* at *7 (citing *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006); *U.S. ex rel. Campie v. Gilead Sci., Inc.*, 862 F.3d 890, 900-02 (9th Cir. 2017)).  The first is a claim for payment to the government that is "literally false or fraudulent," as where a contractor overcharges a government agency.  The next is "promissory fraud," where "the contract or extension of … government benefit" under which a claim is submitted "was originally obtained through false statements or fraudulent conduct." *Hendow*, 461 F.3d at 1170, 1173.  The third is express or implied "false certification," in which a claimant falsely certifies compliance with a statutory, regulatory, or contractual requirement as a condition to government payment.  *Id.* at

1171.  Concerning any type of claim, the FCA is to be "construe[d] … broadly, as it is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'"  *Campie*, 862 F.3d at 899 (quoting *Hendow*, 461 F.3d at 1170).

In *Thrower*, like here, the alleged misconduct constitutes promissory fraud.  To prevail on a promissory fraud theory of FCA liability, a relator must prove "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *Thrower*, 2018 WL 4053484, at *8 (quoting *Hendow*, 461 F.3d at 1174).  Under such a theory, "'subsequent claims are false because of an *original fraud*,' which may include 'a certification or otherwise.'"  *Id.* (quoting *Hendow*, 461 F.3d at 1173) (emphasis in original).  Like NAF, the *Thrower* defendant was a DE lender and argued the FCA does not impose liability where the actual claims for payment to the government are not accompanied with actionable false statements or certifications, even if the claims were submitted pursuant to a fraudulently obtained government benefit.  *Thrower* decisively rejects that argument.

As in *Thrower*, "[h]ere, the original fraud can be found in either the annual certification or a loan-level certification."  *Id.*  With respect to a false or fraudulent loan-level certification, "any claim made [to the government] on that loan would be a false claim under the promissory fraud theory."  *Id.*  With respect to false or fraudulent annual certifications, the theory of liability broadens to encompass "each claim on a loan endorsed in the year of the fraudulent annual certification," because NAF's very participation in the lending program "is premised on the annual certification," rendering "every loan endorsement under the DE program … a fraudulently obtained 'contract or extension of government benefit'—including those individual loans that were otherwise properly underwritten and endorsed."  *Id.* (quoting *Campie*, 862 F.3d at 902).

Although promissory fraud and false certification theories may overlap slightly (*i.e.*, both theories may be grounded in a false certification), promissory fraud is "somewhat broader," *Hendow*, 461 F.3d at 1173, and may succeed even where a false certification or other theory fails. *See U.S. ex rel. Thrower v. Acad. Mortg. Corp.*, 2018 WL 4852377, at *2 (N.D. Cal. Oct. 3, 2018) (explaining, "[t]he falsity element under a promissory fraud theory, unlike with an implied false certification theory, can be met with a showing 'of an original fraud (*whether a certification or otherwise*)' upon which subsequent claims for government benefits are premised.") (quoting *Hendow*, 461 F.3d at 1173) (emphasis in original); *see also U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916-17 (7th Cir. 2005) (upholding promissory fraud claim even where district court rejected false certification claim). Since liability arises out of the original fraud (such as a certification made to obtain a contract or benefit), it is unnecessary to show subsequent requests for payment under that contract or benefit were accompanied with *new* representations about the thing for which payment is requested. Any other rule would undermine the FCA's intent by permitting contractors to profit by fabricating information and certifying compliance with important government rules the contractor knows it is breaking, simply because the contract or benefit was issued separate from the payment request.

NAF attempts to erase the line between promissory fraud and implied false certification, collapsing the former into the latter. The law, however, distinguishes these violations. An implied false certification claim requires a request for payment along with a specific representation about the good or service provided, and the defendant's failure to disclose non-compliance with government requirements. *See U.S. ex rel. Rose v. Stephens Inst.*, 909 F.3d 1012, 1018 (9th Cir. 2018) (citing *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989 (2016)). But a promissory fraud claim will lie where a contract or benefit was extended on the basis of an "original fraud" and requests for payment are only subsequently made. *Hendow*, 461

F.3d at 1173.  Accordingly, NAF's reliance on *Rose*, *Escobar*, and other implied certification cases is misplaced—as, indeed, the *Thrower* court observed in distinguishing the theory in that case from *Rose*.  *See Thrower*, 2018 WL 4852377, at *2-3 (concluding *Rose* did not change the falsity analysis in promissory fraud cases); *see also U.S. ex rel. Thrower v. Acad. Mortg. Corp.*, 2018 WL 6592782, at *1 (N.D. Cal. Dec. 14, 2018) (observing "while [*Rose*] shed light on the requirements for proving falsity under an implied false certification theory, it did not address the promissory fraud theory").

