UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge |
|---|---|
| Wendy Hernandez | Not Reported |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):** Order DENYING Defendant's motion to dismiss

Before the Court is a motion to dismiss filed by Defendant Broker Solutions, Inc. dba New American Funding ("Defendant" or "NAF"). *See* Dkt. # 97 ("*Mot.*"). Relator Malou Tutanes-Luster ("Relator") opposes the motion, *see* Dkt. # 98 ("*Opp.*"), and Defendant replied, *see* Dkt. # 99 ("*Reply*"). The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the moving papers, the Court **DENIES** the motion.

I.   Background

   A.   The Government Programs

The Department of Housing and Urban Development ("HUD"), its sub-agency the Federal Housing Administration ("FHA"), and the Department of Veteran Affairs ("VA") operate programs that help creditworthy military veterans and low and moderate income families get mortgage loans that they otherwise would have difficulty qualifying for. *See First Amended Complaint*, Dkt. # 94 ("*FAC*"), ¶¶ 58–59, 139–40. The loans issued under these programs are originated, underwritten, and serviced by private lenders. *Id.* ¶ 3. But they are insured by the Government. *Id.* If an individual defaults on a loan issued through the programs, the Government insures the private lenders for the full value of HUD-FHA loans and up to 50 percent of the loan amount for VA loans. *See id.* ¶¶ 6–8. This arrangement is lucrative for lenders because they can generate fees and other revenue from servicing the loans while the Government bears all or much of the risk of loss. *See id.* ¶ 12. However, it provides lenders with an incentive to issue as many loans as possible without regard to the risk of default. Accordingly, the programs are subject to extensive regulations governing the conduct of private lenders and the issuance of loans.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

In order to participate in the Government Programs, private lenders must certify that they will comply with the applicable rules and regulations. For the HUD-FHA program, lenders must provide an initial certification to HUD when they first apply to become an FHA lender. *See id.* ¶ 108. Relator alleges that prior to becoming an approved lender, Defendant certified:

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702 et seq.) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

*Id.* After initially becoming certified, lenders in the HUD-FHA program must make additional certifications of compliance each year ("annual certifications"). *Id.* ¶ 110. Relator alleges that each year since 2010, Defendant certified:

> I [NAF] certify that I know, or am in the position to know, whether the operations of [NAF] conform[s] to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of [NAF]. I certify that [NAF] complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, [NAF] conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that [NAF] is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for [NAF] . . . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

*Id.* ¶ 111.[1] Lenders must also submit a separate certification along with each individual loan they endorse, attesting that the loan is "eligible for HUD mortgage insurance" ("loan-level certifications"). *Id.* ¶ 125. As for the VA program, Plaintiff alleges that Defendant had to make similar initial and loan-level certifications, though it does not appear that Defendant had to make annual certifications as it did for the HUD-FHA program. *Id.* ¶¶ 152–160.

In addition to being prerequisites for participation in the Government Programs, Relator alleges that these certifications are important because they are the only means by which the Government can ensure that the loans it insures meet federal regulations and its "stringent underwriting criteria." *See id.* ¶ 3. The Government does not independently assess loans before they are issued, instead relying on lenders to "comply with the Government's operational requirements." *Id.* ¶ 119.

B. The Alleged Wrongdoing

Relator worked for Defendant as a loan processor in San Jose during 2016. *Id.* ¶ 2. Part of her responsibilities included working on loans originated under the Government Programs. *Id.* As discussed above, loans where the Government carries the risk are profitable and provide lenders with an incentive to issue as many of them as they can. *See id.* ¶ 10. Relator alleges that Defendant's pursuit of profits led it to both violate the rules and regulations of the Government Programs and endorse loans that did not satisfy the criteria of those programs. *See generally id.* Consequently, Relator contends that Defendant's initial, annual, and loan-level certifications of compliance with the rules were false.

The FAC describes seven different types of wrongdoing.

    *i.*    *Commission-Based Compensation*

HUD regulations prohibit lenders in the HUD-FHA program from using commissions to compensate employees who perform underwriting functions. *See FAC* ¶ 207–08. According to Relator, "[t]his rule helps ensure that employees performing underwriting functions are making decisions completely on the merits of the individual file and are not incentivized to approve mortgages because of the potential to be paid a commission." *Id.* ¶ 209.

---

[1] The First Amended Complaint also alleges that Defendant made other specified annual certifications. *FAC* ¶¶ 112–14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

Relator alleges that Defendant violated this regulation precisely for the purpose of providing employees with incentives to approve loans that did not meet the Government's requirements. *Id.* ¶ 214. Commissions were based solely on the number of loans that were approved rather than on the extent to which the Government rules were complied with. *See* ¶ 219. For 20 approved loans in a 30-day period, an employee would receive a $2,500 commission; for 30 loans, $4,500; for 35 loans, $5,500; and for 40 loans, $10,000. *Id.* ¶ 223. These commissions could raise employees' pay to more than double their base pay rate. *Id.* ¶ 224. Employees of Defendant allegedly told Relator that "they would attempt approve as many files as they could, without regard to the file's qualifications," in order to increase their commissions. *Id.* ¶ 225.