The legal framework applicable to a promissory fraud case is necessarily different from that which applies to implied certification.  Because the alleged fraud is in obtaining a government benefit, not in mischaracterizing a deficient good or service, *Escobar*'s falsity test cannot apply.  Because NAF is accused not of submitting claims for payment for goods or services rendered false by its failure to disclose regulatory non-compliance, but of falsely certifying its compliance with specific government requirements in order to obtain government benefits, *Escobar*'s falsity framework is not relevant.  *Thrower*, 2018 WL 6592782, at *1.

Nearly all of NAF's dismissal arguments are merely repackaged versions of the same defense theory, namely, that FCA causes of action require the making of false statements in the request for payment itself, even where the request is made pursuant to a fraudulently obtained government benefit.  That theory is inconsistent with Ninth Circuit law, the FCA and its intent, and good sense.  Because the promissory fraud theory of FCA liability captures all claims made under a fraudulently obtained benefit, NAF's motion fails.

## II.   THE GOVERNMENT PAID CLAIMS PURSUANT TO NAF'S FRAUDULENTLY OBTAINED BENEFITS.

NAF argues Relator's allegations (and evidence) showing the government paid at least 66 claims for insurance benefits on NAF-originated loans between 2015-2018, and hundreds more over a longer period, fail to plausibly show that NAF

violated the FCA.  Mem. 4.  NAF maintains that, to do so, Relator would have had to allege "these specific loans" were tainted with fraud, which, NAF claims, Relator has not done.  NAF is wrong on several counts.

*First*, Relator has alleged NAF's company-wide practices plainly violate HUD/VA requirements, such as compensating underwriting employees on a commission basis, have infected all of its insured loans.  Even if a particular defaulting loan happens to satisfy government underwriting rules, NAF originated the loans by the use of illegal practices—practices NAF specifically certified it was *not* implementing in both its annual and loan-level certifications.  Even if NAF were correct in arguing Relator must tie "specific loans" to NAF's alleged wrongdoing, it would not be entitled to dismissal.

*Second*, NAF misstates the law.  Relator need not allege *any* specific examples of false claims to survive this motion; she need only plausibly allege *that* false claims were submitted, providing "reliable indicia" of such.  *Ebeid*, 616 F.3d at 998-99.  Proof the government has *actually paid claims* on dozens or hundreds of NAF-originated government-insured loans, together with details of the loans and amounts paid, constitutes such "reliable indicia" that claims were submitted.  NAF's only possible alternative explanation would have to be the government paid these amounts on these defaulted loans out of the goodness of its heart, voluntarily and without prompting.  That is, to say the least, implausible.

*Third*, under the promissory fraud case law cited above, NAF's acquisition of a government benefit on the basis of fraud in its annual certifications taints all of the loans it originated and endorsed under the Government Programs, in any year for which its annual certification was fraudulent.  *See, e.g.*, *Thrower*, 2018 WL 4053484, at *8 ("Because [defendant's] participation in the DE program for a particular year is premised on the annual certification, every loan endorsement under the DE program would be a fraudulently obtained 'contract or extension of…government benefit'—

including those individual loans that were otherwise properly underwritten and endorsed.  In that case, 'each claim' on a loan endorsed in the year of the fraudulent annual certification would be tainted and constitute a false claim.") (quoting *Campie*, 862 F.3d at 902).  The exemplar claims pertain to loans issued in 2011-2018.  Relator has alleged each of NAF's annual certifications since 2011 were fraudulent.  Accordingly, claims for insurance payments on loans originated in 2011-2018 are "tainted and constitute a false claim."  *Id.*

Relator has demonstrated the government has paid many claims for insurance payments on NAF-originated government-insured loans.  At a minimum, this is sufficient "reliable indicia" that claims were submitted.  Because the unlawful company-wide policies at issue marred every government-insured loan NAF originated, and because the fraudulent annual certifications on the basis of which NAF obtained government insurance for these loans in the first place "taints" each claim made on any of the loans, NAF is liable for the government's losses on these loans.

## III.   RELATOR ADEQUATELY ALLEGES PROMISSORY FRAUD.

The FCA itself expressly states its scienter requirement does not include "specific intent to defraud."  31 U.S.C. § 3729(b)(1)(B) ("[T]he terms 'knowing' and 'knowingly' … require no proof of specific intent to defraud."); *see also U.S. v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1176 (9th Cir. 2016) (rejecting argument that specific intent to defraud is required under FCA).  Nevertheless, NAF maintains "promissory fraud requires specific intent, where other theories of FCA liability do not."  Mem. 5.  NAF is wrong.

In addition to the FCA's clear statutory definition of "knowing" and "knowingly," and case law universally rejecting the proposition NAF is defending, NAF's argument fails for independent reasons.  NAF asserts Relator's claim is deficient because NAF's pre-certification behaviors and post-certification behaviors

are insufficient to establish its behaviors *during* the certification process.  NAF's argument that Relator has not adequately alleged it harbored fraudulent intent at the moment it submitted its initial or annual certifications to HUD and VA, or its individual loan-level certifications, has no merit.