One employee in particular, Denidita Timberlake, told Relator that "the best way to maximize any bonus was to send 'all files through for approval,' regardless of whether they actually met all the qualifications." *Id.* ¶¶ 228. Timberlake allegedly stated that as long as there was a "bare minimum of income, credit, and asset documents," the Government was unlikely to catch other underwriting violations and therefore the loans could be sent for approval without any risk of being caught, resulting in the employees getting credit toward their bonuses. *Id.* ¶ 229.

        ii.       *Management Exception Policy*

Loans are only eligible for government insurance if they meet the rules and regulations of the Government Programs. *Id.* ¶ 234. Defendant certified on a loan-specific basis that each loan it endorsed met these requirements. *Id.* ¶¶ 235–36. Relator alleges, however, that Defendant "created a management override process under which NAF management would dictate that loans should be endorsed even if they did not meet the Government's requirements." *Id.* ¶ 237. Relator alleges three different ways in which this scheme was carried out.

First, the regulations for the Government programs require that all loans be endorsed by licensed and approved underwriters, as evidenced by the underwriter having a Computerized Homes Underwriting Management System ("CHUMS") ID number (for the HUD-FHA program) or a Staff Appraisal Reviewer ("SAR") number (for the VA program). *Id.* ¶¶ 239–43. Relator alleges that when an underwriter refused to approve a loan file, Defendant's policy allowed management-level employees to take the issue to the Regional Manager, who was "empowered to override the decision of the underwriter and have the loan approved." *Id.* ¶ 256. Relator has stated that she specifically remembers Mario Martinez, Jamie Del Bosque, and Leola Edmond submitting non-qualifying loans for Government insurance. *See id.* ¶ 259. All three of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

these individuals were employed on the sales side of the business, were not trained as underwriters, and did not have the necessary CHUMS or SAR certifications. *Id.* ¶ 260. The Government Program rules and regulations therefore barred them from approving loans.

Second, Relator alleges that Defendant implemented a policy to avoid underwriter denials by having management approve problematic loans before they were even sent for underwriting. *Id.* ¶ 269. Processing Manager Kevin English allegedly told Relator that if she saw a file that did not meet underwriting requirements, she was to take it out of the normal process before it was denied by an underwriter and take it to English or her Team Lead Joseph Garcia. *Id.* ¶ 271. English would review any file Relator brought to him and would approve it as long as it did not lack basic documentation in regard to income, assets, and credit—even if Relator pointed out clear deficiencies in other requirements. *Id.* ¶¶ 272–74. Relator also took deficient files to Garcia on multiple occasions each week between September and December 2016. *Id.* ¶ 276. When a file did not meet underwriting requirements, Garcia allegedly told Relator "I'll just have it pushed through" or "Ok, we're fine—just send it off." *Id.* ¶ 279.

The third way in which the management exception policy allegedly operated involved Defendant's "condition approval" policy. *Id.* ¶ 293. Under this policy, underwriters approve a subset of loans for Government insurance with "conditions" that must be satisfied before the loans can close. *Id.* ¶¶ 293–94. Relator alleges that Government Program regulations required that underwriters with CHUMS or SAR numbers make the determination as to whether the conditions were satisfied. *Id.* ¶ 296. Instead, Defendant allowed Processing Managers, who were not underwriters and did not have CHUMS or SAR numbers, to approve files by removing the conditions. *Id.* ¶ 297. Specifically, one experienced underwriter identified only as "Barbara" allegedly told Relator that English, who was not an underwriter, routinely removed conditions from loans even though they had not been satisfied. *Id.* ¶ 302.

Relator contends that through these various management exception and override policies, Defendant "flatly reject[ed] or ignore[d] the very underwriting requirements with which [it] had certified its compliance." *Id.* ¶ 314.

### iii. Inaccurate Appraisals

Relator alleges that Defendant caused non-compliant loans to appear to meet the basic requirements for approval by falsely inflating the value of the loan collateral through the appraisal process. *See id.* ¶ 320. HUD places limits on the eligible loan amount based on the appraised value of the collateral, which is one means by which the agency limits its exposure in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

the event of a default. *Id.* ¶¶ 327–29. To ensure accurate appraisals, the HUD-FHA program has regulations designed to protect the integrity of the appraisal process. Specifically, the regulations prohibit any person who is compensated on a commission basis from "ordering or managing an appraisal assignment." *Id.* ¶ 321. They also prohibit various conduct that could coerce an appraiser into providing an appraisal that is more favorable to the lender. *See id.* ¶ 325 (enumerating several specific prohibitions). Relator alleges that Defendant violated these regulations in various ways.