*First*, Relator has alleged what "specific representations" NAF made to HUD and VA.  Relator pleads the content and timing of NAF's initial, annual, and loan-level certifications in detail.  *See, e.g.*, Compl. ¶¶108 (initial HUD certification), 111-14 (annual HUD certifications), 125-138 (loan-level HUD certifications), 154-57 (initial VA certifications), 158-60 (loan-level VA certifications).

*Second*, Relator is not relying on pockets of bad behavior, either before or after NAF made its certifications, to create the inference these certifications may have been false.  Instead, Relator alleges NAF implemented ongoing policies and practices that are prohibited by the regulations to which it certified compliance.  NAF's certifications were each false when made because, *inter alia*, they stated:

- NAF complied with HUD Handbooks prohibiting compensation of underwriting employees on a commission basis (HUD Handbook 4000.1, 1.A.3.c.iv(B)(3)(b)(ii)) when NAF was compensating underwriting employees on a commission basis (Compl. ¶¶207-33);

- NAF complied with HUD Handbooks prohibiting endorsement of loans that meet all federal lending requirements (HUD Handbook 4000.1, I.B.3.a, II.A) and with HUD forms denying that the loans have defects or should not be approved under FHA standards (HUD 92900-A3), including the requirement of specific accreditations to make underwriting decisions, when NAF created a "management exception" policy by which unaccredited sales managers could override government lending requirements to force through unqualified loans (Compl. ¶¶234-317);

- NAF complied with HUD Handbooks prohibiting anyone compensated on a commission basis from ordering or managing appraisals (HUD Handbook 4000.1, II.A.1.a.iv.C.1.a) and with HUD regulations prohibiting attempts to interfere with appraisals (24 C.F.R. § 203.5(e); HUD Handbook 4000.1, II.A.1.iii(B)(6)(d)), when NAF allowed commission-compensated employees to contact assigned

appraisers and pressure them and the vendors that employ them, effectively blacklisting uncooperative appraisers (Compl. ¶¶318-46);

- NAF complied with HUD Handbooks and Mortgagee Letters prohibiting lenders from willfully manipulating application variables to obtain preferred risk classifications from the automated TOTAL system (HUD Handbook 4000.1, II.A.4.B.iv; HUD Mortgagee Letter 2005-15), when NAF routinely gamed the system in this way, using false asset information to get files approved (Compl. ¶¶347-65);

- information on the loan application was true and accurate and that NAF complied with HUD Handbooks and VA Pamphlets specifying how to calculate borrower income (HUD Handbook 4000.1, II.A.4.c.v.B-C; HUD Handbook 4155.1, 4.D.2.b; VA Pamphlet 26-7, ch.4, 2.h), when NAF was using bonus and overtime income to inflate borrower income and using present earnings as historical earnings to inflate borrower income (Compl. ¶¶366-81);

- NAF complied with HUD Handbooks and VA Pamphlets specifying acceptable debt-to-income ("DTI") ratios (HUD Handbook 4155.1, 4.C.3.c; HUD Handbook 4000.1, II.A.5.d.viii; VA Pamphlet 26-7, ch.4, 10.b), when NAF was omitting borrower debts to achieve an approvable DTI ratio (Compl. ¶¶382-413); and

- NAF complied with HUD Handbooks requiring lenders' quality-control functions to be independent of their origination and servicing functions, and to include periodic audits and self-reporting of underwriting deficiencies (HUD Handbook 4060.1, REV-2, ch.7-2, 7-6; HUD Handbook 4700.2, REV-1, ch.6-1.A, D, 6-3.A), when NAF management ignored quality-control audit findings and failed to correct or report known deficiencies in government-insured loan files, including missing documentation (Compl. ¶¶414-30).

Thus, Relator has not pled a case in which mere "past regulatory noncompliance" is being leveraged to suggest subsequent certifications could have been false, *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1268 (9th Cir. 1996), or in which "nonperformance after entry into an agreement" for a government benefit is the basis of the alleged FCA violation, *U.S. v. Sanford-Brown*, 788 F.3d 696, 710 (7th Cir. 2015). NAF is not accused of simply failing to deliver on a promise, *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 386 (5th Cir. 2003), or breaching a contract, *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,

822 F.3d 650, 662 (2d Cir. 2016); *U.S. ex rel. Unite Here v. Cintas Corp.*, 2008 WL 1767039, at *9 (N.D. Cal. Apr. 16, 2008).  Relator has pled a case in which the defendant obtained government insurance by making certifications of compliance with specific HUD/FHA and VA requirements, while *at the same time* violating those requirements.  And Relator plausibly alleges NAF *knew* it was violating those requirements, because the offending policies and practices were not one-off shortcomings or mistakes, but intentionally crafted, systemic efforts to maximize NAF's profits.  NAF's false certifications are "palpable lies" because NAF was, in fact, engaged in the very activities prohibited by the specific requirements with which it certified compliance, as a condition of participating in the Programs.