First, Defendant's loan officers would contact the appraiser to arrange for an appraisal, even though loan officers received commissions and therefore were not supposed to be involved in the appraisal process. *Id.* ¶¶ 333–34. Second, Defendant's computer system allowed loan officers to see the date and time of the appraisal, so the loan officer could physically attend the appraisal or otherwise be present while the appraiser was there. *Id.* ¶¶ 334. Relator alleges that in September, October, and November 2016, she "observed loan officers commenting that they had been present at the property while the appraiser was performing the inspection, and that they had attended for the purpose of ensuring the appraisal resulted in a 'good' value for the property." *Id.* ¶ 336.

Third, loan officers made clear both internally and to the appraisers themselves that they would only use "cooperative" appraisers, that is those who delivered the property values that the loan officers needed. *Id.* ¶¶ 337. When the appraisers did not do so, loan officers would use the vendor's internal website to record comments such as "please use a different appraiser" or "appraiser comes in too low," which had the effect of steering business away from the appraisers, thereby pressuring them to increase the value of their appraisals. *Id.* ¶¶ 338–39. Relator alleges that Defendant's employees Loretta Bonander and Grace Olivetti, both loan officer assistants, recorded such comments on behalf of their loan officers between September to November 2016. *Id.* ¶ 341. Finally, Relator alleges the appraisal process was almost entirely managed by loan officers and their assistants, rather than underwriters. *Id.* ¶ 344. As explained above, these individuals were not supposed to be involved with the appraisal process

    iv. *Manipulation of the Automatic Underwriting System*

The Government required Defendant to use an automatic underwriting system ("AUS") that connected to a proprietary HUD algorithm called Technology Open to Approved Lenders ("TOTAL"). *Id.* ¶¶ 128–29. TOTAL rates loans as either "accept/approve" or "refer/caution" based on data that Defendant enters into its AUS—for example, the dollar value of the borrower's income and assets. *Id.* ¶ 348. Loans that receive an "accept/approve" rating are

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

subject to less stringent documentation requirements and scrutiny than those that receive a "refer/caution" rating. *Id.* ¶ 349. Lenders like Defendant are not permitted to manipulate the data in their AUS to determine which variable amounts will result in an "accept/approve" rating—instead, if TOTAL provides a "refer/caution" rating, the loan must be manually underwritten. *Id.* ¶ 350. Specifically, the HUD-FHA program regulations provide that if a determination is made that a loan must be manually underwritten, "the Mortgagee must cease its use of the AUS and comply with all requirements for manual underwriting." *Id.* ¶ 354.

To avoid the additional scrutiny required by a "refer/caution" rating, Relator alleges that when TOTAL provided such a rating, Defendant's employees would systematically increase or decrease certain variables during successive AUS/TOTAL runs in an attempt to identify a variable combination that would result in an "accept/approve" rating. *Id.* ¶ 353. As an example, Relator alleges that during the second week of November 2016, Defendant's loan officer Travis Dungca ran a specific loan—identified in the FAC by its file number—twenty-two times after getting a "refer/caution" rating so that he could reverse engineer and discover "what data needed to be fabricated in order to return an approval." *Id.* ¶ 362. Dungca then used this incorrect information to get the loan approved. *Id.* ¶ 363.

    v.  *Inflating Borrower Income*

The Government Program regulations provide certain requirements for how a borrower's income should be calculated. Specifically, they require that bonus or overtime income may only be included if the borrower has received that income in the past two years and it is "reasonably likely to continue." *Id.* ¶ 370–73.

Relator alleges that Defendant violated these regulations. First, instead of using the borrower's average income over the past two years, as the regulations require, Defendant would routinely extrapolate the borrower's *current* income for the *following* two years, which had the effect of significantly inflating the income amount. *Id.* ¶ 376. As a specific example, Relator alleges that for loans sought by tomato pickers in California, English would instruct underwriters to treat their income as if it would be consistently earned from year to year, even though the income of these individuals fluctuated greatly. *Id.* ¶ 378. Further, for one borrower who earned a salary of $24,000 per year but had received a $98,000 one-time bonus upon being promoted, the loan officer included the bonus amount in the borrower's income calculation even though it was unlikely to continue in the future. *Id.* ¶ 379. Finally, Defendant would include bonuses that were anticipated, but had not yet been received, in the income calculations, even though there was no guarantee that the borrower would ever receive the bonus. *Id.* ¶ 380. Relator contends

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

that these practices had the effect of inflating income levels such that loans could qualify for approval even though they would have been deficient had the borrower's income been calculated correctly. *See id.*

        *vi.*    *Understating Borrower Debt Obligations*

The Government Program regulations set maximum debt-to-income ratios for borrowers seeking loans under the programs. *See id.* ¶¶ 383–84. They likewise set forth rules that govern which liabilities must be included in the calculation of a borrower's debt obligations. *See id.* ¶¶ 387–88. For example, under the HUD-FHA program, the borrower must include all monthly liabilities unless the debt will be paid off within ten months and the cumulative payment of such debts is no more than five percent of the borrower's monthly income. *Id.* ¶ 387.