These facts are worlds apart from *Hopper*, *Sanford-Brown*, *Willard*, *O'Donnell*, and *Unite Here*.  Relator alleges precisely what was lacking in those cases: the defendant made a promise (here, to comply with specific government requirements) knowing or recklessly disregarding that it would not carry out its obligations because, when it made its promises, it was *already* violating the relevant requirements and knew it would continue to do so.[1]

---

[1] NAF's reliance on *O'Donnell* as "analogous" to this case is particularly misplaced. Mem. 7.  The extent of the analogy is that both cases involve mortgage loans. Despite beginning as a *qui tam* lawsuit, only claims under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 were at issue; the defendants were accused of selling low-quality mortgages to government-sponsored entities, not of engaging in fraud in originating or endorsing mortgages for government insurance; and the government only offered evidence that the defendants' contractual performance fell short of their promises, not that the defendants made fraudulent certifications of compliance to obtain government benefits.  Indeed, *O'Donnell* itself distinguishes *U.S. v. Naiman*, 211 F.3d 40, 49 (2d Cir. 2000), because in *Naiman*, defendant was found to have defrauded a government entity by making false certifications under a contract with that entity—exactly what the *O'Donnell* case was missing, but which is present here.  Moreover, procedurally, this case could not be more different from *O'Donnell*, which was a post-trial appeal in which the court was able to weigh a full evidentiary record.

## IV.   EVERY CLAIM MADE ON A LOAN ENDORSED BY NAF UNDER NAF'S FRAUDULENT CERTIFICATIONS IS ACTIONABLE.

Again misconstruing the law on promissory fraud, NAF argues the FCA does not attach liability to claims made on "compliant" loans.  Mem. 10.  But the insurance on *all* loans endorsed by NAF under its fraudulent initial or annual certifications, even "compliant" loans (*i.e.*, loans that otherwise satisfy government underwriting criteria), was extended on the basis of fraud.  *Thrower*, 2018 WL 4852377, at *4 (citing *Hendow*, 461 F.3d at 1173; *Neighorn v. Quest Health Care*, 870 F. Supp. 2d 1069, 1091 (D. Or. 2012)).  Moreover, underwriting deficiencies are not the only defect in NAF's lending practices: it also paid underwriting staff commissions and interfered with the appraisal process, among other things, undermining the notion there are any "compliant" loans.

## V.   NAF'S INITIAL AND ANNUAL CERTIFICATIONS EACH SUPPORT FCA LIABILITY.

NAF contends its initial certifications to HUD/FHA and VA do not establish FCA liability because Relator has not alleged they were false or NAF intended to violate them when they were submitted to the government, and because Relator has not alleged NAF's initial certifications were signed within the statute of limitations.  Mem. 10.  Relator has already shown NAF's certifications (whether initial or annual) were false and has alleged facts supporting the reasonable inference NAF had no intention of complying with the Handbooks, VA Pamphlets, and other mandatory government requirements to participate in the Government Programs.  *See* §§ II-IV, *supra*.  NAF's statute of limitations argument fails because it is premature, and it is not clear from the face of the complaint NAF's initial certifications were made to HUD/FHA and VA outside of the relevant limitations period.  *See Graybill v. Wells Fargo Bank, N.A.*, 2013 WL 978245, at *19 (N.D. Cal. Mar. 12, 2013); *Hernandez v. Sutter W. Capital*, 2010 WL 3385046, at *2 (N.D. Cal. Aug. 26, 2010).  Moreover, NAF does not argue the initial certifications *were* submitted outside of the limitations period, but merely states the complaint has not affirmatively alleged they were

submitted within that period.  Mem. 10.  This is not sufficient to warrant dismissal of any part of the claims.  Concerning NAF's annual certifications, the limitations argument has no merit because Relator has alleged these were submitted each year from at least 2011 to 2018.  (Compl. ¶¶14, 481-83, 490-92).