Relator alleges that Defendant excluded liabilities that should have been included in the borrower's debt calculation so that the loan would qualify for government insurance. For example, for one loan identified by number, Relator ran a soft credit check through Equifax shortly before the loan was set to close. *Id.* ¶ 390. It revealed that the borrower had credit card debts and a new personal loan, had refinanced her car, and had a timeshare. *Id.* ¶ 391. Properly calculated, these debts would have taken the borrower's debt-to-income ratio above the allowable amount. *Id.* ¶ 392. However, despit the fact that the borrower's debts had increased significantly since the loan was initially run through the AUS system, Defendant did not resubmit the loan for evaluation, where it would have been rejected—even though Relator alerted her supervisor to the problem. *Id.* ¶¶ 393–95. Instead, Defendant proceeded forward and the loan closed on September 6, 2016. *Id.* ¶ 396.

The Government Program regulations also provide specific requirements for when contingent liabilities, like co-signed liabilities, can be excluded from the calculation of the borrower's debt obligation. *Id.* ¶¶ 399–401. For example, a co-signed liability can only be excluded if there is evidence that the other party to the loan has been making consistent payments over the previous twelve months and does not have a history of delinquent payments. *Id.* ¶ 399. Relator alleges that for a specific FHA loan identified by number, Defendant wrongfully excluded a loan that a borrower had co-signed for her son's car even though there was no evidence that her son had regularly been making payments on it. *Id.* ¶¶ 402–08. She further alleges that for a different loan, also identified by number, Defendant excluded a borrower's unpaid income taxes in violation of HUD rules. *Id.* ¶¶ 410–12.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

*vii.* Quality Control

The Government Program regulations require lenders to maintain a quality control program that includes a periodic review of a sample of loan files to make sure they were underwritten in compliance with the applicable rules and regulations. *Id.* ¶¶ 416–20. Relator alleges that Defendant's quality control program failed to comply with basic requirements, including "the obligation to address serious quality control problems and to take steps to prevent mortgage fraud." *Id.* ¶ 423.

Relator alleges that a quality control auditor that worked in Defendant's Tustin, California headquarters "witnessed multiple incidents in which NAF's quality control auditors identified fraud or other underwriting deficiencies, but NAF ignored the audit findings." For example, in reviewing a file in 2015, an auditor discovered that a borrower used child support income to reach the qualifying income level for a loan. *Id.* ¶ 425. However, while the loan file indicated that the child was 14 years old, s/he was actually 19 years old and therefore the child support income could not be used to qualify the borrower. *Id.* After contacting the borrower, the auditor received information that led him to believe that the borrower had been told by Defendant's loan officer to change the child's date of birth to falsely state that the child was younger than s/he actually was. *Id.* ¶ 426. When the auditor raised this issue and others, he was told by Mike Clary, Defendant's Head of Wholesale Lending, that "we're going to do it this way." *Id.* ¶ 429. Relator alleges that Defendant ignored the audit results and did not self-report the underwriting deficiencies they revealed. *Id.* ¶ 430.

C.   Procedural History

On August 2, 2017, Relator filed this qui tam case against Defendant in the Northern District of California, asserting claims under the False Claims Act ("FCA").[2] *See* Dkt. # 1. In July 2018, the Government declined to exercise its statutory right to intervene. *See* Dkt. # 13; 31 U.S.C. § 3730(b)(4). The court in the Northern District then granted Defendant's motion to transfer the case to this District, where its headquarters is located. *See* Dkt. # 54.

Relator subsequently amended her complaint. The operative First Amended Complaint asserts two causes of action under the FCA: (1) causing false claims from 2011 to the present, 31

---

[2] Patty Arvielo, Defendant's president and co-founder, was initially named as a co-defendant, but Relator later voluntarily dismissed the claims against her. *See* Dkt. # 39.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

U.S.C. § 3729(a)(1)(A), *see FAC* ¶¶ 478–86; and (2) use of false statements from 2011 to the present, 31 U.S.C. § 3729(a)(1)(B), *see FAC* ¶¶ 487–95.

Defendant now moves to dismiss for failure to state a claim. *See generally Mot.*

II.      Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff. *See Turner v. City and County of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015); *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). The court then determines whether the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Accordingly, "for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted).

Rule 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the pleader must state the time, place, and specific content of the false representations. *See Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007). The allegations "must set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (emphasis in original). In essence, the defendant must be able to prepare an adequate answer to the allegations of fraud.