NAF next relies on *U.S. v. Reunion Mortgage, Inc.*, 2013 WL 5944252, at *6 (N.D. Cal. Nov. 5, 2013), to claim its annual certifications cannot give rise to FCA liability because the "government benefit" at issue—namely, government insurance via FHA or VA—does not itself give rise to the right to make claims for payment. NAF's reliance is misplaced and its argument is contrary to settled law.  In *Reunion*, the plaintiff did not assert a promissory fraud theory grounded in false annual certifications, but rather sought to establish liability only with respect to "the allegedly false individualized certification of *each* individual loan." *Id.* at *6 (emphasis in original).  Thus, the court noted "whether [defendant] separately submitted an annual certification of compliance to the FHA is inapposite for purposes of the instant motion." *Id.*  Consequently, *Reunion* only considered FCA claims under an implied certification theory.  As Judge Chen explained in analyzing *Reunion* in the *Thrower* litigation—which, like this case and unlike *Reunion*, involves allegedly false annual certifications made to obtain government mortgage insurance—"the section of *Reunion Mortgage* discussing annual certifications is dicta," and because that court was not presented with a promissory fraud theory, it "did not consider whether the outcome would have been different under a promissory fraud theory[.]" *Thrower*, 2018 WL 6592782, at *4.

That the fraudulently obtained government insurance benefit gives rise to FCA liability is supported by the *Thrower* court's holding on this precise question, and by the Ninth Circuit's promissory fraud case law and the reasoning of courts across the country considering similar FCA claims against DE lenders.  *See*, *e.g.*, *U.S. v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1036-37 (E.D. Mich.); *U.S. ex rel. Fisher*

*v. Ocwen Loan Servicing, LLC*, 2016 WL 2992229, at *8 (E.D. Tex. May 24, 2016); *U.S. v. Movtady*, 13 F. Supp. 3d 325, 330-31 (S.D.N.Y. 2014*); U.S. v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 621-25 (S.D.N.Y. 2013).

## VI.   RELATOR ADEQUATELY ALLEGES FRAUD ON THE VA.

NAF seeks dismissal of Relator's claims concerning the VA.  Mem. 11.  But Relator alleges NAF employed the very same unlawful tactics in pushing unqualified FHA and VA loans through for endorsement, and specifies the particular HUD/FHA and VA requirements that NAF's particular misconduct violates.  NAF can argue only that Relator did not specify exemplar loans originated under the VA Program or identify post-default claims made to the VA by NAF or third parties holding VA mortgages NAF sold.  As noted above, however, Relator is not required to allege any such examples, *see Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997); *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679 (9th Cir. 2018); *Ebeid*, 616 F.3d at 998, or subsequent payment requests following an "original fraud" that caused the government to extend a benefit it otherwise would not have extended, *Hendow*, 461 F.3d at 1173.  Accordingly, Relator's claims regarding NAF's abuse of the VA Program are sufficiently pleaded.

## VII.   RELATOR ADEQUATELY ALLEGES MATERIALITY.

"Under the [FCA], a falsehood is material if it has 'a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *Campie*, 862 F.3d at 904-05 (quoting 31 U.S.C. § 3729(b)(4)).  NAF argues Relator fails to allege its false certifications were material to any payment decision and its alleged violations amount to mere technical violations of inconsequential regulatory minutiae.  Mem. 13-16.  These arguments fail.

Every court to have squarely ruled on the issue has concluded HUD regulations are material for FCA purposes.  *See, e.g.*, *Thrower*, 2018 WL 4053484, at *11 ("[T]he false annual and loan-level certifications were material to HUD's

payment of claims.  [Defendant's] participation in the DE program and therefore its ability to endorse loans and make claims on them was conditioned on [defendant's] annual certification.  Likewise, a loan-level certification was required for individual loans to be endorsed.  In addition, the violated regulations are material to HUD's decision to insure the loans, because the regulations are necessary to shield the Government from undue financial risk and protect the viability of the DE program."); *Quicken*, 239 F. Supp. 3d at 1040 (holding HUD certifications are "material"); *U.S. v. TXL Mortg. Corp.*, 2016 WL 5108019, at *2 (D.D.C. Sept. 20, 2016) (same); *U.S. v. Americus Mortg. Corp.*, 2014 WL 4274279, at *11 (S.D. Tex. Aug. 29, 2014)(same); *Wells Fargo*, 972 F. Supp. 2d at 625 (same).

Attempting to dodge these compelling on-point authorities, NAF claims *Escobar* requires Relator to show the government routinely declines to pay out claims for mortgage insurance where it learns of violations.  Mem. 14.  Putting aside that *Escobar* is not instructive in a promissory fraud context, this argument falters because Relator has alleged the government has enforced the very standards NAF is accused of violating in numerous mortgage fraud cases, and the government has repeatedly taken the position that these requirements are material to its decision to pay claims, *see* Compl. ¶¶26-27, 79, 444-46.  These allegations surmount any argument the government does not consider such violations important, or Relator must provide examples of instances in which the government declined to pay an insurance claim due to its awareness of such violations to show materiality.  *See, e.g.*, *Rose*, 909 F.3d at 1020-22 (consulting defrauded government agency's "past enforcement habits in similar cases" in assessing materiality, and determining that "[t]here is evidence … that the Department *did* care about violations of the [applicable requirements]") (emphasis in original).