III.     Discussion

The FCA imposes liability on any individual who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). The statute recognizes three types of "false or fraudulent claims": (1) claims that are "literally false or fraudulent," such as when an individual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

overcharges under a government contract; (2) "false certification" claims, where the recipient of a payment "falsely certifies compliance with a statute or regulation as condition to government payment;" and (3) "promissory fraud" claims, where the "contract or extension of benefit" under which a claim is submitted was originally procured "through false statements or fraudulent conduct." *United States ex rel. Thrower v. Acad. Mortg. Corp.*, No. 16-cv-2120-EMC, 2018 WL 4053484, at *7 (N.D. Cal. Aug. 25, 2018) ("*Thrower I*") (quoting *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170–73 (9th Cir. 2006)).

Relator proceeds only on a promissory fraud theory here.  In other words, she does not allege that Defendant falsely claimed that recipients of the government-backed loans defaulted in order to get the government to pay out on its insurance for loans that were not actually in default.  Instead, she contends that the government insurance policies *themselves* were procured by Defendant's false initial, annual, and loan-level certifications such that *any* money paid under them—even if the borrower had legitimately defaulted—was the product of a false claim.

Defendant resists Relator's characterization of her claims as promissory fraud claims, arguing that because the alleged falsehoods were certifications of compliance with the rules and regulations of the Government Programs, the claims must be based on an implied false certification theory.  *See Mot.* 8:8–9:5.  But while the two theories are related, and consist of the same elements, a false certification theory involves certifications made *in conjunction with the request for payment*, whereas a promissory fraud theory is "somewhat broader" and attaches liability to "each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." *Hendow*, 461 F.3d at 1171–74.  Because Relator's claims allege fraud in the contracting process rather than in the making of claims on the insurance policies, the Court believes they are properly viewed as promissory fraud claims. *Accord Thrower I*, 2018 WL 4053484, at *8.

To survive the pleading stage, Relator must plausibly allege "(1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material; (4) causing the government to pay out money." *Hendow*, 461 F.3d at 1174.  Because FCA claims sound in fraud, they must satisfy both the plausibility requirement of Rule 8 *and* the particularity requirement of Rule 9(b). *See United Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016).  Accordingly, the Government's complaint must "set forth what is false or misleading about a statement, and why it is false"; in other words, "the who, what, when, where, and how" of the misconduct charged.  *Vess*, 317 F.3d at 1106; *see also Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) ("To comply with Rule 9(b), allegations of

Case 2:19-cv-01630-PSG-JPR Document 101 Filed 07/08/19 Page 12 of 20 Page ID #:1647

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.") (internal quotation marks omitted). In the context of the FCA, Rule 9(b) requires "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998–99 (9th Cir. 2010) (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

Defendant makes several arguments in favor of dismissal, including that the FAC does not adequately plead falsity, materiality, or scienter; that the false schemes are not alleged in enough detail to give rise to an inference that false claims were submitted; and that the alleged false certifications here cannot form the basis for FCA liability. *See generally Mot.* In addressing these arguments, the Court is not writing on a blank slate. In a factually analogous case involving a different lender, a judge in the Northern District of California recently confronted similar arguments—indeed, they were made by many of the same attorneys that are representing both sides in this case. *See generally Thrower I*, 2018 WL 4053484. The court in *Thrower I* denied the defendant's motion to dismiss, concluding that the complaint adequately stated a claim. *Id.*, at *13. For largely the same reasons, the Court reaches the same conclusion here.

    A.    <u>Falsity</u>

The Court separately addresses each of Defendant's arguments for why the complaint fails to plead falsity.

        i.    *Applicability of* Escobar

The Ninth Circuit has stated that the FCA is to be construed "broadly, as it is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (quoting *Hendow*, 461 F.3d at 1170). Consequently, "[s]uch broad construction has thus given rise to a number of doctrines 'that attach potential False Claims Act liability to claims for payment that are not explicitly and/or independently false.'" *Campie*, 862 F.3d at 899 (quoting *Hendow*, 461 F.3d at 1171).

In *Universal Health Services, Inc.*, 136 S. Ct. 1989, 2001 (2016), the Supreme Court addressed the viability of one of these doctrines: the implied false certification theory of liability.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

The Court held that the theory can provide a basis for FCA liability at least when (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.*

Defendant argues that this test from *Escobar* applies here and that the FAC does not state a claim because it does not allege that Defendant made misleading misrepresentations while making claims on the government insurance policies for loans that were in default. *See Mot.* 9:19–10:1. But this argument is a byproduct of Defendant's insistence that Relator is proceeding on a implied false certification theory rather than a promissory fraud theory. As discussed above, the court disagrees with Defendant's characterization of Relator's claims. *Escobar* speaks only to liability on an implied false characterization theory and has no obvious relevance to a promissory fraud claim that alleges false statements "during the contract process, not the claim process." *Thrower I*, 2018 WL 4053484, at *10. Because Relator brings a promissory fraud claim, *Escobar*'s discussion of falsity does not apply. *Accord id.*

### ii. Annual Certifications

The FAC alleges that Defendant could not participate in the HUD-FHA program unless it annually certified that it was complying with the program requirements. *See FAC* ¶¶ 16–17. Defendant argues, however, that any falsities in the annual certifications cannot serve as the basis for FCA liability because Defendant did not receive a government benefit—government insurance on its policies—until after *additional* loan-level certifications were made. *See Mot.* 10: 24–11:18.