Far from asserting merely "any violation of any regulation may set the table for a valid false claim," Mem. 15, or NAF violated mere technicalities, Relator alleges

NAF breached the core regulations serving to shield the HUD and VA from undue financial risk and to protect the viability of the Government Programs.  NAF's certifications of compliance with those regulations was a necessary condition to endorse loans under those Programs, and were therefore material to HUD's and VA's decisions to insure NAF-originated loans and to pay out subsequent insurance claims.  *See, e.g.*, *Thrower*, 2018 WL 4053484, at *11; *Quicken*, 239 F. Supp. 3d at 1040-41.  Indeed, these regulations are designed to reduce the default risk on government-insured loans; in the context of the government's decision to outsource the mortgage underwriting/origination process to private companies and accept liability for loans that default, it is difficult to conceive of any kind of regulation more material than those NAF is accused of violating.[2]

## VIII.  RELATOR ADEQUATELY ALLEGES SCIENTER.

Relator alleges NAF knew or recklessly disregarded its certifications were false and the requirements it violated were material to the government's decision to insure NAF's endorsed loans and, thus, to pay subsequent claims made on those loans.  Scienter may be alleged generally, Fed. R. Civ. P. 9(b), and may be established by alleging "that a defendant knew a claim for payment was false, or that it acted with reckless disregard or deliberate indifference as to the truth or falsity of the claim."  *Silingo*, 904 F.3d at 679-80 (citing *U.S. v. Corinthian Colleges*, 655 F.3d 984, 996 (9th Cir. 2011)).  Relator's allegations satisfy this requirement.

## A.     NAF Knew Or Recklessly Disregarded That Its Certifications Were False.

NAF implemented a bevy of company policies and standard practices that run afoul of the HUD/FHA and VA requirements with which it certified compliance in

---

[2] NAF's contention that its misconduct is best remediated under HUD's and/or VA's in-house administrative review procedures, Mem. 15-16, rather than litigation under the FCA, is a red herring that has no bearing on the materiality of its alleged misconduct.  Whether HUD or VA undertakes to review NAF's conduct makes no difference to its liability under the FCA for defrauding the government.

order to endorse loans under the Government Programs and thus obtain government insurance on such loans. These policies and practices are not mistakes but "clear instances of deliberate misbehavior" sufficient to plead scienter. *Thrower*, 2018 WL 4053484, at *12. Among other things, NAF created a commission-based compensation policy for employees performing underwriting activities (Compl. ¶¶207-33), a "management exception" policy enabling NAF managers to push unqualified loans through for endorsement (Compl. ¶¶234-317), and a policy of concealing and withholding subsequently discovered underwriting deficiencies from the government (Compl. ¶¶414-30), and implementing a variety of inappropriate standard practices, such as interfering with appraisals and manipulating borrower income, debt, and debt-to-income figures (Compl. ¶¶318-413). It is implausible that these nationwide, company-wide policies and practices of long standing fell into place, or were perpetuated, by accident.[3]

Moreover, Relator has provided numerous specific instances of NAF managers (such as Processing Manager Kevin English and Loan Officer Manager Michael Garcia) actually making use of the management exception process to force unqualified loans through for endorsement (Compl. ¶¶251-313), and discussions with other NAF underwriters (Schultz, Burley, Bonander, Dandha, Pineda) who each objected and protested about this policy directly to Relator (Compl. ¶¶282-92). Similarly, Relator has provided specific details about the commissions inappropriately paid by NAF to employees performing underwriting activities, including amounts paid (Compl. ¶¶22a, 206, 212-30) and averments from employees that, due to the compensation opportunity, "they would attempt to approve as many files as they could, without regard to … qualifications" (Compl. ¶225). As one

---

[3] Moreover, the FCA scienter standard merely requires that NAF knew what it was filing and what its filing said, not that NAF knew it was breaking the law. Nowhere does the FCA require knowledge of illegality or "specific intent to defraud." 31 U.S.C. § 3729(b).

former NAF employee (Timberlake) informed Relator, "at NAF, the best way to maximize any bonus was to send 'all files through for approval,' regardless of whether they actually met all the qualifications" (Compl. ¶228).  The Complaint is replete with similar, highly plausible allegations showing NAF's company policies and practices were no mistake, but a calculated effort to maximize the number of endorsed loans.

Relator's allegations are directly in line with other FCA cases in the same industry, in which courts have held scienter is adequately pleaded where a complaint "specifically alleges the practices by which [a lender] sought to increase its loan originations without regard to whether the practices or the loans themselves complied with HUD regulations, [the lender's] decision to continue its loan origination practices, despite knowledge of these violations; and its motive for doing so."  *Wells Fargo*, 972 F. Supp. 2d at 616-17 (internal citations omitted); *see also Thrower*, 2018 WL 4053484, at *12 (alleged use of management exception policy and concealment of underwriting deficiencies suffice to plead scienter); *Quicken*, 239 F. Supp. 3d at 1034 (stating the "focus on management actions and intent is relevant on the question of recklessness").  Accordingly, Relator has adequately pleaded scienter.