This argument has been considered and rejected by several courts, which have held that because compliance with the regulations that are the subject of the annual certifications is a prerequisite to even participating in the FHA-HUD program, these regulations are conditions of payment that can give rise to FCA liability. *See United States v. Acad. Mortg. Corp.*, No. 16-cv-2120-EMC, 2018 WL 6592782, at *4 (N.D. Cal. Dec. 14, 2018) ("*Thrower II*"); *United States v. Movtady*, 13 F. Supp. 3d 325, 331 (S.D.N.Y. 2014) ("[B]oth the individual-loan and annual certifications at issue in this case are explicit conditions for ongoing payments and therefore proper bases for False Claim Act claims."); *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 622–25 (S.D.N.Y. 2013).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

Defendant relies on a single case that stated that FCA liability could not be grounded in false annual certifications because the purpose of these certifications was to "prospectively maintain [the lender's] status with the FHA," not to "obtain the FHA's endorsement as to each loan transaction at issue." *See United States v. Reunion Mortg., Inc.*, No. C 13-2340 SBA, 2013 WL 5944252, at *6 (N.D. Cal. Nov. 5, 2013). However, as multiple courts have recognized, these statements in *Reunion* were dicta because that case did not actually involve claims based on false annual certifications. *See Thrower II*, 2018 6592782, at *4; *Movtady*, 13 F. Supp. 3d at 331. The Court is more persuaded by the majority view that false annual certifications can form the basis for FCA liability because these certifications are threshold requirements for gaining access to the FHA-HUD program. Accordingly, it rejects Defendant's arguments to the contrary.

Defendant's argument that it cannot be held liable for claims on the Government insurance from complaint loans—i.e. loans where the borrower met the required qualifications—fails for the same reason. *See Mot.* 10:2–11. Because a false annual certification can taint all loans issued in the relevant year, Relator need not show that each individual loan was not otherwise "properly underwritten and endorsed." *Thrower I*, 2018 WL 4053484, at *8.

       *iii.*    *Specificity*

Defendant contends that "Relator has not sufficiently pled that any certification was false with the specificity required by Rule 9(b)." *Mot.* 12:1–24. It specifically focuses on the fact that the FAC does not identify the individual NAF employee who made each alleged false certification. *See id.* 19–24.

To comply with Rule 9(b), the allegations in the FAC "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019. Here, the FAC provides Defendant with ample notice of precisely which certifications are alleged to be false and why they are alleged to be false.

The FAC alleges the exact content of the certifications and when they were made: initial certifications when Defendant began participating in the HUD-FHA and VA programs, annual certifications each year (for the HUD-FHA program), and loan-level certifications, which the FAC ties to specific loans that are identified by file number. *See FAC* ¶¶ 106–38, 152–60; *see also e.g.*, *id.* ¶ 362–363. For each of the alleged fraudulent schemes, it identifies individuals

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

involved by name. And while it does not specifically identify the NAF employees who signed each certification or the dates upon which each one was made, this information can be easily determined by Defendant from the detailed allegations in the FAC. It did not need to be pleaded when "[the] allegations already provide Defendant[] with the notice required by Rule 9(b). *See United States ex rel. Mei Ling v. City of Los Angeles*, No. CV 11-974 PSG (JCx), 2018 WL 3814498, at *11 (C.D. Cal. July 25, 2018). Accordingly, the Court concludes that the allegations of falsity satisfy Rule 9(b).

      *iv.*    *The VA Program*

Defendant contends that the allegations with regard to the VA program are insufficient because the FAC "does not identify a single claim NAF made to VA for payment or even a specific VA loan that was affected by Relator's alleged fraudulent schemes." *See Mot.* 11:20–27.

It is true that all of the individual loans identified in the FAC were made under the HUD/FHA program, not the VA program. However, under the law of this Circuit, Relator is not required to plead a specific example of a false claim for each program. *See Cooper v. Pickett*, 137 F.3d 616, 626–27 (9th Cir. 1997). Instead, she need only allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998–99.

The rules and regulations that Defendant is alleged to have violated are substantially the same for both the HUD/FHA and VA programs. The FAC describes company-wide policies that violated these rules. For example, it alleges that Defendant had a "standard and long-standing" policy of allowing unqualified loans to be approved by non-underwriting management personnel, in violation of the rules of both the HUD/FHA and VA programs. *See* ¶¶ 234–317. And it alleges that Relator personally witnessed specific managers improperly approving loans. *See, e.g.*, ¶ 279. For other schemes, it identifies specific HUD/FHA loans by file number that were approved even though the borrowers failed to meet the program's requirements. *See, e.g.*, ¶ 362.