## B.    NAF Knew Or Recklessly Disregarded That The Requirements It Violated Were Material.

As shown above, NAF's certifications were necessary to participate in the Government Programs and to obtain government insurance, and as NAF undisputedly did certify its compliance, join the programs, and submit loans under the programs, it knew such compliance was absolutely necessary to do so—and thus was material to the government's extension of the insurance benefits at issue.  *See Thrower*, 2018 WL 4053484, at *12 (rejecting identical argument and holding, "Since [lender] did in fact certify compliance and join the [DE] program, it presumably (and therefore plausibly) knew that certification and compliance were necessary and therefore

material to its ability to endorse loans and make claims on them.").  Moreover, as NAF knew or should have known, the government had previously commenced litigation or enforcement proceedings against other lenders for substantially similar underwriting, compensation, and auditing misconduct in violation of HUD requirements, clearly demonstrating the materiality of these requirements.  *See* Compl. ¶¶27, 445; *see also Rose*, 909 F.3d at 1020-21 (noting relevance of prior enforcement history).  Accordingly, Relator has adequately pleaded scienter.

## IX.    RELATOR'S ALLEGATIONS SATISFY RULE 9(B).

NAF's remaining arguments challenge the sufficiency under Rule 9(b) of Relator's allegations concerning each of the seven unlawful policies and practices. Mem. 19-25.  NAF's arguments fail because it overlooks, downplays, or mischaracterizes Relator's actual allegations.  Relator satisfies Rule 9(b).

Rule 9(b) is satisfied where a relator alleges the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz*, 476 F.3d at 764.  Here, Relator has specified the content of the false certifications NAF made to HUD and VA (Compl. ¶¶108-23 (initial and annual FHA certifications), 124-37 (loan-level FHA certifications), 152-60 (VA certifications)), together with comprehensive explanations of why these certifications were false.  Relator thoroughly describes her "first-hand experience of the scheme unfolding," and therefore has properly alleged an actionable scheme to submit false claims.  *Silingo*, 904 F.3d at 679 (quoting *Grubbs*, 565 F.3d at 192). Rule 9(b) requires nothing more.  Nevertheless, Relator responds to each argument.

***Commission-based compensation policy and management exception policy.*** HUD Handbook 4000.1 prohibits NAF from "compensat[ing] employees who perform underwriting … activities on a commission basis" (Compl. ¶¶207-08). Relator alleges NAF's compensation policy directly resulted in NAF endorsing unqualified loans and employees benefiting from the policy simply pushed all files

through for approval regardless of underwriting deficiencies to maximize their compensation (Compl. ¶¶22a, 206, 212-33).  NAF's management exception policy is antithetical to the government's lending requirements, which prohibit endorsement of loans that do not meet FHA/VA underwriting standards (Compl. ¶¶234-36), impose specific requirements on underwriting staff qualifications (Compl. ¶¶238-43), and prohibit any employees whose compensation depends on the number of loans s/he closes from performing underwriting activities (Compl. ¶244).  These requirements are violated by NAF's policy, which allows unlicensed managerial staff lacking a CHUMS or SAR certification and the requisite professional experience, with a financial incentive to maximize endorsed loan volume, to perform underwriting activities.  Courts have found similar allegations to satisfy the pleading standard. *See, e.g.*, *Thrower*, 2018 WL 4053484, at *11; *Quicken*, 239 F. Supp. 3d at 1029-31.

**Interference with appraisals.**  Relator alleges NAF violated HUD's requirement that lenders abstain from interfering with the appraisal process (Compl. ¶¶321, 324-25), implementing policies under which commission-compensated loan officers would contact appraisers to encourage them to report high property values, and such loan officers would sometimes show up in person at the appraisal (due to NAF making the appraisal schedule available to loan officers) (Compl. ¶¶331-36). NAF loan officers effectively blacklisted appraisers who refused to inflate property values by recording negative comments about such appraisers on the internal website of the appraisal service vendor who provided appraisers to NAF (Compl. ¶¶337-43). Relator need not positively identify appraisers impacted by these practices to plausibly allege NAF impermissibly interfered with the appraisal process.  Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Quicken*, 239 F. Supp. 3d at 1025-29.

**Manipulation of AUS/TOTAL inputs.**  As an example, Relator alleges a NAF loan officer (Travis Duncga) submitted an FHA loan file no fewer than 22 times,

subtly modifying the input criteria to determine weak points, and then used false information to get an "accept/approve" rating (Compl. ¶¶362-63).  Though not required, Relator identifies the loan file (No. 120016109350), the date (Nov. 2016), and the loan officer (Duncga).  *Id*.  Relator also identifies the regulations prohibiting such manipulation (Compl. ¶¶354-55).  NAF's argument boils down to a request that Relator specify which inputs (income, debt, property value, etc.) were manipulated, what other NAF staff worked on the file, and whether the loan ultimately defaulted. Neither Rule 9(b) nor the FCA require such allegations.  Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Quicken*, 239 F. Supp. 3d at 1037-38.