Taken as true, these allegations clearly identify specific violations of the HUD/FHA program rules. Because the violations are alleged to be a product of company-wide policies, the Court believes that they also provide "reliable indicia" leading to a "strong inference" that similar VA program rules were violated as well. Accordingly, the Court concludes that the FAC adequately pleads falsity.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

    B.    <u>Materiality</u>

        *i.*    *Legal Standard*

A false statement is material under the FCA if it has "a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3129(b)(4). The materiality standard "is demanding." *Escobar*, 136 S. Ct. at 2003. As the Supreme Court recently explained,

> [a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* at 2002–03.

In evaluating materiality, this Court has previously looked to four factors that *Escobar* identified as potentially relevant (1) whether the violated requirement was expressly identified as a condition of payment, which, though "relevant, [is] not automatically dispositive," *see id.* at 2003; (2) whether the violation went to the essence of the bargain; (3) whether the violation was minor or insubstantial; and (4) the actions the Government took in response to the violation at issue or similar violations. *See Mei Ling*, 2018 WL 3814498, at *13. Analyzing these factors, the Court has little trouble concluding that the FAC adequately pleads materiality.

        *ii.*    *Discussion*

First, it appears undisputed that compliance with the rules and regulations of the Government Programs was expressly identified as a condition of payment because Defendant's ability to participate in the programs was contingent upon it. This weighs in favor of materiality but is not dispositive on its own. *See Escobar*, 136 S. Ct. at 2003.

Second, the Court concludes that the FAC adequately alleges that the alleged violations were not "minor or insubstantial" but instead "went to the essence of the bargain." *See Mei Ling*, 2018 WL 3814498, at *13. While Defendant characterizes the violations as merely "technical," *see Mot.* 14:10, this blinks reality. As an example of a minor violation, the Supreme

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

Court pointed to a hypothetical regulatory requirement that contractors for health services "buy American-made staplers." *See Escobar*, 136 S. Ct. at 2004. The rules that are alleged to have been violated here are a far cry from that. For example, Relator contends that Defendant violated the Government Programs' rules and regulations for calculating the income and debt obligations of borrowers, which led to it procuring government insurance for loans that otherwise would have been deemed unqualified. *See FAC* ¶¶ 366–413. It is hard to imagine any rules more material than those regulating the key variables that go into the determination of whether the Government will insure a loan. The same goes for the alleged violations of policies intended to ensure that underwriting and appraisal decisions were untainted by employees who were paid by commission and therefore had an inherent incentive to approve as many loans as possible. *See FAC* ¶¶ 207–346. It is little surprise that courts have consistently found these types of violations material. *Thrower I*, 2018 WL 4053484, at *11 ("Violations such as overriding endorsement conditions, manipulating the data to get an otherwise unqualified loan to qualify, hiding adverse documentation, and incentivizing underwriters to facilitate the making of bad loans through payment of commission go to the heart of the . . . lender's duty to the Government under the program."); *United States v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1040 (E.D. Mich. 2017); *United States v. TXL Mortg. Corp.*, No. 15-1658 (JEB), 2016 WL 5108019, at *2 (D.D.C. Sept. 20, 2016).

      Defendant largely hangs its hat on the fact that the FAC does not allege that HUD and the VA regularly decline claims when they have knowledge that these regulations have been violated. *See Mot.* 14:9–11. But the FAC *does* allege several instances in which the Government has either sanctioned or pursued legal action against various companies for similar violations, to the tune of billions of dollars returned to the public fisc. *See FAC* ¶ 27, 445. That the Government cares enough to initiate significant enforcement actions weighs in favor of materiality. And even putting that aside, *Escobar* did not create a categorical requirement that a relator plead specific instances in which the Government has denied payment in order to state a claim. *See United States ex rel. Prather v. Brookdale Senior Living Cmtys.*, 892 F.3d 822, 834 (6th Cir. 2018) (holding that a relator "is not required to make allegations regarding past government action" because "[t]he Supreme Court was explicit that none of the factors it enumerated was dispositive"). The Court joins others that have held that the nature of the violations alleged here, which went to the core of the Government Programs, are sufficient on their own to render it plausible that they were material. *See, e.g.*, *Thrower I*, 2018 WL 4053484, at *11.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

### C. Scienter

The FCA imposes liability on individuals who act "knowingly," which is defined by statute as acting with knowledge that a claim was false or with reckless disregard or deliberate indifference as to the truth or falsity of the claim. *See* 31 U.S.C. § 3729(b)(1); *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679 (9th Cir. 2018). The statute explicitly states that it "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