**Manipulation of borrower incomes and debts.**  Relator alleges NAF improperly manipulated borrower incomes and excluded debts to force bad loans through for insurance.  NAF argues only Relator's allegations are insufficient because Relator does not specify the particular borrowers or loans in the examples provided, who else worked on the exemplar files, and whether the loans were approved or resulted in claims.  Mem. 23-25.  These arguments fail.  Concerning manipulated incomes, Relator's examples illustrate the company's use of an inappropriate "rolling 24 month" income metric that is inconsistent with HUD/FHA and VA requirements concerning the calculation of income and use of overtime and bonuses in such calculations (Compl. ¶¶370-81).  Concerning excluded debts, Relator has provided the file number of an affected loan (No. 137316088706), the kinds of debts excluded (credit card, personal loan, car, timeshare) and the amount by which these omitted debts increased the borrower's monthly payment obligations (over $100/month), the identity of the loan manager notified (Garcia), and the date on which the loan nevertheless closed based on the knowingly inaccurate debt

information (Sept. 6, 2016) (Compl. ¶¶390-96).[4]  Relator also identified the managers pushing the loans through (Garcia and English) and their specific knowledge about the improper exclusions.  Such allegations are far beyond what Rule 9(b) requires.

Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *U.S. v. Miller*, 645 F.2d 473, 474-76 (5th Cir. 1981) (FHA applications for mortgage insurance containing false statements about home buyers' "past and present debts" stated plausible FCA violations); *Quicken*, 239 F. Supp. 3d at 1031-38 (allegations of borrower income manipulation, inaccurate debt figures or unverified, undocumented income and debt figures, to obtain approvals stated plausible FCA violations); *U.S. v. Americus Mort. Corp.*, 2013 WL 4829271, at *6 (S.D. Tex. Sept. 10, 2013) (unverified income in loan files supported FCA violations); *Wells Fargo*, 927 F. Supp. 2d at 624 (unverified income supported FCA violations).

***Concealing and withholding underwriting deficiencies.***  NAF complains Relator has not identified the auditor who uncovered the NAF-directed manipulation of the age of a child on a loan application to manipulate child support income or the specifics of a conversation between the auditor and NAF Head of Wholesale Lending Mike Clary, as though such information would constitute the difference between inadequate and adequate notice of the claims asserted.  Of course, it does not.  The detailed concrete facts in the complaint show NAF intentionally withheld from the government significant underwriting deficiencies its auditors discovered and its self-interested, commission-focused managers buried.  Courts have found similar allegations to satisfy the pleading standard.  *See, e.g.*, *Wells Fargo*, 972 F. Supp. 2d at 624-25; *Americus*, 2013 WL 4829271, at *5-6.

## CONCLUSION

For the foregoing reasons, NAF's motion to dismiss should be denied.

---

[4] Relator provided other similar examples as well (Compl. ¶¶402-38 (omitted car debt), 409-12 (omitted tax debt)).

1

2    Dated: June 17, 2019

3                                    **GRANT & EISENHOFER P.A.**

4

5                                    _/s/ Kyle J. McGee_
                                     Kyle J. McGee (*pro hac vice*)
6                                    Laina M. Herbert (*pro hac vice*)
                                     123 Justison Street
7                                    Wilmington, DE  19801
                                     Telephone:  (302) 622-7000
8                                    Emails: kmcgee@gelaw.com
                                               lherbert@gelaw.com

9                                    **CUTTER LAW PC**
                                     C. Brooks Cutter (121407)
10                                   John R. Parker, Jr. (257761)
                                     401 Watt Avenue
11                                   Sacramento, CA 95864
                                     Telephone:  (916) 290-9400
12                                   Emails:  bcutter@cutterlaw.com
                                               jparker@cutterlaw.com
13

14                                   **THOMAS & SOLOMON LLP**
                                     J. Nelson Thomas (*pro hac vice*)
15                                   Jonathan W. Ferris (*pro hac vice*)
                                     Michael J. Lingle (*pro hac vice*)
16                                   Annette M. Gifford (270777)
                                     693 East Avenue
17                                   Rochester, New York 14607
                                     Telephone:  (585) 272-0540
18                                   Emails:
                                     nthomas@theemploymentattorneys.com
19                                   jferris@theemploymentattorneys.com
                                     mlingle@theemploymentattorneys.com
20                                   amgifford@gmail.com

21                                   *Attorneys for Plaintiff*

22

23

24

25

26

27

28
─────────────────────────────────────────────