Defendant contends, however, that claims brought under a promissory fraud theory are subject to a heightened "specific intent" scienter requirement, where the relator must prove that the false statements were made willfully with the intent to defraud. *See Mot.* 5:10–12 ("This requirement of knowing and willful fraud—*i.e.* a specific intent to defraud—distinguishes the promissory fraud theory of liability from a standard FCA allegation."). This argument appears to be grounded entirely on a passage from *United States ex rel. Hopper v. Anton*, 91 F.3d 1262, 1267 (9th Cir. 1996), which is reproduced below:

> In addition, although promissory fraud may be actionable in rare circumstances under the FCA, the promise must be false when made. *See U.S. v. Shah*, 44 F.3d 285, 290 (5th Cir.1995) (holding a promise of nondisclosure made after the defendant had made a specific promise to another party to disclose the information was actionable). For a certified statement to be "false" under the Act, it must be an intentional, palpable lie. Innocent mistakes, mere negligent misrepresentations and differences in interpretations are not false certifications under the Act. "For a qui tam action to survive summary judgment, the relator must produce sufficient evidence to support an inference of knowing fraud." *United States ex rel. Anderson v. Northern Telecom*, 52 F.3d 810, 815 (9th Cir.1995).

*Id.* (some internal citations omitted).

The Court does not read this paragraph from *Hopper* to create a scienter requirement for promissory fraud claims that differs from the "knowingly" requirement set forth in the FCA, which allows for liability based on deliberate indifference and reckless disregard. *See* 31 U.S.C. § 3729(b)(1). The Ninth Circuit instead appears to have been intending to distinguish culpable conduct from "mere negligent misrepresentations and differences in interpretations." *See Hopper*, 91 F.3d at 1267. Its discussion of "an intentional, palpable lie" is specifically directed toward the element of falsity, not scienter.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

The Ninth Circuit has subsequently made clear on several occasions that allegations of reckless disregard are enough to support an FCA claim. *See, e.g.*, *Silingo*, 904 F.3d at 679–80. It has also described promissory fraud claims as having the "same elements" as implied false certification claims, which Defendant agrees can create liability based on reckless disregard. *See Hendow*, 461 F.3d at 1174. Defendant's argument that promissory fraud is subject to a specific intent scienter requirement departs from the text of the FCA and is not supported by the case it cites. The Court is not persuaded by it. *Accord Thrower I*, 2018 WL 4053484, at *12 ("[The] argument that scienter under promissory fraud has a higher standard than under false certification is unsupported and unpersuasive.")

In any event, the FAC contains facts sufficient to give rise to a plausible inference of specific intent because it alleges that Defendant had widespread policies of compensating underwriters on a commission basis and allowing non-underwriting management to approve loans *at the same time* that it was making annual certifications attesting that it was doing neither of these things. Further, on the individual loan level, Defendant is alleged to have certified that each loan was eligible for government insurance and processed in accordance with government regulations even when management-level employees knew that loans that they were approving were *not* eligible but approved them anyway. *See FAC* ¶ 124–26, 159–60, 274 ("Even when Relator pointed out to [English] the clear problems in the file stemming from deficiencies in other requirements, Mr. English would have the file sent through for approval."). "These clear instances of deliberate misbehavior cannot be chalked up to mere negligence." *Thrower I*, 2018 WL 4053484, at *12. The Court concludes that these allegations are more that sufficient to plead scienter.

D.  The Seven Alleged Schemes

Finally, the Court addresses Defendant's contention that the FAC insufficiently pleads the seven fraudulent schemes that it alleges. *See Mot.* 19–25:27. Little needs to be said in rejecting this argument.

As described above, the FAC describes each scheme in extensive detail, including alleging (1) the names of specific employees who knowingly persisted in violating the Government Programs' rules and regulations, (2) specific wrongfully approved loans—identified by file number, and specific dates upon which alleged wrongful conduct took place. Defendant complains that the FAC failed to tie the alleged violations to specific loans that ended up defaulting. *See id.* 20:19–22. But as discussed above, Relator's theory is that *each* loan issued during the relevant period was tainted, at a minimum, by false initial and annual certifications,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-1630 PSG (JPRx) | Date | July 8, 2019 |
|---|---|---|---|
| Title | United States ex rel. Malou Tutanes-Luster v. Broker Solutions, Inc. | | |

such that *every* default was the product of a false statement. *See Thrower I*, 2018 WL 4053484, at *8. And even accepting Defendant's argument on its own terms, the complaint's detailed allegations of widespread violations along with specific examples of wrongfully approved loans is enough to provide "reliable indicia that lead to a strong inference" that at least some of the defaulting loans were also wrongfully approved such that the loan-level certifications were false. *See Ebeid*, 616 F.3d at 998–99. Accordingly, the Court concludes that the alleged fraudulent schemes have been adequately pleaded.

IV.   Conclusion

For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss.

**IT IS SO ORDERED**.